**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

CRAIG DOBBS and                                                                    PLAINTIFFS
EILEEN DOBBS

v.                                   Case No.: 4:20-cv-01192-LPR

UNITED STATES OF AMERICA                                             DEFENDANT

### MEMORANDUM OF DECISION

On October 7, 2020, Plaintiffs Craig and Eileen Dobbs filed a Complaint against the United States of America under the Federal Tort Claims Act, alleging that Mr. Dobbs suffered a brain hemorrhage as a result of negligent medical care by Dr. Diaa Bahgat.[1]  More specifically, the Complaint alleges that:  (1) during the laminectomy surgery performed by Dr. Bahgat, Mr. Dobbs suffered a dural tear; and (2) Dr. Bahgat's subsequent medical treatment of Mr. Dobbs—particularly the placement of a drain near the dural tear site—was below the standard of care in Arkansas and caused Mr. Dobbs to suffer a brain hemorrhage.[2]

The Court held a bench trial from November 29, 2022, through December 2, 2022.[3]  At this trial, Plaintiffs pressed their right to monetary relief for the following categories of damages: (1) Mr. Dobbs's past and future physical pain and suffering; (2) his past and future mental pain and anguish; (3) his past and future permanent physical impairment; (4) his past and future mental impairment; (5) his past and future physical disfigurement; (6) his past and future medical, health care, and attendant care expenses; (7) his out-of-pocket expenses; (8) his past and future loss of

---

[1] *See* Compl. (Doc. 1) ¶¶ 6.1–7.2.

[2] *See id*.  At trial, the witnesses used the terms "dural tear" and "durotomy" interchangeably.  For consistency, the Court will refer to the tear as a "dural tear."

[3] *See* Clerk's Minutes (Docs. 37–39, 41).

enjoyment of life; (9) the loss of consortium with his wife; and (10) Mrs. Dobbs's loss of consortium with her husband.[4]

After the Plaintiffs rested, the Government made a Motion for Judgment on Partial Findings under Federal Rule of Civil Procedure 52(c).[5]  Parts of that Motion were easy to address. For example, the Government argued that the Plaintiffs had failed to introduce any evidence that Dr. Bahgat (1) negligently caused the dural tear, and (2) negligently repaired the dural tear.[6] Plaintiffs' counsel effectively conceded the points.  She explained that Plaintiffs were not making a claim that Dr. Bahgat was negligent in making the dural tear.[7]  She also explained that they were not alleging that the dural-tear repair itself was negligent, except to the extent that Dr. Bahgat "negligently left a drain in place in the absence of a complete repair."[8]  Accordingly, and without objection, the Court granted the Government's Motion for Judgment on Partial Findings on the two very specific issues raised by the Government.[9]

Other parts of the Government's Motion for Judgment on Partial Findings were not so easy. For example, with respect to Plaintiffs' claims concerning the placement of a drain, the Government argued that there had been no evidence to suggest that the use of a drain in the circumstances of this case fell below the standard of care in Arkansas.[10]  The Government also

---

[4] *See* Compl. (Doc. 1) ¶¶ 8.1, 8.2.  At the start of the trial, Mr. Dobbs withdrew his claim for loss of earning capacity. *See* Tr. of Bench Trial (Doc. 45) at 20:15–20.  And Mrs. Dobbs withdrew her claims for negligent infliction of emotional distress and for loss of household services.  *See id*. at 20:21–21:7.

[5] *See* Tr. of Bench Trial (Doc. 47) at 652:20–22.

[6] *See id*. at 658:7–659:19.  The Government made a Motion for Judgment on Partial Findings with respect to a third issue as well:  that there was no evidence Dr. Bahgat had improperly delayed taking Mr. Dobbs for a re-exploration surgery. *See id*.  But the Government withdrew this part of its Motion when Plaintiffs' counsel explained that Plaintiffs were not making any claim for relief related to the delay in the re-exploration surgery.  *See id*. at 662:11–22, 663:6–15.  Instead, this was merely a fact pled, not an independent allegation of wrongdoing.  *See id*.

[7] *See* Tr. of Bench Trial (Doc. 47) at 659:23–24.

[8] Compl. (Doc. 1) ¶ 6.12.  *See also* Tr. of Bench Trial (Doc. 47) at 660:3–8.

[9] *See* Tr. of Bench Trial (Doc. 47) at 662:9–10.

[10] *See* Tr. of Bench Trial (Doc. 47) at 654:8–657:7.

argued that there was not enough evidence to prove that the use of the drain was a "but-for" and proximate cause of the brain hemorrhage.[11]  The Court denied those parts of the Motion because the Court had heard evidence that could ultimately lead to the conclusion that Plaintiffs had proved Dr. Bahgat's decision to place the drain fell below the standard of care in Arkansas and caused the injury at issue.[12]  At the conclusion of the trial, the Government again moved for Judgment on the Findings on these issues.[13]  And the Court again denied the Government's Motion.[14]

On December 19, 2022, the parties submitted post-trial proposed findings of fact and conclusions of law.  In accordance with Federal Rule of Civil Procedure 52(a), and after reviewing the entire trial record, the Court makes the following findings of fact and conclusions of law as set out below.  As a threshold matter, however, the Court wishes to note several global points.  First, the Court makes all findings of fact in this case subject to the preponderance-of-the-evidence standard.[15]  And Plaintiffs bear the burden of proof with respect to all findings.  Second, the Court notes that sometimes—but not always—it expressly discusses the evidence in the trial record that is contrary to the Court's ultimate finding.  Whether or not the Court expressly discusses conflicting or contrary evidence, the Court's findings should be taken to imply that any such conflicting evidence was overcome by the evidence supporting the particular fact found.  Third, to the extent the Court has erroneously designated any findings of fact as conclusions of law, they

---

[11] *See id.*

[12] *See id.* at 657:8–10.

[13] *See* Tr. of Bench Trial (Doc. 48) at 885:6–11.

[14] *See id.* at 885:17–18.

[15] Although the Court may not always expressly state it, all medical opinions were given to a reasonable degree of medical certainty.  The terms "certainty" and "probability" were used interchangeably at trial, but either term is appropriate and sufficient under Arkansas law.  *See Williamson v. Elrod*, 348 Ark. 307, 311, 72 S.W.3d 489, 492 (2002).

should be deemed findings of fact.[16]  And any conclusions of law erroneously designated by the Court as findings of fact shall be likewise deemed conclusions of law.[17]  Fourth, and finally, some of the findings of fact (and maybe conclusions of law) in the liability section are relevant to the issue of damages as well.  The particular section of this Memorandum of Decision in which a finding is made, or conclusion is drawn, does not affect the substance of this Memorandum of Decision.

## FINDINGS OF FACT – LIABILITY

1.       During the bench trial, 11 witnesses provided testimony.   Plaintiffs called Dr. Christopher Taylor,[18] Dr. Diaa Bahgat,[19] Dr. Paul Moore,[20] Dr. Arthur Joyce,[21] Dr. Carl

---

[16] *See Ridings v. Maurice*, 444 F. Supp. 3d 973, 981 n.5 (W.D. Mo. 2020).

[17] *See id.*

[18] Dr. Taylor is the Vice Chairman of Clinical Outreach for UT Southwestern Medical Center's Department of Neurosurgery.  *See* Pls.' Trial Ex. 28 at 1.  He was called by the Plaintiffs to provide expert testimony about the neurosurgical standard of care and the cause of Mr. Dobbs's brain injury.  *See generally* Tr. of Bench Trial (Doc. 45) at 47:25–134:22.

[19] Dr. Bahgat was a staff neurosurgeon for the Central Arkansas Veterans Healthcare System from December 2015 until October 2019.  *See* Def.'s Trial Ex. 4 at 2.  Dr. Bahgat was the surgeon who performed Mr. Dobbs's October 9, 2018 laminectomy and his re-exploration repair surgery on October 15, 2018.  *See* Tr. of Bench Trial (Doc. 45) at 164:3–12.  Plaintiffs' counsel treated Dr. Bahgat as an adverse party, and the Government did its direct examination of Dr. Bahgat as cross-examination.  *See id.* at 162:21–163:2.  Under the Arkansas Medical Malpractice Act, "[n]o medical care provider shall be required to give expert opinion testimony against himself or herself as to any" standard of care or proximate cause opinions "at a trial."  Ark. Code Ann. § 16-114-207(3).

[20] Dr. Moore is the Medical Director for Somnologix, Limited and specializes in neurology and sleep medicine.  *See* Pls.' Trial Ex. 26 at 1; Tr. of Bench Trial (Doc. 46) at 366:1–6.  Dr. Moore was called by the Plaintiffs to provide expert testimony about Mr. Dobbs's injury and how the injury affected Mr. Dobbs.  *See* Tr. of Bench Trial (Doc. 46) at 330:1–364:4.  Dr. Moore is not a neurosurgeon, and he testified that he is not qualified to render neurosurgical standard-of-care opinions.  *See id.* at 365:12–16.

[21] Dr. Joyce is a neuropsychologist in private practice.  *See* Pls.' Trial Ex. 25 at 2.  Dr. Joyce was called by the Plaintiffs to give expert testimony about a neuropsychological evaluation he gave to Mr. Dobbs and the type of care Mr. Dobbs would need throughout his life as a result of the brain hemorrhage.  *See generally* Tr. of Bench Trial (Doc. 46) at 386:14–419:15.

Hubbard,[22] Victoria Powell,[23] Dave Hussey,[24] and Eileen Dobbs.[25]   The Government called Dr. John Day[26] and Dr. Margaret Tremwel.[27]

2.      For purposes of liability, our story begins on October 9, 2018.  That is when Mr. Dobbs (a 61-year-old, retired United States Marine[28]) arrived at the Central Arkansas Veterans Healthcare System for a scheduled laminectomy with Dr. Bahgat.[29]  Mr. Dobbs's laminectomy was "an L2 to S1 fusion and decompression."[30]  In layman's terms, Mr. Dobbs was getting spinal surgery.

3.      Once Mr. Dobbs was admitted to the hospital, Dr. Bahgat met with Mr. Dobbs to examine and evaluate him.[31]  In what looks and reads like a boilerplate paragraph, Dr. Bahgat's

---

[22] Dr. Hubbard is an economist and retired business professor.  *See* Pls.' Trial Ex. 24 at 1. Dr. Hubbard was called by the Plaintiffs to provide expert testimony about the cost of a life care plan for Mr. Dobbs.  *See generally* Tr. of Bench Trial (Doc. 46) at 432:5–438:19.

[23] Ms. Powell is a nurse and certified life care planner.  Pls.' Trial Ex. 27 at 1. Ms. Powell was called by the Plaintiffs to provide expert testimony about a proposed life care plan she created for Mr. Dobbs.  *See generally* Tr. of Bench Trial (Doc. 47) at 485:1–535:21.

[24] Mr. Hussey lives next door to Mr. and Mrs. Dobbs in Cotter, Arkansas.  *See* Tr. of Bench Trial (Doc. 47) at 561:11–12.  Mr. Hussey has known Mr. and Mrs. Dobbs since they moved next door to him in 2015.  *See id.* at 561:14–15.

[25] Mrs. Dobbs is the wife of Mr. Dobbs and is a Plaintiff in this case.  *See* Tr. of Bench Trial (Doc. 47) at 574:20; Compl. (Doc. 1) ¶ 8.2.

[26] Dr. Day is a professor and Chairman of the Department of Neurosurgery at the University of Arkansas for Medical Sciences.  *See* Def.'s Trial Ex. 2 at 1.  Dr. Day was called by the Government to offer expert testimony about the neurological standard of care and cause of Mr. Dobbs's brain hemorrhage.  *See generally* Tr. of Bench Trial (Doc. 47) at 668:24–718:17.

[27] Dr. Tremwel is a neurologist and Medical Director of the Comprehensive Stroke Center at Washington Regional Medical Center in Fayetteville, Arkansas.  *See* Def.'s Trial Ex. 3 at 1; Tr. of Bench Trial (Doc. 48) at 821:14–19. Dr. Tremwel was called by the Government to provide expert testimony about Mr. Dobbs's physical and neurological state post-hemorrhage.  *See generally* Tr. of Bench Trial (Doc. 48) at 822:17–859:4.  She also examined Mr. Dobbs and provided expert testimony about the results of that examination.  *See generally id.*

[28] *See* Tr. of Bench Trial (Doc. 45) at 54:11–12; Tr. of Bench Trial (Doc. 47) at 576:22.

[29] *See* Pls.' Trial Ex. 1 at 1578–79.  Although the medical records typically refer to the surgery as some variation of an "L2-S1 decompression and fusion" surgery, multiple witnesses at trial referred to the procedure as a "laminectomy" or "laminectomy and fusion."  *See, e.g.*, Tr. of Bench Trial (Doc. 45) at 164:9–12.  Thus, the Court will simply refer to Mr. Dobbs's procedure as either a laminectomy or a surgery throughout this Memorandum of Decision.

[30] *See* Tr. of Bench Trial (Doc. 45) at 138:19–22.

[31] *See* Pls.' Trial Ex. 1 at 1575–79.

pre-surgery notes reflect that "[t]he patient and/or family representative have been presented with the risks, benefits, potential complications and alternatives to planned surgery and agree with the planned procedure."[32]   In these same notes, Dr. Bahgat also recorded that a history and physical exam of Mr. Dobbs was performed on September 27, 2018, and, having "reviewed and assessed the patient[,]" Dr. Bahgat determined "[t]here [had] been NO CHANGES since that exam."[33]   The Court finds Dr. Bahgat's notes to be an accurate representation of his post-admission encounter with Mr. Dobbs.

4.      Dr. Bahgat testified at trial that he remembered having another "case to do" before Mr. Dobbs's laminectomy on October 9, 2018.[34]  Dr. Bahgat admitted that his memory of finishing the earlier case and of seeing Mr. Dobbs before his laminectomy was "very vague."[35]  Dr. Bahgat could not remember what the earlier case was about.[36]  He could not remember what he had for breakfast that morning.[37]  He could not remember the specifics of his drive to work.[38]  He could not remember giving the consent forms to Mr. Dobbs or getting them back from him.[39]  As a

---

[32] *Id*. at 1579.  This was not the first time Mr. Dobbs had been presented with such information.  At a July 2018 appointment, Dr. Bahgat discussed with Mr. Dobbs the potential risks of the surgery, as well as the potential success. *See id*. at 1614; Tr. of Bench Trial (Doc. 45) at 176:12–179:7.  According to Dr. Bahgat's July 2018 notes, he informed Mr. Dobbs that "[r]isks include but [are] not limited to weakness, paralysis, infection, hemorrhage, pulmonary embolism, increased pain, bowel and bladder problems[,] . . . injury to surrounding neurovascular structures, durotomy with [cerebrospinal fluid] leak . . . ." Pls.' Trial Ex. 1 at 1614.  But Dr. Bahgat testified at trial that he did not remember whether he specifically informed Mr. Dobbs about the risk of a brain hemorrhage.  *See* Tr. of Bench Trial (Doc. 45) at 178:19–179:7.  At first, Dr. Bahgat testified that he only told Mr. Dobbs about the risk of "stroke and bleeding in general."  *Id*.  Dr. Bahgat later clarified at trial that he did not actually remember the specific conversation with Mr. Dobbs about the risks of the surgery.  *See* Tr. of Bench Trial (Doc. 46) at 259:9–260:3.  Instead, his recollection was "based on what [he] normally would do . . . ." *Id*. at 259:18.

[33] Pls.' Trial Ex. 1 at 1575.

[34] Tr. of Bench Trial (Doc. 46) at 270:23.

[35] *Id*. at 270:25.

[36] *See id*. at 271:3–7.

[37] *See id*. at 271:8–10.

[38] *See id*. at 271:11–14.

[39] *See id*. at 271:15–17.  This was the second set of consent forms obtained from Mr. Dobbs.  Because the original consent forms—which Mr. Dobbs had signed on an earlier date—were only valid for 30 days, Dr. Bahgat had to again

general matter, the Court finds that Dr. Bahgat did not remember that day—which was more than four years prior to trial—very well.

> **I.    The Surgery and the Dural Tear**

5.      Mr. Dobbs's laminectomy began at 11:42 on October 9, 2018, and finished at 16:19 the same day.[40]  Other people were in the room with Dr. Bahgat during the surgery (or portions of the surgery), including an anesthesiologist (or anesthetist).[41]  However, none of these people were called to testify by either party.  Accordingly, the only three sources of direct evidence concerning what occurred during the surgery are:  (1) Dr. Bahgat's post-operative report, (2) Dr. Bahgat's trial testimony, and (3) the anesthesiologist's (or anesthetist's) notes.  And, as the Court will explain below, the Court discounts a great deal of Dr. Bahgat's trial testimony—when it is in tension with Dr. Bahgat's medical notes—because the Court finds that Dr. Bahgat's memory of the day in question is, at best, hazy.

6.      Dr. Bahgat authored his post-operative report very shortly after he finished Mr. Dobbs's surgery.[42]  The post-operative report has several sections, including sections titled Indication, Operative Findings, Adverse Events, and Procedure.[43]

7.      In the Indication section, Dr. Bahgat recounted Mr. Dobbs's medical history and the reasons for surgery.[44]  Then, in the Operative Findings section, Dr. Bahgat explained that:

---

obtain Mr. Dobbs's consent to proceed with the laminectomy on the morning of the procedure.  *See id*. at 269:22–270:4.

[40] *See* Pls.' Trial Ex. 1 at 1563.  The records also show Mr. Dobbs's anesthesia care began shortly before his surgery at 10:51 and ended at 16:38.  *See id*.

[41] *See id*. at 1987.

[42] *See id*. at 1984–86.  The record reflects that the post-operative report was entered at 16:33 on October 9, 2018, and signed by Dr. Bahgat at 18:17 the same day.  *See id*.  *See also* Tr. of Bench Trial (Doc. 45) at 188:20–22.

[43] *See* Pls.' Trial Ex. 1 at 1984–86.

[44] *See id*. at 1984–85.  The report incorrectly states that Mr. Dobbs was 55 years old at the time of the surgery.  *See id*. at 1984.  As the Court explained above, Mr. Dobbs was 61 years old at the time of the surgery.  *See, e.g.*, Tr. of Bench Trial (Doc. 45) at 54:11–12.

Intraoperative navigation with the use of the O arm was used for placement of L2, L3[,] L4, L5, S1 pedicle screws as well as interbody cage[]at L2-3.  Pre and postplacement spin was used to confirm adequate positioning of the implants.  That was significant lateral recess stenosis and facet arthropathy and foraminal stenosis at L4-L5.[45]

8.     In the Adverse Events section of Dr. Bahgat's post-operative report, Dr. Bahgat provided the following details about Mr. Dobbs's dural tear:

> Dural tear at right L2-3 t closed with onlay muscle and Duraseal
> EBL:  500 mL
> Counts:  Complete at the end of the procedure
> Anesthesia:  Gen. prone position
> Implants:  Medtronic Solera system (L2 : Right side 5.5 x 45, left side splint 5 x 45, L3 bilateral 6.5 x 45, L4 6.5 x 45 mm screws, L5 6.5 x 45 right side 6.5 x 50 mm screws, S1 4.5x40mm screws
> -7 mm elevate cage at L2-3 and 10 mL of MAP3 putty.[46]

This is the entirety of Dr. Bahgat's notes in the Adverse Events section of the post-operative report.[47]

9.     In the Procedure section of the post-operative report, Dr. Bahgat detailed how he performed Mr. Dobbs's laminectomy.[48]   These details included everything from identifying Mr. Dobbs as the correct patient and marking the site for the incision, to "hand[ing]" Mr. Dobbs "to anesthesia for extubation and recovery."[49]  This section also included further reflections by Dr. Bahgat about Mr. Dobbs's dural tear.[50]  Dr. Bahgat's notes recounted that:

---

[45] *See* Pls.' Trial Ex. 1 at 1985.

[46] *See id.*

[47] *See id.*

[48] *See id.* at 1985–86.

[49] *Id.*

[50] *See id.* at 1986.

> [During] the cage placements [a] dural tear at the axilla was identified.  This tear was not amenable to primary [repair] so a muscle graft was placed on top of which a thin piece of Gelfoam was placed.[51]

Along with the discussion in the Adverse Events section, this description is the extent of Dr. Bahgat's notes about Mr. Dobbs's dural tear and the efforts taken to repair it.[52]

10.     A dural tear is a tear in the dura mater, which is a "covering that encases the brain and the spinal cord and contains spinal fluid[,]" specifically cerebrospinal fluid (CSF).[53]  A dural tear is a known complication of spine surgery.[54]  As even the Plaintiffs' expert witness (Dr. Taylor) admits, the fact that a dural tear occurs during surgery does not mean the surgeon did something wrong.[55]  Approximately five to seven percent of patients who undergo lumbar surgeries experience dural tears.[56]  But only 1 in 10,000 spinal surgeries (or about 0.03 percent) result in the patient experiencing an intracranial hemorrhage.[57]

11.     The Court finds that Mr. Dobbs's intraoperative dural tear occurred when Dr. Bahgat "took out the disc material and then put the cage in."[58]  The cage, which was "thick and metal[,]" had to be hammered in.[59]  Mr. Dobbs suffered a dural tear when Dr. Bahgat was hammering the cage in.[60]

---

[51] *Id.*  At trial, Dr. Bahgat testified that he cannot pronounce the letter "R" correctly when dictating his notes, "[s]o during is often put in [as] doing."  Tr. of Bench Trial (Doc. 45) at 189:13–16.  The Court finds this is one of those instances where "doing" should read "during."

[52] *See* Pls.' Trial Ex. 1 at 1984–86.

[53] *See* Tr. of Bench Trial (Doc. 45) at 55:8–9.

[54] *See id.* at 141:6–8.

[55] *See id.* at 141:12–14.

[56] *See id.* at 129:1–5.

[57] *See id.* at 53:25–54:4; Tr. of Bench Trial (Doc. 47) at 712:21–713:2.  The testimonial evidence is conflicting as to whether the 1 in 10,000 figure means one brain hemorrhage in 10,000 surgeries or one brain hemorrhage in 10,000 dural tears.  This is not a conflict that requires resolution.  In either scenario, the agreed consensus is that the vast majority of dural tears do not lead to a brain hemorrhage.

[58] Tr. of Bench Trial (Doc. 46) at 276:18.

[59] *Id.* at 276:19.

[60] *See id.* at 276:22–23.

12.     When a patient loses CSF, the loss *can* cause his brain to "sag."[61]  That's because one role of CSF is to help the brain float.[62]  The sag *can* cause veins in the brain to stretch and occlude, which in turn *can* cause a brain hemorrhage.[63]

13.     But not all losses of CSF cause brain sag.  For brain sag to occur, a patient has to lose enough CSF to cross some unknown threshold.  As a rough and general matter, and holding all things equal, the larger and more sudden the loss of CSF, the more likely it is to cause brain sag (and, consequently, a brain hemorrhage).[64]  Conversely, a smaller and less sudden loss of CSF is less likely to cause brain sag.

14.     In this case, the Government contends that there was a large and immediate loss of CSF associated with the intraoperative dural tear.[65]  The Government's point is that this large loss of CSF caused the brain to sag (and the consequent brain hemorrhage) on its own.  *If* this is true, then any loss of CSF associated with the placement of subfascial drains would not be a but-for or proximate cause of Mr. Dobbs's brain sag (and consequent brain hemorrhage).  So, it is important to determine whether the evidence shows a large and immediate loss of CSF associated with the intraoperative dural tear.

---

[61] *See* Tr. of Bench Trial (Doc. 45) at 93:11–12.

[62] *See* Tr. of Bench Trial (Doc. 46) at 331:20–22.

[63] *See, e.g.*, Tr. of Bench Trial (Doc. 45) at 93:8–14.

[64] *See, e.g.*, *id.* at 209:11–18; Tr. of Bench Trial (Doc. 47) at 697:1–3.  Dr. Day testified that, "[b]ecause of the initial gush of spinal fluid . . . [t]hat's when the large, immediate loss occurs, sagging of the cerebellum, compromise of the veins bridging there and then also happened up above in this gentleman's case, unfortunately."  *Id.* at 709:18–22.  To the Court, this testimony suggests that an *average* loss of CSF at the time of an intraoperative dural tear (i.e., not a large gush) would likely not cause brain sag.  Furthermore, the trial record reveals that the body contains approximately 300 milliliters of CSF and reproduces CSF at a rate of about 20 milliliters per hour.  *See* Tr. of Bench Trial (Doc. 45) at 55:24–56:6, 56:23–57:2.  Considering both of these things, the Court finds that an average loss of CSF from an intraoperative dural tear is unlikely to be enough to cause the brain to sag.  That is consistent with the fact that only 1 in 10,000 spinal surgeries result in a brain hemorrhage even though far more result in dural tears.  *See, e.g.*, *id.* at 129:5–8.

[65] *See, e.g.*, Tr. of Bench Trial (Doc. 45) at 41:1–2.  Throughout trial, the "gush" was variously qualified as "big," "large," or "sudden."  *See, e.g.*, *id.* at 128:18–19, 191:6–7, 192:8.

15.     The evidence in favor of a large gush of CSF during the surgery comes principally from Dr. Bahgat's testimony.  Dr. Bahgat testified that "the cut would have produced a lot of fluid, a sudden gush."[66]  He also testified that "there was definitely a gush."[67]  And he testified that he "vividly remember[ed] the tear" and the fact that "it gushed."[68]

16.     But Dr. Bahgat didn't know how much CSF leaked from the dural tear.[69]  Indeed, Dr. Bahgat testified that there was no way to specifically measure the CSF that leaks when there's a dural tear.[70]  And there was no way for him to reasonably guess how much came out.[71]

17.     Dr. Bahgat also conceded at trial that he did not note the quantity of CSF in the post-operative report.[72]  And he concedes that he never mentioned in his post-operative report (or to Mrs. Dobbs after surgery) that there was a big, large, or otherwise abnormal amount of CSF that leaked from the intraoperative dural tear.[73]  Concerning the absence of any reference to a gush of CSF in the post-operative report, Dr. Bahgat testified that his notes were "not to describe, you know, an event as a movie and give, you know, the surrounding atmosphere about what happened[,]" and "it wouldn't occur to [him] to describe like how much fluid there was or the intensity at the time T [sic] didn't seem like a big deal, because it happens all the time."[74]

---

[66] *Id*. at 192:7–8.

[67] *Id*. at 192:24–25.

[68] Tr. of Bench Trial (Doc. 46) at 284:9–12.

[69] *See* Tr. of Bench Trial (Doc. 45) at 192:7–25.

[70] *See* Tr. of Bench Trial (Doc. 46) at 290:24–25.

[71] *See id*. at 291:1–6.

[72] *See* Tr. of Bench Trial (Doc. 45) at 193:20–194:8.

[73] *See id*. at 193:20–194:1; Tr. of Bench Trial (Doc. 47) at 588:18–20.  Based on this testimony, the Court finds that the "EBL:  500 mL" notation in the post-operative report is not about this supposed "gush" of CSF.  Pls.' Trial Ex. 1 at 1985.

[74] *See* Tr. of Bench Trial (Doc. 45) at 191:9–17.

18.     When asked by Plaintiffs' counsel (in the context of Dr. Bahgat's prior evaluations of Mr. Dobbs and the corresponding medical records) whether, "if there were anything unusual, you would note it in the medical record[,]" Dr. Bahgat responded, "If it was something that was, you know, clearly, you know, a problem, yeah, we would have [sic] at least have to address it." [75]

19.     One of the Plaintiffs' expert witnesses, Dr. Taylor, testified that, if there was a large CSF leak at the time of the dural tear, he (Dr. Taylor) would have documented it.[76]  One of the Government's expert witnesses, Dr. Day, testified that, despite no record of a "large gush" of CSF in Dr. Bahgat's post-operative report, Dr. Day believed there was a "large gush" at the time of the dural tear because he has "seen it in surgery."[77]  Dr. Day did not attempt quantify or otherwise explain the possible volume of the gush.[78]

20.     Considering paragraphs 12–19 above, the Court finds it more likely than not that only an average amount of CSF immediately leaked from Mr. Dobbs's intraoperative dural tear. Dr. Bahgat couldn't quantify the amount.  Moreover, given his hazy recollections of other specifics on that day, the Court does not believe Dr. Bahgat could accurately remember whether the immediate leak was small, average, or large.[79]  And the mere fact that Dr. Day has seen large gushes occur in other operations is not a basis to speculate that one occurred here.  On the other side of the ledger is the omission of any reference to a "gush" or an otherwise large amount of CSF

---

[75] *See id.* at 171:1–5.

[76] *See id.* at 128:18–24.

[77] Tr. of Bench Trial (Doc. 47) at 725:20–726:4.

[78] *See id.*

[79] *See supra* ¶ 4.

leakage in the post-operative report.[80]  And there is also the fact that Mrs. Dobbs was told right after the surgery that everything went well; she was not told anything about a serious CSF leak.[81]

21.     The Court understands Dr. Bahgat's testimony that the post-operative report is not a movie script.  But if the dural tear resulted in an abnormally big or large gush of CSF, the Court finds that Dr. Bahgat would have made note of that in the post-operative report that he authored very shortly after Mr. Dobbs's surgery concluded.  This finding is consistent with Dr. Bahgat's comment that, if there was anything unusual or problematic, it would be documented in the medical records.[82]  It is also consistent with Dr. Taylor's expert testimony that, if there was a large CSF leak at the time of the dural tear, Dr. Taylor would have documented such an occurrence.[83]  Taking all the foregoing into account, Plaintiffs have proved that it is more likely than not that the intraoperative CSF leak that immediately followed the dural tear was not large, but rather no more than an average leak of CSF that would occur from the average dural tear.[84]

## II.     The Secondary Repair

22.     When there is a dural tear, there are two methods by which a surgeon can repair it.[85]  The first method is a primary repair.[86]  As Dr. Taylor explained, a primary repair entails using a "suture" and "sewing the opening closed so that it is watertight."[87]  When the dural tear is not

---

[80] *See* Pls.' Trial Ex. 1 at 1984–86.

[81] *See* Tr. of Bench Trial (Doc. 47) at 588:18–20.

[82] *See* Tr. of Bench Trial (Doc. 45) at 171:1–5.

[83] *See id.* at 128:18–24.

[84] The Court understands that the implication of its finding is that Dr. Bahgat's testimony on the stand was inaccurate.  But the Court wishes to emphasize two points.  First, this does not mean that Dr. Bahgat was lying.  It only means that there is a greater than 50 percent likelihood that he was remembering things incorrectly.  Second, because the Court is only finding facts on a more-likely-than-not standard, there is a fair (but less than 50 percent) chance that Dr. Bahgat was actually testifying accurately.

[85] *See* Tr. of Bench Trial (Doc. 45) at 62:24–63:2, 64:13–65:1.

[86] *Id.* at 63:3–5.

[87] *See id.* at 62:24–63:2.

amenable to a primary repair, the surgeon must attempt a secondary repair.[88]   As Dr. Taylor explained, a secondary repair generally consists of using muscle, fascia, Gelfoam, or dural sealants to "cover the hole . . . long enough for the dura to heal."[89]   A secondary repair is weaker than a primary repair.[90]   This is because, among other reasons, the tear is not sutured closed.[91]   As Dr. Taylor and Dr. Day agree, there can be a CSF leak after either type of repair.[92]   Logic, of course, suggests that there is greater risk of a CSF leak with the secondary repair as opposed to the primary repair.   And there was credible testimony to support this finding.[93]   Nonetheless, a secondary repair can be considered watertight if the seal passes one of the tests described below.[94]

23.   Because of the location of Mr. Dobbs's dural tear, Dr. Bahgat was unable to do a primary repair.[95]   As a result, Dr. Bahgat attempted a secondary repair "with onlay muscle and Duraseal"—more specifically, "a muscle graft was placed on top of which a thin piece of Gelfoam was placed."[96]

---

[88] *See id*. at 62:24–63:2, 64:13–65:14.

[89] *See id*. at 64:13–65:1.

[90] *See id*. at 65:12–14.

[91] *See id*. at 62:22–65:20.

[92] *See id*. at 144:20–22; Tr. of Bench Trial (Doc. 47) at 684:2–21.

[93] *See* Tr. of Bench Trial (Doc. 45) at 74:22–75:13, 196:14–23.

[94] *See* Tr. of Bench Trial (Doc. 47) at 683:24–684:1.

[95] *See* Pls.' Trial Ex. 1 at 1986; Tr. of Bench Trial (Doc. 46) at 278:25–279:19.

[96] Pls.' Trial Ex. 1 at 1985, 1986.

24.     After a surgeon has repaired a dural tear—whether by a primary or secondary repair—the surgeon must confirm the seal is closed.[97]  The standard of care in Arkansas requires such confirmation.[98]  And such confirmation can be accomplished in two ways.[99]

25.     First, a surgeon can use the Valsalva maneuver.[100]  The Valsalva maneuver is done by having the anesthesiologist (or anesthetist) "stop respiration and increase intrathoracic pressure."[101]  This "increase[s] the spinal fluid pressure, which is continuous, with the lumbar spinal pressure."[102]  When the pressure increases, CSF will come out of the tear if the seal is not closed.[103]

26.     The other way to determine whether a seal is closed is to elevate the patient's head, which also "increase[s] the pressure of the fluid in the lumbar spine . . . ."[104]  This is known as a reverse Trendelenburg position.[105]

---

[97] See Tr. of Bench Trial (Doc. 45) at 62:22–63:2, 63:25–64:2, 66:3–20; Tr. of Bench Trial (Doc. 47) at 764:7–17.

[98] See Tr. of Bench Trial (Doc. 45) at 144:2–19.  The standard of care for laminectomies does not vary from one locality to another.  See id. at 50:9–12.  The literature is the same throughout the United States, and none of the literature is unique to Arkansas or another region.  See id. at 50:3–12.  As Dr. Taylor testified, following the repair of an intraoperative dural tear, it is within the standard of care to perform a Valsalva maneuver to check and see if there is a persistent leak.  See id. at 144:2–15.  And if Dr. Bahgat had performed the Valsalva maneuver (or otherwise checked the sufficiency of the secondary repair's seal), that would have been within the standard of care.  See id. at 144:12–19.  As Dr. Day similarly testified, if Dr. Bahgat had checked the sufficiency of the secondary repair's seal, Dr. Bahgat's surgical actions would have been within the standard of care.  See Tr. of Bench Trial (Doc. 47) at 687:2–8.

[99] See Tr. of Bench Trial (Doc. 45) at 66:5.

[100] See id. at 66:5–6.

[101] Id. at 66:6–7.

[102] Id. at 66:8–9.

[103] See id. at 66:10–11.

[104] See id. at 66:12–17.

[105] See id. at 66:15.

27.     The post-operative report does not show that Dr. Bahgat used either method to check whether the secondary repair was sufficiently sealed.[106]  The Government does not contend that Dr. Bahgat used the reverse Trendelenburg position to determine whether the secondary repair was sealed.  Thus, a principal fact question in dispute is whether Dr. Bahgat performed the Valsalva maneuver to test the sufficiency of the secondary repair's seal.

28.     At trial, Dr. Bahgat testified multiple times that he performed the Valsalva maneuver after completing the secondary repair.[107]  In one instance, Dr. Bahgat and the Plaintiffs' counsel engaged in the following colloquy:

> Q: In the October 9th surgery, you do not document at all confirming that that tear was sealed, right?
>
> A: Yes. But, again, this is—I'm describing one part of a big procedure. If and when I say, "this tear was not amiable to primary tear, so a muscle graft was placed on top, of which a thin piece of Gelfoam was placed," it's not like I just dumped it on there and went, oh, no.  I actually did do at least the first part of the second procedure, because I have to tuck it around and make sure it's secured in place, and then I have to put the Gelfoam on it in that location, make sure it's tight, and I have to do a Valsalva to make sure it's not leaking, because I'm not there to cheat on myself.  I have no reason to cut corners and not do that stuff. And then at the end—
>
> Q: Dr. Bahgat, let me stop you there.  All I'm asking is whether in the first surgery operative note, you note that you looked for a leak.  And you don't note that, do you?
>
> A: I don't note it, but it happened.
>
> Q: And you also—you mentioned the Valsalva maneuver.  You say, you testified in deposition that you did a Valsalva maneuver.  You remember that?
>
> A: I did.

---

[106] *See* Pls.' Trial Ex. 1 at 1984–86.  Nor do the anesthesiologist's (or anesthetist's) post-operative or intraoperative reports document that the Valsalva maneuver was performed.  *See id.* at 44–65; Tr. of Bench Trial (Doc. 45) at 203:11–204:2.

[107] *See* Tr. of Bench Trial (Doc. 45) at 202:9–204:2; Tr. of Bench Trial (Doc. 46) at 279:23–280:3.

Q: But in the operative note on October 9th, 2018, nowhere in there does the word "Valsalva maneuver" or phrase "Valsalva maneuver" appear, right?

A: Correct.

Q: And we talked about earlier in this trial how a Valsalva maneuver is done with the help of an anesthesiologist, right?

A: Yes.

Q: And that's because the patient is unconscious.  He can't bear up/down, right?

A: Correct.

Q: And we have the anesthesiology notes in this case, right?

A: I assume so.

Q: And you didn't find any note from your anesthesiologist that he helped you perform a Valsalva maneuver, right?

A: I don't know if they ever document that.  This is a 15-, 20-second thing that we just ask them, okay, hold his breath, do a Valsalva maneuver.  When the pressure reach 30, let me know.  They control the bag, elevate the patient's pressure in his lung, we count to 10, I keep looking, there is no CSF, we release it, okay, let him breathe again.

Q: Well, Doctor—

A: I don't know if they ever have documented it.

Q: What we can agree on is neither you, in your operative note, nor the anesthesiologist, in the anesthesiology notes, document a Valsalva maneuver, right?

A: I haven't reviewed the anesthesiology notes, but if you say so.[108]

At another point in his testimony, Dr. Bahgat testified that "we . . . did the Valsalva, even though I didn't document it, because I have to make sure that he's not leaking. . . . So at that point I was satisfied that it wasn't leaking . . . ."[109]

---

[108] Tr. of Bench Trial (Doc. 45) at 202:3–204:2.

[109] Tr. of Bench Trial (Doc. 46) at 279:23–280:3.

29.     When asked about his memory of performing the Valsalva maneuver, Dr. Bahgat

testified that:

> I remember [asking] anesthesia to perform a Valsalva and make sure that it wasn't
> leaking. It's just a reflex thing we ask for. Like, let's say when I do brain surgery.
> After I finish, I tell them do Valsalva to make sure that it doesn't bleed at the
> surgical bed. When I do, like, neck surgeries, after I put the retractors, I ask them
> to deflate and inflate the cuff. I've never thought about dictating it, but it's just a
> routine thing. I mean, I have no reason to, again—[.][110]

30.     Dr. Bahgat also testified that:

> I remember doing it. I remember. Again, I only remember the vivid time of the
> tear, the repair and how tedious I tried to do it, and then was glad that when I put
> the muscle and the Gelfoam and did the Valsalva, that it wasn't leaking. Because
> if it was leaking, it's just more time, and then at some point you run out of options.
> You keep packing stuff, and then you don't know what to do. . . . So I remember
> looking at it, asking if he do Valsalva, are you up to 30, or whatever number I said,
> 10 seconds. The dura started to pulsate, but I didn't see spinal fluid coming out for
> the most part. . . . I mean, I don't remember what number they said, if it was for 10
> seconds or 15 seconds. But I remember looking at it. You know, you have this,
> like, snapshot memory of something pulsating, the muscle patch, the white Gelfoam
> on it and nothing coming out of it.[111]

31.     The Court again discredits Dr. Bahgat's testimony based on his hazy memories of

other parts of that day.[112]  There is no support in the evidence for why the performance of the

Valsalva maneuver would stand out in Dr. Bahgat's memory.  And the absence of it from his

post-operative report is significant evidence that it did not occur.

32.     The Government's standard-of-care expert, Dr. Day, testified that it was standard

practice for a surgeon to record the use of the Valsalva maneuver in his notes in the post-operative

report.[113]  The Court credits this testimony.  Dr. Day qualified his testimony about this standard

---

[110] *Id.* at 288:4–12.

[111] *Id.* at 288:15–21, 289:1–10.

[112] *See id.* at 259:24–260:3, 270:10–271:17.  *See also supra* ¶ 4.

[113] *See* Tr. of Bench Trial (Doc. 47) at 685:2–20.

practice by explaining that "[k]ind of in every day [sic] reality have I seen where people didn't do it?  Sure.  Is it possible that I've forgotten to do that myself a time or two in my orientation?  Yeah, I'm not infallible with that. . . . [But] I think most of the time it should—it should be in there, yeah."[114]  When asked by Plaintiffs' counsel:  "if Dr. Bahgat had done a Valsalva maneuver, you'd expect it to be documented," Dr. Day responded, "I would hope so."[115]  But Dr. Day also testified that, while surgeons are expected to document relevant procedures undertaken in the operation, "unfortunately there's a difference between expectations and reality sometimes."[116]

33.     Dr. Day's qualifications to his testimony do not help Dr. Bahgat much at all, given the applicable preponderance-of-the-evidence standard.  While it is possible that Dr. Bahgat performed the Valsalva maneuver without documenting it, the Court finds that it is more likely than not that Dr. Bahgat would have documented such a procedure had he performed it.

34.     At trial, it came to light that Dr. Bahgat was once one of Dr. Day's residents at the University of Arkansas for Medical Sciences.[117]  Plaintiffs' counsel elicited testimony from Dr. Day about whether he teaches his residents to document performing a Valsalva maneuver.[118]  Dr. Day testified that he teaches his residents to document when they do a Valsalva maneuver, but he could not specifically remember whether he had ever told Dr. Bahgat to do so.[119]  Based on this testimony, the Court finds that it is more likely than not that Dr. Day did teach Dr. Bahgat to

---

[114] *Id.* at 685:9–13, 19–20.

[115] *Id.* at 731:22–24.

[116] *See id.* at 733:23–734:1.

[117] *See id.* at 721:15–20.  Dr. Day testified that he "hardly see[s]" Dr. Bahgat since Dr. Bahgat left residency.  *Id.* at 721:24–25.  The Court does not find that Dr. Day's past relationship with Dr. Bahgat undermines Dr. Day's credibility in any way.

[118] *See id.* at 729:19–21.

[119] *See id.* at 729:19–24.

document the use of the Valsalva maneuver.  And this strengthens the Court's foregoing finding that Dr. Bahgat would have documented the maneuver if he had done it.

35.     For the reasons explained in Paragraphs 27–34 above, the Court finds that Plaintiffs have proved that it is more likely than not that Dr. Bahgat did not perform the Valsalva maneuver or otherwise test the sufficiency of the secondary repair's seal.[120]

### III.     The Use of a Drain

36.     The post-operative report and Dr. Bahgat's testimony reveal that Dr. Bahgat installed a subfascial drain in Mr. Dobbs near the end of Mr. Dobbs's laminectomy.[121]  There appears, however, to be some confusion in the medical records about the precise type of drain used.[122]  For example, in the post-operative report, Dr. Bahgat documents that he installed a Jackson-Pratt (JP) drain.[123]  The use of a JP drain is also reflected in the nurse's Progress Notes from the day after surgery.[124]  But the Post Anesthesia Care Unit ("PACU") records reflect, in part, that the drain was a "Hemovac" drain.[125]  The PACU records also refer to the drain as a "[b]ulb drain" in one instance.[126]

37.     Testimony at trial went some way to clearing up the seemingly conflicting documentary descriptions of the drain.  At trial, Dr. Bahgat referred to the drain as a JP drain

---

[120] The Court's two observations made in note 84, *supra*, apply here as well.

[121] *See* Pls.' Trial Ex. 1 at 1986; Tr. of Bench Trial (Doc. 45) at 195:20–196:1.  The Progress Notes refer to multiple drains.  *See, e.g.*, Pls.' Trial Ex. 1 at 1560.  However, the testimony suggests that only one drain was installed.  *See, e.g.*, Tr. of Bench Trial (Doc. 46) at 282:17, 287:7–8.  The Court understands the medical records and testimony to mean that there was one drain, but there were two compartments into which the drain emptied.  *See, e.g.*, Pls.' Trial Ex. 1 at 49.  Ultimately, the number of drains doesn't matter.  As discussed below, placing any drain without ensuring a watertight seal of the dural tear falls below the standard of care in Arkansas.

[122] *Compare* Pls.' Trial Ex. 1 at 1545, 1986, *with* Pls.' Trial Ex. 1 at 48, 49.

[123] *See id*. at 1986.

[124] *See id*. at 1545.

[125] *Id*. at 48, 49.

[126] *Id*. at 47.

multiple times.[127]  He also described Mr. Dobbs's drain as "a hand bulb . . . ."[128]  When asked if "[t]here was a JP lumbar drain that was a Hemovac drain installed in the lumbar region of Mr. Dobbs," Dr. Taylor testified that:

> JP and Hemovac are both—are two different types of drains that are used in surgery, and I think both of those words are used in the medical record.  So it was one or the other.  It's irrelevant in terms of the function and in terms of the issues of this case, I think.[129]

Later in his examination, Dr. Taylor again testified that a JP drain and Hemovac drain are essentially the same thing.[130]  Like Dr. Bahgat, Dr. Taylor refers to Mr. Dobbs's drain as a bulb.[131]

Dr. Day similarly testified that "I don't use the ones that are called Hemovacs, which a lot of people—you know, people will use that word even for a bulb.  They're just using it like a general term, but it's not accurate."[132]  He further explained that:

> [U]nfortunately in the hospital, there are other examples of this where a—like a trade name of something is used kinda broadly, but it's not—it's not correct.  So they could have written Hemovac, but it was the little bulb suction.  So that doesn't mean it was a Hemovac on suction.  It means that somebody's using that as a general term for the drain, wrongly unfortunately, but then they put that in the chart.  Then it creates confusion.[133]

Considering all this testimony and the evidence admitted at trial, the Court finds that the drain installed in Mr. Dobbs at the end of his surgery was, more likely than not, a JP drain with a bulb suction function—not a high suction Hemovac drain.  The one stray reference to the Hemovac drain in the PACU records was, more likely than not, made in error.

---

[127] *See* Tr. of Bench Trial (Doc. 45) at 212:6; Tr. of Bench Trial (Doc. 46) at 282:22.

[128] Tr. of Bench Trial (Doc. 46) at 293:6.

[129] Tr. of Bench Trial (Doc. 45) at 58:23–59:4.

[130] *Id*. at 110:9–15.

[131] *See, e.g.*, *id*. at 69:23–70:4.

[132] Tr. of Bench Trial (Doc. 47) at 692:4–7.

[133] *Id*. at 765:19–766:1.

38.     It is still unclear from the trial record, however, whether the drain used was only gravity-based, or also had a negative suction feature that could either be turned on or manually employed.  The Court need not resolve this factual dispute because the Court finds that it is below the standard of care in Arkansas to use either type of drain when the sufficiency of the seal of the dural tear has not been confirmed by way of the Valsalva maneuver of reverse Trendelenburg position.[134]  The use of any drain near a dural-tear site without confirmation of a watertight seal of the dural tear is below the standard of care because it allows, encourages, or promotes additional leakage of CSF if the repaired dural tear is not sufficiently sealed.[135]

39.     Dr. Bahgat testified that, near the end of surgery, he installed a JP drain in Mr. Dobbs to remove excess blood and tissue fluid from the cavity around Mr. Dobbs's spine.[136] Dr. Bahgat testified that the build-up of excess blood and tissue fluid in this cavity could lead to increased pressure in the cavity, which could cause pain, paralysis, blood clots, or numerous other problems.[137]  The Court accepts this portion of Dr. Bahgat's testimony as fact.

40.     Dr. Bahgat testified that, when deciding to install the drain, he "put into consideration" the fact that Mr. Dobbs had suffered a dural tear.[138]  Dr. Bahgat also testified that he was "fully aware" that the dural tear "could leak again."[139]  At one point, Dr. Bahgat suggested that he weighed the risk of a rare complication, e.g., a remote cerebral brain hemorrhage, with

---

[134] *See, e.g.*, *id*. at 729:25–730:11, 764:7–13.

[135] *See, e.g.*, *id*.  *See also* Tr. of Bench Trial (Doc. 45) at 160:23–24 ("The drain makes its [sic] more likely that the patch is going to fail."); *id*. at 97:18–20 ("It is not safe [to use a drain] when there has been a durotomy, and the durotomy has not been closed in a watertight fashion.").

[136] *See* Tr. of Bench Trial (Doc. 45) at 195:23–196:1; Tr. of Bench Trial (Doc. 46) at 280:20–283:24.

[137] *See* Tr. of Bench Trial (Doc. 46) at 282:11–23, 283:8–23.

[138] *Id*. at 282:24–25.

[139] *Id*. at 283:2–3.

other more common complications.[140]   But after being questioned about his memory of the decision-making process, Dr. Bahgat testified that, while he "vividly remember[ed] the tear," he "[wouldn't] lie and say [he] was focusing on the cerebral hemorrhage. . . . [He] didn't think about it."[141]   When asked whether he was "really thinking about at that moment, should I put this drain in or should I not[,]" Dr. Bahgat testified, "One hundred percent, yes."[142]

41.     Although there is some internal conflict in Dr. Bahgat's testimony in the preceding paragraph, the Court need not resolve the conflict.   Whatever Dr. Bahgat's reasoning for placing the drain, it is clear that doing so without confirming a watertight seal of the dural tear was below the standard of care in Arkansas.

### IV.     Post-Laminectomy Events

42.     The Court finds that Plaintiffs have proved that it is more likely than not that, after Dr. Bahgat performed the secondary repair and finished the surgery, CSF continued to leak out of the dural-tear site.   The reasons for this finding are set out below, but generally consist of evidence that (1) a significant amount of fluid was collected over many hours by the drain, and (2) CSF leakage from the dural-tear site was found during a second surgery six days later.

43.     After surgery, Mr. Dobbs was taken to the PACU to recover from his anesthesia.[143] The PACU records show that at 17:29—an hour and ten minutes after Mr. Dobbs's surgery ended—the right side of the drain had collected a total of 25 milliliters of fluid, and the left side

---

[140] *See id.* at 283:17–23 ("The remote cerebral hemorrhage is one in 10,000, you know, again, give or take the literature.  So this is where being rare puts into the consideration.  I can either not put the drain and avoid potentially causing that, or not put it and then get a clot, and then he can have bowel and bladder problems where he has to catheterize himself, or he has more pain or more weakness.").

[141] *Id.* at 284:11, 22–24.

[142] *Id.* at 285:6–9.

[143] *See* Pls.' Trial Ex. 1 at 1986.

of the drain had collected 75 milliliters of "all serous sanguinous [sic]" fluid.[144]  Dr. Taylor testified

that serosanguineous means "blood-tinged fluid[,]" and Dr. Day testified that it means "that there

is blood in fluid."[145]  The 17:29 notes also show that Mr. Dobbs was alert, awake, and following

commands, but he was moaning.[146]

      44.     At 18:35, the PACU record shows that Mr. Dobbs's right side of the drain now

contained an additional 150 milliliters of fluid, and the left side of the drain had an additional 100

milliliters of fluid.[147]  A 19:04 check-up shows that Mr. Dobbs was still alert, awake, and following

commands.[148]  At 19:08, the fluid collected in the drains still measured 150 milliliters in the right

side of the drain and 100 milliliters in the left side of the drain.[149]  The fluid was again described

as serosanguinous.[150]

      45.     Mr. Dobbs's next check-up was at 20:30.[151]  In a record labeled "Progress Notes[,]"

Mr. Dobbs's neurological assessment revealed that he was alert, oriented to person, place, and

time, and able to respond to verbal commands and answer questions appropriately.[152]  He did not

exhibit any signs of weakness, numbness, tingling, inattention, disorganized thinking, or visual or

hearing impairments.[153]  At this time, he spoke clearly and could move all extremities.[154]  Another

---

[144] *Id.* at 48.

[145] Tr. of Bench Trial (Doc. 45) at 106:23; Tr. of Bench Trial (Doc. 47) at 755:2–3.

[146] *See* Pls.' Trial Ex. 1 at 48.

[147] *See id.* at 49.

[148] *See id.*  There was no longer any indication that Mr. Dobbs was moaning.

[149] *See id.*

[150] *See id.*

[151] *See id.* at 1549.

[152] *See id.* at 1550.

[153] *See id.*

[154] *See id.*

check-up at 00:30 on October 10th revealed that Mr. Dobbs's neurological assessment was essentially unchanged.[155]

46.     Mr. Dobbs's next check-up was four-and-a-half hours later at 05:00.[156]  This time, the nurse noted that Mr. Dobbs had "poor verbal expression[.]"[157]  Dr. Taylor testified that this was a "nonspecific comment that the person doing the evaluation thought that [Mr. Dobbs's] speech was not normal for him."[158]  But otherwise, the nurse's observations were unchanged from the 20:30 and 00:30 check-ups.[159]

47.     At 05:06, the records show that an additional 200 milliliters of fluid had collected in Mr. Dobbs's drain.[160]  At 07:06, there was an additional 225 milliliters collected in the drain.[161]

48.     By this point, Mr. Dobbs had lost approximately 775 milliliters of fluid since Dr. Bahgat installed the drain fourteen hours earlier.[162]

49.     Drs. Taylor, Bahgat, and Day all testified that there was no way to know exactly how much of the drained fluid was CSF.[163]  Dr. Taylor testified that the average person has

---

[155] See id. at 1551–52.

[156] See id. at 1552.  There is no record of any check-ups between 00:30 and 05:00 on October 10th.  However, Mrs. Dobbs testified that on the night of October 9th and in the early morning of October 10th, Mr. Dobbs was repeatedly vomiting and "would roll back and forth in his bed, back and forth, back and forth, because he said his head was hurting so badly."  Tr. of Bench Trial (Doc. 47) at 590:21–591:3.  Mrs. Dobbs also testified that she "felt like [Mr. Dobbs's talking] was normal, you know, but, I mean, obviously he wasn't talking too much because all that other stuff was kinda going on.  So, I mean, but I didn't think to myself, wow, he's not responding normally or looking at me normally.  It seemed all fine to me."  Id. at 594:7–12.  Moreover, Mrs. Dobbs testified that Mr. Dobbs continued to vomit at least until he was taken for his MRI, but it is unclear which trip to the MRI she is referring to.  See id. at 594:19–595:3.  Of course, Mrs. Dobbs is likely not a particularly reliable witness here.  That night, she passed out and hit her head.  See id. at 591:4–15.  As Mrs. Dobbs testified, she "was knocked out cold."  Id. at 591:14–15.  The Court accepts the general tenor of her testimony but cannot accept the specifics because of the head injury.

[157] Pls.' Trial Ex. 1 at 1552.

[158] Tr. of Bench Trial (Doc. 45) at 110:2–5.

[159] See Pls.' Trial Ex. 1 at 1552–53.

[160] See id. at 1545.

[161] See id.

[162] See Tr. of Bench Trial (Doc. 45) at 113:13–17.

[163] See id. at 112:7–9; Tr. of Bench Trial (Doc. 46) at 306:4–11; Tr. of Bench Trial (Doc. 47) at 715:2–6.

approximately 300 milliliters of CSF in his body at one time.[164]   Dr. Taylor also testified that the

average person produces about 20 milliliters of CSF per hour.[165]

     50.      By 07:20, Mr. Dobbs had begun to exhibit signs of expressive aphasia, which is the

inability to speak.[166]   Dr. Bahgat was informed of this development, and an urgent brain MRI was

ordered.[167]   Mr. Dobbs, however, did not have an MRI until later that afternoon.[168]   In the

intervening hours, nurses performed two neurological checks at 08:00 and 13:00.[169]   At both

checks, Mr. Dobbs was alert and able to follow commands, but he was still unable to speak.[170]

     51.      Mr. Dobbs's MRI revealed that he had three brain bleeds.[171]   The neuroradiologist's

notes explain that:

> The cerebral venous sinuses appear widely patent on 3D postcontrast imaging.
> Diffuse mildly thickened dural enhancement consistent with the given history of
> recent dural tear.   Favor transient intracranial hypotension that resulted in brain
> sagging and mechanical obstruction of cingulate and superior cerebellar veins.   This
> likely resulted in venous ischemia/infarction with subsequent hemorrhage.[172]

When asked about the neuroradiologist's findings at trial, Dr. Bahgat said it would be fair to

conclude that the most likely cause of the brain bleeds was CSF draining through the dural tear,

---

[164] *See* Tr. of Bench Trial (Doc. 45) at 56:23–57:2.   Specifically, Dr. Taylor said the average person could have anywhere from 150 to 400 milliliters of CSF in his body, with an average of 300 milliliters.   *See id*.

[165] *See id*. at 55:24–56:6.   Under normal circumstances (i.e., when there is no dural tear), CSF is recycled into the bloodstream.   *See id*. at 56:8–20.   Dr. Day agreed with Dr. Taylor's estimate.   *See* Tr. of Bench Trial (Doc. 47) at 708:1–6.

[166] *See* Pls.' Trial Ex. 1 at 1540; Tr. of Bench Trial (Doc. 45) at 114:1–2.

[167] *See* Pls.' Trial Ex. 1 at 1540; Tr. of Bench Trial (Doc. 45) at 206:1–4.

[168] *See* Pls.' Trial Ex. 1 at 1530.   Mr. Dobbs's MRI was delayed because he had a metal Foley catheter with a temperature probe, which needed to be removed before he could have an MRI.   *See id*. at 1529, 1539.

[169] *See id*. at 1524, 1527.

[170] *See id*.

[171] *See id*. at 644–45, 1521; Tr. of Bench Trial (Doc. 45) at 206:10–15.

[172] Pls.' Trial Ex. 1 at 645.

which would have resulted in the brain sagging.[173]  In turn, the brain sag would have stretched and torn veins in Mr. Dobbs's brain.[174]

52.     At 15:55, Mr. Dobbs was transferred to the Surgical Intensive Care Unit ("SICU").[175]  Dr. Bahgat's post-MRI notes show that he ordered the drains to stay in Mr. Dobbs.[176] At 17:00, Mr. Dobbs was able to follow some commands, such as squeezing a nurse's hands, but he could not hold up two fingers when asked.[177]  By 19:00, Mr. Dobbs was "becoming increasingly more apneic and less responsive to following commands."[178]

53.     A CT scan of Mr. Dobbs's head was performed at 20:12.[179]  The CT scan revealed that Mr. Dobbs's "ventricles were bigger.  They looked enlarged."[180]  Based on the CT results, Dr. Bahgat's concern was, "maybe the blood or the shift in the brain had blocked any of these outflows, and it was building enough that these cavities were now expanding[,]" which could "just squeeze the brain tissue against the walls of the skull, and then it can cause more damage."[181]  As

---

[173] *See* Tr. of Bench Trial (Doc. 45) at 211:19–23.

[174] *See id.*

[175] *See* Pls.' Trial Ex. 1 at 1516, 1521.  When asked at trial whether he considered taking the drain out after the MRI, Dr. Bahgat testified:

> Probably.  I mean, I don't remember vividly, but definitely I think logic would dictate I would have thought about taking it out.  But I believe it was solid, looked at the drainage, and then again assessed whether was [sic] coming out of it was blood more or exudate more or spinal fluid, and decided that to keep it to prevent other issues with not—with taking it out, like you get a clot or a hematoma. That would be my guess of why I kept it.  I don't remember vividly, but that would be—definitely had to consider it, because I remember looking at it, remember reviewing the output of it.

Tr. of Bench Trial (Doc. 46) at 300:14–24.

[176] *See* Pls.' Trial Ex. 1 at 1457, 1521; Tr. of Bench Trial (Doc. 45) at 206:16–207:4.

[177] *See* Pls.' Trial Ex. 1 at 1493.

[178] *See id.*

[179] *See id.*

[180] Tr. of Bench Trial (Doc. 46) at 302:8–9.

[181] *Id*. at 302:9–15.  *See also* Pls.' Trial Ex. 1 at 1492 ("CT shows enlarging ventricle with loss of CSF space and sylvian [fissure] tightness").

a result, an external ventricular drain ("EVD") was placed at 22:20.[182]  Dr. Bahgat testified that an EVD was necessary to measure the pressure of the brain and drain fluid to reduce the pressure, if necessary.[183]

54.     Mr. Dobbs had another CT scan the next morning (October 11th), which showed that the "stability of the bleed . . . was the same."[184]  At this point, Mr. Dobbs's drain output over the previous twenty-four hours was 300 milliliters, which, according to Dr. Bahgat, was "within what you would expect."[185]  The Progress Notes from 08:00 on October 11th reflect that Mr. Dobbs "does not follow commands but will withdraw to painful stimuli.  Occasional blinking of eyes noted but [Mr. Dobbs] does not open eyes to command or track around room."[186]  At 10:34, a check-up of Mr. Dobbs showed the "EVD working well with very low pressure.  CSF is clear. . . . Continue surgical drains which have thin output serosanginous [sic]."[187]

55.     On the morning of October 12th, Mr. Dobbs underwent an electroencephalography ("EEG") to determine whether he was having seizures.[188]  The impressions of the EEG showed that the EEG was "[a]bnormal . . . because of generalized slowing of teh [sic] EEG activity and frequent bifrontal epileptiform discharges.  This [is] indicative of moderate-severe generalized cerebral [dysfunction] with bifrontal potential epileptogenicity."[189]

---

[182] *See* Pls.' Trial Ex. 1 at 1493.

[183] *See* Tr. of Bench Trial (Doc. 46) at 302:19–21.

[184] *Id*. at 303:8–11.

[185] *Id*. at 303:18–20.  *See also* Pls.' Trial Ex. 1 at 1458.

[186] Pls.' Trial Ex. 1 at 1461.

[187] *Id*. at 1456–57.

[188] *See id*. at 1401; Tr. of Bench Trial (Doc. 46) at 307:3–8.

[189] Pls.' Trial Ex. 1 at 1401–02.

56.     Because of "worsening mentation since yesterday[,]" Mr. Dobbs had another CT scan on October 12th.[190]  This scan revealed "[t]hat everything [was] stable."[191]  (Dr. Bahgat testified that, when the bleeds are stable, it simply means they have not worsened.[192])  However, Mr. Dobbs's "EVD and lumbar JP drains" were "pulled" at this time.[193]  Dr. Bahgat testified that he decided to remove the drains at this time because:

> [T]he EVD was, the pressure was not high, the ICPs were controlled.  We didn't need to drain anything out of it.  We got a repeat CT scan.  The ventricles weren't enlarged, were appropriate size, so they had no function.  We had closed them that morning and then got a scan later in the day, make sure that it doesn't expand.  So we took them out, the JP drain.  That time the flow coming out of it had gone down.  The odds of having a hemorrhage or anything concerning that I needed to drain was not needed, so I pulled them out.  They did the function that I wanted them to do.[194]

57.     On October 13th, Mr. Dobbs's consciousness level was not improving, so another MRI was done.[195]  Dr. Bahgat testified that "[f]or the most part [the findings of the MRI were] stable. . . . [T]he ventricles were a little bit larger, but there was air in them probably from taking out the EVD . . . ."[196]  When Dr. Bahgat checked on Mr. Dobbs after his most recent MRI, Dr. Bahgat observed that Mr. Dobbs had a "[s]table neuroexam, slight improved flexation on left [upper extremity], flex both [lower extremity] to minimal stimulation, [o]pen eye to stimuli once . . . ."[197]  Dr. Bahgat testified that these observations indicated that Mr. Dobbs "was stable" and "[n]othing had changed."[198]

---

[190] *Id*. at 1399.

[191] *See* Tr. of Bench Trial (Doc. 46) at 307:13.

[192] *See id*. at 317:8–12.

[193] Pls.' Trial Ex. 1 at 1426.

[194] Tr. of Bench Trial (Doc. 46) at 308:7–18.

[195] *See id*. at 309:4–17; Pls.' Trial Ex. 1 at 1329–30.

[196] Tr. of Bench Trial (Doc. 46) at 309:14–16.  *See also* Pls.' Trial Ex. 1 at 1328.

[197] Pls.' Trial Ex. 1 at 1328.

[198] Tr. of Bench Trial (Doc. 46) at 309:25.

58.     Dr. Bahgat's next interaction with Mr. Dobbs was the following day (October 14th) around noon.   Dr. Bahgat's notes and testimony reveal that nothing happened to Mr. Dobbs overnight, and that Mr. Dobbs was "showing subtle improvement in neurological function."[199]

59.     Despite subtle improvement, Dr. Bahgat decided on October 15th that Mr. Dobbs would need a second surgery.[200]   In deciding that a second surgery was necessary to determine whether there was a CSF leak, Dr. Bahgat testified:

> So the thought process was that he hadn't gotten any better.  There's no significant change.  We got repeat scans that for the most part were stable.  Other than keep watching, there's nothing active we can do.  The only thing surgical I could offer is to say, okay, maybe he does have a leak in his back, maybe it was still leaking some.  There was nothing leaking out of the incision.  The incision wasn't puffed, wasn't leaking to the outside, wasn't soft, wasn't . . . no clear clinical indication that would say he definitely had a leak.  It was just an assumption that, okay, if he was having a leak, why not to go in.  The risk of going in again is low; and look at it.  If there is a leak we can fix it, give him a better chance.  And I explained to the family as best as I could this is what we're thinking.  It may end up being a helpful surgery, maybe not, but the risk is low, and the potential benefit could be worth it.[201]

Because Mr. Dobbs was unable to give consent, Dr. Bahgat "believe[s]" he obtained consent from Mrs. Dobbs to perform the re-exploration surgery.[202]   Again, while there were other people in the operating room with Dr. Bahgat for the re-exploration surgery, including an anesthesiologist (or anesthetist), neither party called any of those other people to testify at trial.[203]

60.     The October 15th re-exploration surgery revealed that, after "the paraspinal muscles were separated with a cerebellar retractor[,]" Dr. Bahgat "could see fluid within the

---

[199] Pls.' Trial Ex. 1 at 1290.  *See also* Tr. of Bench Trial (Doc. 46) at 310:11–14 ("So seems to be he's opening his eyes, had more consistent responses.  So maybe somewhat better, but really nothing major worse or better, just some very subtle improvement I would say.").

[200] *See* Pls.' Trial Ex. 1 at 1238–41.

[201] Tr. of Bench Trial (Doc. 46) at 311:3–19 (ellipsis in original).

[202] *Id.* at 311:20–23.

[203] *See* Pls.' Trial Ex. 1 at 1981.

epidural space."[204]  "The fluid was suctioned out . . . to inspect the site of the dural tear[,]" and "[t]he prior muscle graft and Gelfoam was removed and the tear was identified."[205]  The Operative Findings in the post-operative report state that "[t]he site of the prior dural tear was explored[,] [and] CSF could be seen coming from the tear but was not aggressive."[206]

61.     At one point, Dr. Bahgat testified that, "[t]heoretically, [Mr. Dobbs] could have been not leaking at the time . . . [a]nd once [Dr. Bahgat] opened it the pressure is less and it could start to leak."[207]  He also testified that he saw "some fluid coming out of the edges of the repair[,]" but doesn't "remember if it was when [he] manipulated it or before [he] even touched it . . . ."[208]  Dr. Bahgat testified that the leak was "nothing that was like a gush of fluid."[209]  Instead, according to Dr. Bahgat, it was "[j]ust like a small trickle."[210]  Dr. Bahgat testified that it could have been "a combination of blood, normal tissue fluid, and in this case it could be CSF."[211]  Dr. Bahgat could not remember "exactly how much [fluid] it was."[212]

62.     At this point, "a large muscle graft was obtained and gently tucked and wrapped around the tear."[213]  Dr. Bahgat then "placed another piece of muscle graft to hold it in place after which an onlay Gelfoam was placed soaked in blood."[214]  Dr. Bahgat "sprayed DuraSeal after

---

[204] *Id*. at 1980.

[205] *Id*.

[206] *Id*. at 1979.

[207] Tr. of Bench Trial (Doc. 46) at 312:25–313:4.

[208] *Id*. at 313:5–7.

[209] *Id*. at 313:7–8.

[210] *Id*. at 313:8.  Dr. Bahgat testified that it was possible that the re-exploration surgery could have caused the leak. *See id*. at 315:24–316:4.  But he also testified that Mr. Dobbs could have had an active leak on October 15th.  *See* Tr. of Bench Trial (Doc. 45) at 199:16–18.

[211] Tr. of Bench Trial (Doc. 45) at 199:6–8.

[212] Tr. of Bench Trial (Doc. 46) at 313:8–9.

[213] Pls.' Trial Ex. 1 at 1980.

[214] *Id*.

which another muscle layer was placed and a Gelfoam."[215]  "These were secured and held in place with a crossing stitch after which we inspected the rest of the surgical cavity for sites of other leaks or tears."[216]  No other leaks or tears were identified.[217]

63.    After Mr. Dobbs's "skin was closed with a stapler[,]" he "was flipped to a supine position . . . and an EVD catheter was placed advanced to about 6-7 cm."[218]  Dr. Bahgat's post-operative report for the re-exploration surgery explains that on "[t]he first pass we could not obtain any CSF so a second pass was attempted this point we could see CSF coming back but at a very low pressure."[219]  This time, Dr. Bahgat did not install a JP drain.[220]  A post-surgery CT scan revealed that Mr. Dobbs's brain bleeds were "stable, but there was more air just from putting the catheter in, that air just got in, filled up the ventricles."[221]

64.    The Court finds that the re-exploration surgery revealed a CSF leak from the original dural-tear site.  It is sheer speculation to suggest that this leak only began at the time the re-exploration surgery was conducted.  Based on the chain of events and testimony discussed above, it is far more likely that the CSF discovered during the re-exploration surgery on October 15th was from an ongoing CSF leak from Mr. Dobbs's original dural tear during the October 9th laminectomy.  Given Dr. Bahgat's failure to confirm the sufficiency of the seal of the dural tear in the first surgery, the subsequent placement of a drain, and the significant amount of drainage noted between the first surgery and the second surgery, it is more likely that CSF began to leak shortly

---

[215] *Id.*

[216] *Id.*

[217] *See id.*

[218] *Id.*

[219] *Id.*

[220] *See* Tr. of Bench Trial (Doc. 45) at 133:4–6.

[221] *See* Tr. of Bench Trial (Doc. 46) at 316:13–23.

after the first surgery was completed.[222]   While no one can know how much of the fluid collected

in the drains was CSF compared to other fluids, it is very likely that some portion of it was CSF.

The Court finds that Plaintiffs have proved this by a preponderance of the evidence.

65.   The Court also finds that Plaintiffs have proved that it is more likely than not that

the drain promoted the CSF leak after the end of the October 9th surgery.   Dr. Taylor explained

that a "negative pressure drain draws fluid out of the space and would promote CSF leakage from

the dura."[223]   He also testified that "[t]he drain makes its [sic] more likely that the [secondary

repair] is going to fail."[224]   For his part, Dr. Bahgat agreed with the Plaintiffs' counsel's assertion

that "a subfascial drain in that secondary closure setting promotes the movement of fluid from

inside the body to out . . . ."[225]   Even gravity drains encourage such leakage by creating an easy

path for the CSF to take.[226]   That is consistent with Dr. Day's fervor about not placing a drain

without confirming a watertight seal.   When asked whether he had ever placed a drain in such

circumstances, Dr. Day testified, "if I couldn't fix it with suture or with a graft and then prove that

nothing's coming with a Valsalva maneuver, then, no, that's not something that anybody would

---

[222] The Court cannot determine with any accuracy how much of the drainage between the two surgeries was CSF. However, the Court can and does find that some significant portion of the drainage was CSF. *See* Tr. of Bench Trial (Doc. 45) at 129:20–22 ("I think that his injury occurred following surgery, as there was CSF drained out, and a large volume of CSF drained out the morning after surgery.").  That finding follows—at least given the preponderance-of-the-evidence-standard—from the fact that the seal of the dural tear in the first surgery was not confirmed and that CSF was found leaking from the same place during the re-exploration surgery.  In sum, the overarching story told by the Plaintiffs—a dural tear not confirmed to be sealed, followed by post-operative leakage of CSF into the drain, eventual brain hemorrhage from the continuous post-operative loss of CSF, and discovery of the leakage during a second surgery—is far more persuasive than the one told by the Government—a dural tear properly closed, no CSF in the drains at all, CSF only found in the second surgery because that surgery somehow opened the original dural-tear site, and a delayed brain hemorrhage arising many hours after the initial intraoperative dural tear.  The Court cannot definitively say the Government's version of events is wrong.  But the Court can definitively say that the Government's version of events is less likely than Plaintiffs' version of events.  Plaintiffs' version of the events is more likely than not what happened.

[223] *Id*. at 100:4–6.

[224] *Id*. at 160:23–24.

[225] *Id*. at 209:1–4.

[226] *See id*.  *See also id*. at 160:23–24.

do."[227]   According to Dr. Day, no neurosurgeon in his right mind would place a drain in that situation.[228]   The reasonable inference from this is that a drain—whether a gravity, negative pressure, or suction drain—would promote or exacerbate a CSF leak.

### V.      The Cause of the Brain Sag and Hemorrhage

66.      The Court finds that Plaintiffs have proved that it is more likely than not that the immediate, intraoperative CSF leak from the dural tear did not—on its own—cause Mr. Dobbs's brain sag.   Correspondingly, the Court finds that the Plaintiffs have proved that it is more likely than not that the continuous CSF leak caused by the placement of the drain was a but-for cause and proximate cause of the brain sag.   That is, whether or not the immediate loss of CSF during the October 9th surgery contributed to the brain sag, it is more likely than not that the brain sag would not have occurred without the post-operative CSF leak caused by the placement of the drain. The Court finds that Plaintiffs have proved this by a preponderance of the evidence for the following reasons.

67.      Dr. Taylor testified that he believed, within a reasonable degree of medical certainty, that the drain caused Mr. Dobbs's brain bleeds.[229]   He opined that Mr. Dobbs's "injury occurred following surgery, as there was CSF drained out, and a large volume of CSF drained out the morning after surgery."[230]   Dr. Taylor based this opinion "on the understanding of the mechanism of injury, that symptoms of brain injury from intracranial hypotension and brain shift and compressed veins and ischemia, those are all things that occur fairly quickly."[231]   Quoting an

---

[227] Tr. of Bench Trial (Doc. 47) at 764:7–13.

[228] *See id*. at 764:14–17.

[229] *See* Tr. of Bench Trial (Doc. 45) at 130:9–12.

[230] *Id*. at 129:20–22.

[231] *Id*. at 129:24–130:2.

article titled *Symptomatic Intracranial Hemorrhage After Dural Tear in Spinal Surgery—A Series of 10 Cases and Review of the Literature* ("the Allouch Article"), Dr. Taylor testified that when a patient loses CSF, "'brain sagging may take place and possibly promote intra cerebral hemorrhaging as a result of stretching of cortical bridging veins.'"[232]  According to Dr. Taylor, the symptoms of the insult to the brain that Mr. Dobbs suffered "occur immediately or within minutes or an hour or two[]" of the brain sag, "not a half a day later or 16 hours later."[233] The point being, if the symptoms occur fairly quickly after the brain sag, then the timeline is far more consistent with a brain sag occurring hours after the surgery as opposed to a brain sag occurring during or right after surgery.

68.     Dr. Day's testimony generally supports Dr. Taylor's testimony that the loss of CSF can lead to a brain hemorrhage.[234]  Dr. Day testified that:

> [W]hen you get a loss, a sudden loss of spinal fluid, and you get this so-called cerebellar sag, then it stretches those veins and pulls on them.  These veins are fragile.  The same thing can happen up top along the cerebrum, especially near the midline.  That's where most of our big bridging veins are, above the tentorium. Those veins are very fragile.  When they stretch, they close down.  So, you know, if it's loose, then it's, you know, it has the volume like that.  But as it stretches, it goes like this.  And some of them will tear.  So whether they're stretched and flattened and not flowing or they actually tear, the result is the same.  You've interrupted the normal outflow of venous blood from that brain tissue.[235]

The stretching of the veins, Dr. Day concluded, could lead to a brain hemorrhage.[236]

---

[232] *Id*. at 86:14–17, 93:11–14.

[233] *Id*. at 129:24–130:4.

[234] *See* Tr. of Bench Trial (Doc. 47) at 723:19–724:9.

[235] *Id*. at 697:1–13.

[236] *See id*. at 700:5–7, 12–13. ("And it's because it's the loss at the time of the big drainage of CSF is when the sag occurs and you have the problem . . . You get the sag, the veins break, stretch, occlude, and then things go from there.").

69.     But Dr. Day testified that the cause of Mr. Dobbs's brain sag—and, therefore, the cause of the brain hemorrhage—was the loss of a large amount of CSF at the time of the dural tear.[237]   In support of this theory, the Dr. Day testified that Mr. Dobbs brain sagged sometime before 16:30 on October 9th.[238]   That is, the brain sagged during surgery or immediately thereafter.[239]

70.     Dr. Day acknowledged that Mr. Dobbs had normal neurological checks in the 15 hours following his first surgery.[240]   But Dr. Day suggested this was not inconsistent with his timeline of when the brain sag occurred.   According to Dr. Day:

> [When y]ou occlude a vein, patient's doing pretty well, and then usually about 12-ish hours later things start to change.   And things get worse and worse, and then you end up getting a scan somewhere between 12 and 38 hours, and there's the hemorrhage, it's in the tissue.   So, you know, when a vein busts initially from that sag, you could have some hemorrhage then, but that hemorrhage is outside the brain tissue.   It's not in the tissue like you see on Mr. Dobbs'[s] scan.   That's hemorrhage in the tissue.[241]

As the Court best understands Dr. Day's testimony, it is his opinion that the initial dural tear resulted in a "big gush" of CSF, which caused the brain to immediately sag.   But the sag did not immediately cause the brain hemorrhage.   Instead, it caused some veins to "break, stretch, occlude, and then things go from there."[242]   Dr. Day described the things going from there as a "cascade of events[,]" with the manifestation of the insult taking place "somewhere between 12 and 38 hours" later.[243]   According to Dr. Day, the ultimate manifestation is a bleed in the brain tissue (i.e., the

---

[237] *See, e.g.*, *id*. at 700:11–12, 725:20–22, 726:5–7.

[238] *See id*. at 726:24–727:2.

[239] *See id*.

[240] *See id*. at 727:3–6.

[241] *Id*. at 699:6–14.  *See also id*. at 728:4–6 ("We know that it occurs somewhere between 12 and up to 48 hours later, when the scans are done, when we see the hemorrhage.").

[242] *Id*. at 700:12–13.

[243] *Id*. at 698:14–699:15.

hemorrhage) no sooner than 12 hours after the sag, which immediately followed the significant loss of CSF.[244]

71.     Based on this theory, Dr. Day testified that, because of the significant loss of CSF at the time of the dural tear, Mr. Dobbs's brain hemorrhage would have occurred regardless of Dr. Bahgat's decision to install a drain.[245]  And the hemorrhage would've been just as severe.[246]

72.     The Court finds that Dr. Taylor's theory of the injury here is more likely than Dr. Day's theory.  First, Dr. Day's theory is premised on a fact that the Court has already concluded did not occur—namely, an unusually large and immediate loss of CSF at the time of the intraoperative dural tear.   Dr. Day does not suggest an average release of CSF from an intraoperative dural tear would cause the brain to immediately sag.  And, given the statistics the Court has already credited concerning the frequency of intraoperative dural tears and the infrequency of resulting brain hemorrhages, something more than an average loss of CSF during the surgery would be necessary to support Dr. Day's theory.

73.     Second, Dr. Taylor testified that "symptoms of brain injury from intracranial hypotension and brain shift and compressed veins and ischemia, those are all things that occur fairly quickly.  They occur immediately or within minutes or an hour or two, not a half a day later or 16 hours later."[247]  So this really is a true battle of the experts on the timeline from CSF loss to brain sag to brain hemorrhage.  After listening to the dueling expert testimony, the Court finds Dr. Taylor's testimony about the usual timeline of the brain bleed more credible than Dr. Day's

---

[244] *See id.* at 699:11–25.

[245] *See id.* at 710:8–17.

[246] *See id.* at 710:12–17.

[247] Tr. of Bench Trial (Doc. 45) at 129:25–130:4.

testimony.[248]   It is not that Dr. Day's scenario is impossible.   Rather, the Court believes the

Dr. Day's scenario is more of an outlier than Dr. Taylor's scenario.[249]

74.     The facts in this case line up better with the more compressed timeline testified to

by Dr. Taylor.   Put another way, Dr. Taylor's testimony concerning the likely chain of events

seems to be consistent with, and accounts for, all the facts found by the Court so far in this case—

especially the absence of a large and immediate "gush" of CSF during the October 9th surgery.

And given the compressed timeline between the CSF loss, brain sag, and hemorrhage, it is far less

likely that the brain sag occurred during or immediately after the surgery than several hours later.

This, in turn, means that the brain sag must have occurred because of the post-operative CSF leak

into the drain (either alone or in combination with the original CSF leak during surgery), which

eventually caused the loss of so much CSF that the remaining CSF could no longer keep that part

of the brain afloat.

## **CONCLUSIONS OF LAW – LIABILITY**

The Dobbses brought their claim against the United States under the Federal Tort Claims

Act.[250]   When analyzing a claim brought under the Federal Tort Claims Act, courts apply the

substantive law of the state where the events giving rise to the complaint occurred.[251]   Because the

alleged medical malpractice occurred in Arkansas, Arkansas law applies.[252]   The Arkansas

Medical Malpractice Act governs claims of medical negligence.[253]

---

[248] *See Kaplan v. Mayo Clinic*, 847 F.3d 988, 991 (8th Cir. 2017) (the Court of Appeals "'give[s] due regard to the opportunity of the district court to judge the credibility of the witnesses'" (quoting *Tadlock v. Powell*, 291 F.3d 541, 546 (8th Cir. 2002)).

[249] *See supra* note 222.

[250] *See* Compl. (Doc. 1) ¶ 1.4.

[251] *See Day v. United States*, 865 F.3d 1082, 1086 (8th Cir. 2017).

[252] *See id.*

[253] *See* Ark. Code Ann. § 16-114-201 *et seq.*

"[W]hen the asserted negligence does not lie within the jury's comprehension as a matter of common knowledge," Arkansas statute provides that a plaintiff has the burden of proving:

> (1)      By means of expert testimony provided only by a medical care provider of the same specialty as the defendant, the degree of skill and learning ordinarily possessed and used by members of the profession of the medical care provider in good standing, engaged in the same type of practice or specialty in the locality in which he or she practices or in a similar locality;

> (2)      By means of expert testimony provided only by a medical care provider of the same specialty as the defendant that the medical care provider failed to act in accordance with that standard; and

> (3)      By means of expert testimony provided only by a qualified medical expert that as a proximate result thereof the injured person suffered injuries that would not otherwise have occurred.[254]

But there is an important tweak to this standard.  In *Broussard v. St. Edward Mercy Health System, Inc.*, the Supreme Court of Arkansas held unconstitutional the requirement that standard-of-care opinions must be given by a doctor of the same specialty as the defendant.[255]  In short, given this gloss on the statute, Plaintiffs must prove by competent medical expert testimony:   (1) the applicable standard of care, (2) that Dr. Bahgat failed to act in accordance with that standard, and (3) that this failure was a proximate cause of Mr. Dobbs's injuries.[256]  Plaintiffs must only prove these by a preponderance of the evidence.[257]

---

[254] Ark. Code Ann. § 16-114-206(a)(1)–(3).

[255] 2012 Ark. 14, at 6, 386 S.W.3d 385, 389.  Even though the Court is not required to make the "same specialty" finding, the Court finds that Dr. Taylor and Dr. Day were of the same specialty as Dr. Bahgat—neurosurgery.

[256] *See e.g.*, *Webb v. Bouton*, 350 Ark. 254, 264, 85 S.W.3d 885, 891 (2002).

[257] *See id.*, at 261–62, 85 S.W.3d at 889.

### I.        Standard of Care

Plaintiffs called Dr. Taylor as their standard-of-care expert.[258]  Dr. Taylor testified that he was familiar with the standard of care for neurosurgeons.[259]  At the time of trial, Dr. Taylor had performed laminectomies at least hundreds of times.[260]  He testified that the standard of care for laminectomies and dural tears does not change from one locality to another; for example, it is the same in Dallas, Texas, as it is in Little Rock, Arkansas.[261]

Dr. Taylor did not criticize Dr. Bahgat for causing a dural tear, and Dr. Taylor agreed that the fact a dural tear occurred does not alone mean that Dr. Bahgat was negligent.[262]  Moreover, it was Dr. Taylor's opinion that, to a reasonable degree of medical certainty, Dr. Bahgat's secondary repair of Mr. Dobbs's dural tear (as well as Dr. Bahgat's inability to do a primary repair) was within the standard of care.[263]

The meat of Dr. Taylor's standard-of-care testimony centered on Dr. Bahgat's failure to perform a Valsalva maneuver and his use of a JP drain.  Quoting *Treatment of Dural Tears Associated with Spinal Surgeries* ("the Eismont Article"), Dr. Taylor testified that when repairing a dural tear, "'[a]ll repairs should be tested by using the reverse Trendelenburg position and Valsalva maneuvers to increase intrathecal pressure.  Any persistent leaks should be repaired.'"[264]  Still quoting the Eismont Article, Dr. Taylor testified that "'[t]here is no evidence that simply placing Gelfoam or muscle over a dural leak is effective.  This use of Gelfoam and muscle has

---

[258] *Supra* note 18.  Dr. Taylor was accepted as an expert witness without objection.  *See* Tr. of Bench Trial (Doc. 45) at 51:7–15.

[259] *See* Tr. of Bench Trial (Doc. 45) at 47:25–48:2.

[260] *See id*. at 48:3–7.

[261] *See id*. at 49:6–13, 50:4–23.

[262] *See id*. at 141:12–21.

[263] *See id*. at 143:12–144:1.

[264] *Id*. at 76:11–17, 79:15–18.

been associated with failure of closure of the dura in other series.'"[265]   Furthermore, Dr. Taylor testified that the Eismont Article clearly stood for the proposition that, "in closing around the dura when there's been a spinal fluid leak, no drain should be used."[266]

Another article Dr. Taylor relied on was *Incidental Durotomy in Spine Surgery* ("the Cammisa Article").[267]   This article reviewed a study of 2,144 patients, 74 of whom had dural tears.[268] None of these 74 patients with dural tears suffered brain hemorrhages.[269]   And all 74 dural tears "'were deemed watertight to Valsalva maneuver before closure of the facie and skin.'"[270] Quoting the Cammisa Article (which in turn cited the Eismont Article), Dr. Taylor testified that the "'Valsalva maneuver was recommended to check for the completeness of repair.  Finally, they advised against placement of subfascial drains in deference to the possibility of formation of duro-cutaneous fistula.'"[271]

According to Dr. Taylor, the Cammisa Article also referenced another study: the Wang Study.[272]  In the Wang Study, 87 of the 88 patients had primary repairs, while only one patient had a secondary repair.[273]   There, "'[a] substantial closed suction drain was used for all patients and remained in place for an average of 2.1 days.'"[274]   Considering this study, the Cammisa Article concluded that "'[c]losed suction wound drainage does not seem to aggravate the leak and can be

---

[265] *Id*. at 80:12–15.

[266] *Id*. at 81:19–20.

[267] *See id*. at 82:22–25.

[268] *See id*. at 83:8–11.

[269] *See id*. at 83:12–16.

[270] *Id*. at 84:13–15.

[271] *Id*. at 85:7–11.

[272] *See id*. at 85:15–17.

[273] *See id*. at 85:22–25, 151:22–152:10.

[274] *Id*. at 152:11–15.

used safely in the presence of a dural repair.'"[275]  Dr. Taylor testified that the Cammisa Article and the studies cited within the article instruct doctors "[t]hat in general, drains should be avoided, but they can be used safely if there's been a suture watertight closure.'"[276]

Dr. Taylor testified that it was not his position that a neurosurgeon should never use a drain.[277]  Instead, according to Dr. Taylor, a neurosurgeon should not use a drain when there has been a dural tear, and the dural tear was not "closed in a watertight fashion."[278]  He based this testimony on an article titled *Intracranial Hemorrhage After Spine Surgery* ("the Kaloostian Article"), which, provided, in part, that "'drain placement and continued suction at the site of dural repair have also been proposed as a mechanism for sustained cerebral hypotension.'"[279]  The Kaloostian Article further explained that "'[r]ecent reports reflect a growing concern over the placement of drains at the surgical site, which has emerged as one of the most consistently confirmed variables in patients with intracranial hemorrhage after spine surgery.'"[280]  As Dr. Taylor explained, the Kaloostian Article concluded that based on the eight patients studied, "'the presence of interoperative CSF leak and the use of drains postoperatively, with aforementioned moderate outputs, were all common factors shared among [the] patients.  This does not indicate a causal relationship because of the lack of statistical validation, but merely that these are factors that show an association.'"[281]

---

[275] *Id*. at 152:20–22.

[276] *Id*. at 86:2–6.

[277] *See id*. at 97:15–17.

[278] *Id*. at 97:18–20.

[279] *Id*. at 94:21–95:1, 96:3–5.

[280] *Id*. at 96:18–21.

[281] *Id*. at 97:1–7.

Dr. Taylor also testified about the Allouch Article, which the Court introduced earlier.[282] The Allouch Article found that, in a survey of 12,185 patients who underwent spinal surgery, eight of them suffered intracranial hemorrhages.[283]  Quoting the Allouch Article, Dr. Taylor testified that the risk of post-operative CSF loss following an intraoperative dural tear "'is especially increased by suction drains[,] [which] seem to be risk factors for intracranial hemorrhage, complicating the spinal surgery.'"[284]  According to the Allouch Article, "'[i]n every case in our series, CSF loss was enhanced through use of drains in the subfascial space.  In cases of observed durotomy, we used gravity-driven drains, whereas in the four patients with occult dural tears, drains with negative pressure were used, according to our usual practice in our department.'"[285]

Importantly, the Allouch Article explained that:

In cases of intra operative durotomy and [sic] intra operative repair in a watertight fashion should be attempted.  Intraoperative assessment of sealing the dural tear may be controlled by visual inspection under the Valsalva maneuver for 10 seconds or longer.  In complex defects, lumbar drainage should be considered.  Minimization of CSF loss during spinal surgery through the immediate closure of a dural tear and head-down positioning of the patient is suggested.

***

In cases of intracranial hemorrhage after spinal surgery, drains should be removed, and patients should be advised to stay in bed rest.  Some investigators advocate resting in the Trendelenburg position.  We perform MRI of the spinal index region to exclude persistent CSF leakage.  In these patients, we consider revision surgery with dural repair to reduce CSF loss if the general condition of the patient allows it.

***

---

[282] *See generally id*. at 86:14–94:3.

[283] *See id*. at 88:3–6.

[284] *Id*. at 88:14–17.

[285] *Id*. at 89:10–15.  Dr. Taylor explained that an occult dural tear is one where the doctors are unaware of it at the time of the surgery.  *Id*. at 89:17–19.

> An intentional or inadvertent opening of the dura during spinal surgery should be managed by a watertight closure.  Whenever possible, drains should be avoided or, if necessary, placed without negative pressure.[286]

Finally, Dr. Taylor considered *Remote Cerebellar Hemorrhage as a Complication of Lumbar Spine Surgery* ("the Lim Article").[287]  In doing so, Dr. Taylor testified that drains are an associated risk for brain hemorrhages.[288]

Considering the medical records, the relevant medical literature, and his own experience, Dr. Taylor concluded, to a reasonable degree of medical certainty, that Dr. Bahgat failed to act in accordance with the standard of care in Arkansas by installing a drain after a secondary repair.[289]  Dr. Taylor testified that this was a failure to act in accordance with the standard of care, even if the Valsalva maneuver was done or the seal of the secondary repair was otherwise confirmed to be sufficient.[290]

The Government called Dr. Day as its standard-of-care expert.[291]  To establish the standard of care, Dr. Day testified about some of the same articles Dr. Taylor relied on, while also considering a few additional articles.[292]  Like Dr. Taylor, Dr. Day testified that it was within the

---

[286] *Id.* at 91:7–14, 92:19–93:1, 93:19–22.

[287] *See generally id.* at 97:21–100:18.

[288] *See id.* at 97:23–25.  The Lim Article explained that "'[t]he presence of a subfascial drain was observed in 42 percent, suggesting that a prolonged postoperative CSF leak may be riskier than an intraoperative leak, which would have been promptly repaired.'"  *Id.* at 98:18–21.

[289] *Id.* at 51:4–6, 102:8–14, 134:20–22.

[290] *Id.* at 102:8–19.

[291] *See generally* Tr. of Bench Trial (Doc. 47) at 668:24–718:17.  Dr. Day was accepted as an expert witness without objection.  *See id.* at 668:17–22.

[292] One of the additional articles Dr. Day testified about was titled *Cerebellar Hemorrhage After Spinal Surgery: Case Report and Review of Literature* ("the Konya Article").  *See generally* Tr. of Bench Trial (Doc. 47) at 710:23–712:8.  But in this article, the patient had a dural tear that was closed with a primary repair, and the doctor didn't see any more leakage of CSF.  *See id.* at 711:16–712:8.  This is quite distinguishable from Dr. Bahgat's repair of Mr. Dobbs's dural tear.  The other article was *Cerebellar Hemorrhage After Spinal Surgery, Report Two of Cases and Literature Review* ("the Friedman Article").  *See id.* at 757:10–12.  The Friedman Article discussed two patients who suffered dural tears.  *See id.* at 757:13–17.  One patient had a drain, and the other didn't.  *See id.* at 757:16–17.  The article does not discuss how each patient's dural tear was repaired, but the patient who had a drain suffered a brain hemorrhage.  *See id.* at

standard of care for Dr. Bahgat to attempt a secondary repair of the dural tear when he was unable to do a primary repair.[293]  Dr. Day also testified that the simple failure to document the Valsalva maneuver in the post-operative report was within the standard of care, so long as Dr. Bahgat did, in fact, perform the Valsalva maneuver.[294]

When asked about the use of a drain after a spinal surgery, Dr. Day testified that "if you didn't use a drain you'd be criticized . . . ."[295]  Dr. Day explained that this is because excess tissue fluid and blood from the surgery could collect and cause inflammation and swelling.[296]  Furthermore, Dr. Day testified that "when you look at the bulk of people that have been reported [to] have had [a brain hemorrhage], the presence of a drain is not a common factor.  A CSF leak is a common factor."[297]  According to Dr. Day's testimony, there are "just as many people that had a spinal fluid leak and had no drain placed that ended up with a delayed hemorrhage in those cases, as those who had a leak and then there was a drain.  So what that tells me is the drains don't make a difference."[298]

But during cross-examination, Dr. Day agreed that it is important for a doctor to do the Valsalva maneuver so he can know whether the dural tear is sufficiently sealed.[299]  Dr. Day went

---

757:13–15, 22–24.  Dr. Day's testimony about the Friedman Article seems to support the Plaintiffs' theory that a drain can increase the risk of a brain hemorrhage.

[293] See id. at 680:13–681:15.

[294] See id. at 687:2–8.

[295] Id. at 687:13–14.  Despite this assertion, Dr. Day later testified that he did not criticize Dr. Bahgat's decision to not install a drain after the re-exploration surgery.  See id. at 751:5–11.  Dr. Day maintained this assertion, even though the repair of the dural tear in the re-exploration surgery consisted of many more layers than the first repair (as well as a suture).  See id. at 751:12–14.  Dr. Day later agreed with the Government's assertion that one reason Dr. Bahgat would not have used a drain in the second surgery is "because the fluids had gone down and the drains had done their job . . . ."  Id. at 766:5–11.

[296] See id. at 688:2–689:10.

[297] Id. at 716:15–17.

[298] Id. at 716:20–24.

[299] Id. at 729:25–730:4.

on to testify that, "[i]f you have an active leak, you're not going to use a drain . . . you're not going to put a drain in and continue to suck out spinal fluid."[300]  Furthermore, when asked whether he had ever placed a drain in a situation where he did not achieve a sufficient closure of the dural tear, Dr. Day testified:  "No.  If there's—if I couldn't fix—if I couldn't fix it with suture or with a graft and then prove that nothing's coming with a Valsalva maneuver, then, no, that's not something that anybody would do."[301]  Again, according to Dr. Day, no neurosurgeon in his right mind would place a drain in that situation.[302]  This opinion was clearly given to a reasonable degree of medical certainty.

Considering Dr. Taylor's and Dr. Day's expert testimony (to a reasonable degree of medical certainty) about the use of the Valsalva maneuver and the placement of a drain after a dural tear, Plaintiffs have proved by a preponderance of the evidence that the standard of care requires a doctor to (1) check—either by way of the Valsalva maneuver or reverse Trendelenburg position—that the repair of a dural tear is sufficiently sealed, and (2) not place a drain—whether gravity, negative pressure, or high suction—if the doctor cannot determine that the repair of the dural tear is sufficiently sealed.

## II.     Deviation From the Standard of Care

Plaintiffs must also prove by a preponderance of the evidence that Dr. Bahgat "failed to act in accordance with" the applicable standard of care—i.e., that Dr. Bahgat did not test the sufficiency of the secondary repair's seal, but he nevertheless installed a drain.[303]  Because the Court has found that Dr. Bahgat did not perform the Valsalva maneuver or otherwise test the

---

[300] *Id*. at 730:4–5, 10–11.

[301] *Id*. at 764:7–13.

[302] *See id*. at 764:14–17.

[303] Ark. Code Ann. § 16-114-206(a)(2).

sufficiency of the secondary repair's seal, Plaintiffs have proved by a preponderance of the evidence that Dr. Bahgat failed to act in accordance with the applicable standard of care by placing a JP drain.[304]

Both Dr. Taylor and Dr. Day testified that, to a reasonable degree of medical certainty, the installation of a drain after a secondary repair falls below the standard of care when the seal of the secondary repair has not been tested to see whether the seal was sufficient.  These opinions were clearly made to a reasonable degree of medical certainty.  And even though Dr. Day testified that physician judgment is a part of neurosurgery—particularly in the context of weighing the risks of surgery and the likelihood of more common complications versus less common complications— he did not testify that physician judgment allows a surgeon to place a drain in the absence of a confirmed watertight seal of a dural tear.[305]   Considering this, Plaintiffs have proved by a preponderance of the evidence that Dr. Bahgat failed to meet the standard of care by installing a drain (whether a gravity drain or other type of drain) without first performing the Valsalva maneuver to confirm a watertight seal of the dural tear.

## III.   Proximate Cause

Finally, Plaintiffs must prove (by a preponderance of the evidence) that, "as a proximate result" of Dr. Bahgat's failure to act in accordance with the applicable standard of care, Mr. Dobbs "suffered injuries that would not otherwise have occurred."[306]   "[I]t is not enough for an expert to

---

[304] The Government all but conceded during closing arguments that, if the Court finds that Dr. Bahgat did not perform the Valsalva maneuver or otherwise check the sufficiency of the secondary repair's seal, the Government loses on the standard-of-care and breach issues.  *See* Tr. of Bench Trial (Doc. 48) at 968:1–970:14.

[305] *See* Tr. of Bench Trial (Doc. 47) at 713:12–22.  Again, a watertight seal is possible even with a secondary repair. *See, e.g.*, Tr. of Bench Trial (Doc. 45) at 196:9–23.  When the Valsalva maneuver is used, and no CSF leaks, a watertight seal is confirmed.  *See id.* at 66:3–11.

[306] Ark. Code Ann. § 16-114-206(a)(3).

opine that there was negligence that was the proximate cause of the alleged damages."[307] "The opinion must be stated within a reasonable degree of medical certainty or probability."[308] That standard has been satisfied here.

Under Arkansas law, for a cause to be considered a proximate cause of injury, the cause must be a but-for cause of the injury.[309] However, while that is necessary, it is not sufficient.[310] In addition, there must be a sufficiently tight, legally cognizable nexus between the cause and the injury.[311] In short, a "[p]roximate cause is 'that which in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred.'"[312] That is, Plaintiffs must prove "causation in fact and legal causation."[313]

The Court has already found above—based on the expert medical testimony given to a reasonable degree of medical certainty—that Mr. Dobbs's brain hemorrhage was a direct result of the continuous, post-operative CSF leak, which occurred because of the use of a drain without confirmation of a watertight seal of the intraoperative dural tear. The Court's findings above already satisfy but-for (factual) causation. Without the continuous post-operative CSF leak, there would have been no brain sag and no brain hemorrhage. Legal causation is also satisfied by the Court's previous factual findings. The line from using a drain in the absence of a confirmed

---

[307] *Williamson*, 348 Ark. at 311, 72 S.W.3d at 492.

[308] *Id.*

[309] *See Ford v. St. Paul Fire & Marine Ins. Co.*, 339 Ark. 434, 437, 5 S.W.3d 460, 462–63 (1999) (explaining that the Arkansas Medical Malpractice Act "implements the traditional tort standard of requiring proof that but for the tortfeasor's negligence, the plaintiff's injury or death would not have occurred[]" (internal quotation marks omitted)).

[310] *See* Ark. Code Ann. § 16-114-206(a)(3).

[311] *See id.*

[312] *Dodson v. Charter Behav. Health Sys. of Nw. Ark., Inc.*, 335 Ark. 96, 105, 983 S.W.2d 98, 103 (1998) (quoting *Union Pac. R.R. Co. v. Sharp*, 330 Ark. 174, 181, 952 S.W.2d 658, 662 (1997)).

[313] *Id.*

watertight seal of the dural tear, to the continuous post-operative CSF leak, to the brain sag, to the brain hemorrhage, is short, direct, and unbroken by any intervening cause.  The trial testimony shows this to a reasonable degree of medical certainty.  The Court now turns to damages.

### FINDINGS OF FACT – DAMAGES

1.      When Mr. Dobbs suffered the brain hemorrhage, he was 61 years old.[314]

2.      Mr. Dobbs is a retired United States Marine.[315]  He served in the Marines for 32 years.[316]

3.      While in the Marines, Mr. Dobbs completed multiple combat tours.[317]  He also served as a drill instructor and aircraft structures mechanic.[318]

4.      Mr. Dobbs is married to Eileen Dobbs, and they have been married since June 2015.[319]

5.      Mr. Dobbs first saw Dr. Bahgat about neck and arm pain in June of 2017.[320] Dr. Bahgat ordered physical therapy and a regimen of steroid injections.[321]  Mr. Dobbs returned for a follow-up appointment with Dr. Bahgat in September of 2017 and reported that his neck pain had improved.[322]  But Mr. Dobbs now complained about lower back pain, so Dr. Bahgat ordered imaging and more physical therapy.[323]

---

[314] *See* Tr. of Bench Trial (Doc. 45) at 54:11–12.

[315] *See, e.g.*, Tr. of Bench Trial (Doc. 47) at 576:22.

[316] *See id.*

[317] *See id.* at 577:6–13.

[318] *See* Tr. of Bench Trial (Doc. 48) at 880:19–24.

[319] *See* Tr. of Bench Trial (Doc. 47) at 574:19–24.

[320] *See* Pls.' Trial Ex. 1 at 1709; Tr. of Bench Trial (Doc. 46) at 248:17–24.

[321] *See* Pls.' Trial Ex. 1 at 1709 ("[W]ill order PT and and [sic] ESI and will FU in 3 months . . . .").

[322] *See* Tr. of Bench Trial (Doc. 46) at 250:14–20.

[323] *See id.* at 250:20–25; Pls.' Trial Ex. 1 at 1671.

6.      As reflected in Dr. Bahgat's September 2017 notes, Mr. Dobbs "ha[d] noweakness [sic], no bowel or bladder problems[.]"[324]  Dr. Bahgat's physical exam of Mr. Dobbs showed that Mr. Dobbs was "[a]lert and oriented to person, place" and had "[f]luent comprehensive speech."[325]  Mr. Dobbs had "[n]o dysarthria, no dysphasia[,] CN II-XII grossly intact."[326]  Dr. Bahgat also observed that Mr. Dobbs's "[f]ace [was] symmetric with no mouth droop."[327]  Concerning Mr. Dobbs's motor power and strength, Dr. Bahgat noted that "Right UE 5/5, LE 5/5[,]  [l]eft UE 5/5, LE 5/5[,] [n]ormal tone and bulk bilaterally[,] [c]erebellar function with finger-to-nose testing normal[,] [s]ensation to light touch and pin prick is normal[,] [r]eflex are normal,  [n]egative Babinski sign[,] [g]ait normal, [and] kyphotic posture."[328]  Dr. Bahgat also noted that Mr. Dobbs had an earlier "lumbar decompression" surgery in August 2016.[329]  Dr. Bahgat's assessment of Mr. Dobbs in September 2017 provided:

> X-ray shows L3-4 laminectomy[,] patient has kyphotic posture, will order [a] long spine x-ray to assess his sagital [sic] balance[,] will start PT to help with his muscle stifness [sic] and range of motion since with effort he is able to stnad [sic] up stright [sic] and if needed will order an ESI.  If these maesures [sic] fail will need an MRI to better assess his spinal condition but will wait for now.[330]

The Court finds all these notes to be an accurate reflection of the facts.

7.      Mr. Dobbs returned to Dr. Bahgat in February 2018 for another follow-up appointment.[331]  At that visit, Mr. Dobbs "complain[ed] of constant aching lower lumbar pain in

---

[324] Pls.' Trial Ex. 1 at 1669.

[325] *Id.* at 1670.

[326] *Id.*

[327] *Id.*

[328] *Id.* at 1670–71.

[329] *Id.* at 1669.

[330] *Id.* at 1671.

[331] *See id.* at 1628.

the midline that increases with sitting and relieved partially with standing."[332]   Mr. Dobbs also complained to Dr. Bahgat that the pain sometimes radiated to his inner thigh and groin.[333]   Despite chiropractic adjustments and steroid injections, Mr. Dobbs complained that "[h]is pain ha[d] become increasingly intense[,]" which "affected his day-to-day living and ability to bend[,] sits [sic] and even sleep comfortably."[334]

8.      Based on this, Dr. Bahgat's assessment of, and plan for, Mr. Dobbs was as follows:

Patient's MRI shows multilevel degenerative disc disease with spondylosis and a right L2-3 disc collapse with root compression.  His standing MRI shows a positive sagittal balance of 4-5 cm.

Patient has back pain with significant spondylosis Modic changes at multiple levels. I explained to the patient if his main problem is his leg pain and an L2-3 decompression would help with his radicular pain.  The patient states that his main problem is his back in this case he would require a multilevel fusion.  The patient has not had any recent physical therapy and and [sic] would like to try that prior to having an extensive procedure.

Will plan for physical therapy if that fails then the patient may require an L2-S1 fusion either from a combined anterior and posterior approach O just posterior approach.  Patient will follow up according to his progression with physical therapy.[335]

Mr. Dobbs followed Dr. Bahgat's direction and went to physical therapy.[336]

9.      Mr. Dobbs again saw Dr. Bahgat in July 2018.[337]   By this point, Mr. Dobbs had "tried physical therapy and injections but his pain ha[d] continued to progress."[338]   As the July

---

[332] *Id.*

[333] *Id.*

[334] *Id.*  Dr. Bahgat's observations of Mr. Dobbs's neurological and motor strength characteristics were unchanged from the September 2017 examination, except that Dr. Bahgat now characterized Mr. Dobbs's kyphotic posture as "slight[.]"  *Compare id.*, *with id.* at 1670–71.

[335] *Id.* at 1628.

[336] *See* Tr. of Bench Trial (Doc. 45) at 174:7–17; Pls.' Trial Ex. 1 at 1614.

[337] *See* Pls.' Trial Ex. 1 at 1614.

[338] *Id.*

2018 medical records reflect, Mr. Dobbs's "pain [was] a constant aching pain in his low lumbar region" that radiated into his legs and "affect[ed] his walking standing up all all [sic] activity."[339] But Mr. Dobbs "ha[d] no weakness and no focal deficits."[340]

10.     Mr. Dobbs's pre-surgery "MRI showed multilevel degenerative disc disease with spondylosis and Modic changes at the L2-3 and also extensive changes at L3-4 L4-5 and L5-S1."[341]

11.     Based on the foregoing, before the brain hemorrhage, Mr. Dobbs suffered from some chronic back pain, but otherwise had normal cognitive and neurological functions.  The back pain made some daily activities more difficult and painful, but it did not appear to prevent him from doing the normal activities of daily life.

12.     After the brain hemorrhage, Mr. Dobbs's physical and cognitive abilities were severely diminished.  For example, he had expressive aphasia—i.e., the inability to speak—on the morning after the surgery.[342]   A little over a week later, on October 18th, Mr. Dobbs had spontaneous, non-purposeful movement.[343]   Mr. Dobbs was able to "[f]urrow[] [his] brow to noxious stimuli."[344]   But he did not obey commands.[345]   Mr. Dobbs could not grip with either

---

[339] *Id.*

[340] *Id.*

[341] *See id.* at 1985.

[342] *See id.* at 1540; Tr. of Bench Trial (Doc. 45) at 113:25–114:2.

[343] *See* Pls.' Trial Ex. 1 at 1065, 1076, 1082.

[344] *See id.*

[345] *See id.*

hand.[346]  His right hand was curled tight, and his left hand was flaccid.[347]  As the medical notes say, Mr. Dobbs had a "[n]eurologial impairment due to CVA[.]"[348]

13.    On October 19th, Mr. Dobbs had "some neurological improvement although it [was] fluctuating[.]"[349]  Mr. Dobbs was able to wiggle his toes on command and, in one instance, was able to give a thumbs-up.[350]

14.    On October 20th, Mr. Dobbs was transferred via helicopter to Houston Methodist Hospital, where he was admitted to the neuro-intensive care unit ("NICU").[351]

15.    Upon admission to Houston Methodist Hospital, it was determined that Mr. Dobbs had suffered a frontal intracranial hemorrhage and a bilateral cerebellar intracranial hemorrhage and had acute respiratory failure.[352]  He was in a coma and had to be put on a ventilator.[353]  On October 22nd, doctors at Houston Methodist determined it was necessary to place a feeding tube and perform a tracheotomy.[354]  Although the Court cannot determine from the Houston Methodist medical records when Mr. Dobbs awoke from his coma, the reasonable inference from the evidence is that he awoke well before November 20th.

16.    In any event, Mr. Dobbs underwent a month of treatment at Houston Methodist's NICU before doctors concluded that "admission to inpatient rehabilitation [was] medically

---

[346] See id. at 1055, 1065, 1076, 1082.

[347] See id.

[348] Id. at 1065, 1076, 1082.  "CVA" is a cerebrovascular accident.

[349] Id. at 1017.

[350] See id.

[351] See id. at 953; Pls.' Trial Ex. 6 at 1, 495.

[352] See Pls.' Trial Ex. 6 at 4, 16, 24, 26.

[353] See id. at 16; Pls.' Trial Ex. 1 at 971, 1054.  While at Houston Methodist, Mr. Dobbs developed several additional complications, including a urinary tract infection, a pulmonary embolism, and deep vein thrombosis.  See Pls.' Trial Ex. 6 at 474.

[354] See Pls.' Trial Ex. 6 at 15.

necessary."[355]   On November 20th, Mr. Dobbs was discharged from the NICU and entered

inpatient rehabilitation.[356]   His discharge notes showed that Mr. Dobbs had "gradually

improved . . . ."[357]

17.     Among the goals of Mr. Dobbs's admission to the in-patient rehabilitation program

were to "improve functional independence and decrease caregiver burden[.]"[358]  To accomplish

these goals, Mr. Dobbs would need:

> 24 hour rehabilitation nursing for management of bowel, bladder, skin integrity,
> medication management, safety measures and preventing risk factors and
> complications . . . [and] will require a minimum of 15 hours every 7 days throughout
> the hospitalization, including at least the following:  1-2 hours Physical Therapy,
> 1-2 hours Occupational Therapy and 1 hour Speech-Language pathology,
> Neuropsychology.  These disciplines will be needed in order to improve [Mr.
> Dobbs's] impairments in mobility, transfers, activities of daily living, swallowing
> and cognition and evaluation of durable medical equipment if needed at
> discharge.[359]

18.     On December 12, 2018, Mr. Dobbs was discharged from Houston Methodist's in-

patient rehabilitation and returned to his home in Cotter, Arkansas.[360]  As the discharge notes

showed, Mr. Dobbs was "referred to [r]ehab for extensive therapy services and for further medical

management & close monitoring of his medical condition."[361]

---

[355] *Id*. at 474.

[356] *See id*.

[357] *Id*. at 149.

[358] *Id*. at 487.

[359] *Id*. at 488.

[360] *Id*. at 519.

[361] *Id*. at 513.

## I.      Personal Observations of Mr. Dobbs's Post-Hemorrhage Changes

19.      Mrs. Dobbs testified that, before the brain hemorrhage, Mr. Dobbs was "very strong" and "very physically fit."[362]  Now he is "weaker and very unstable."[363]  The Court credits this testimony and finds it as fact.

20.      However, that is not the whole picture.  Despite Mrs. Dobbs's description of her husband's diminished physical abilities, he still suffered from some physical deficits before his brain hemorrhage.    Mr. Dobbs had chronic back pain (the underlying reason for the laminectomy).[364]  He also suffered from lumbar spondylosis, osteoarthritis, degenerative joint disorder, cervical disc disorder, hypertension, and gastroesophageal reflux disease ("GERD"), and he had problems with neck pain that radiated to his shoulder.[365]  Mrs. Dobbs testified that Mr. Dobbs "had trouble with his hands" before the brain hemorrhage.[366]  He also had problems with his gait, and he was diagnosed with neuropathy before the brain hemorrhage.[367]  As a result, he had some balance issues and problems with falling before he suffered the brain hemorrhage.[368]  He also (at least in 2016) had difficulty walking barefoot and experienced dizziness and light-

---

[362] Tr. of Bench Trial (Doc. 47) at 635:9–13.

[363] *Id*. at 635:14–16.

[364] *See, e.g.*, Tr. of Bench Trial (Doc. 46) at 367:8–10; Tr. of Bench Trial (Doc. 47) at 639:5–17, 670:18–21; Tr. of Bench Trial (Doc. 48) at 824:24–825:1.

[365] *See, e.g.*, Tr. of Bench Trial (Doc. 45) at 249:20–24; Tr. of Bench Trial (Doc. 46) at 367:11–24; Tr. of Bench Trial (Doc. 48) at 825:2–10.

[366] Tr. of Bench Trial (Doc. 47) at 568:13–14.

[367] *See, e.g.*, Tr. of Bench Trial (Doc. 46) at 368:3–4; Tr. of Bench Trial (Doc. 47) at 568:12; Tr. of Bench Trial (Doc. 48) at 825:11–12.

[368] *See, e.g.*, Tr. of Bench Trial (Doc. 46) at 368:5–7; Tr. of Bench Trial (Doc. 48) at 825:13–15; Pls.' Trial Ex. 1 at 1805.

headedness when standing.[369]   And on top of all that, he suffered from general high levels of pain.[370]   Again, all of this was before the brain hemorrhage.

21.     As Mrs. Dobbs testified, Mr. Dobbs likes to fish, and the two of them used to go out on their boat together every week.[371]   They would also hike through the woods on their property and ride four-wheelers around the neighboring properties.[372]

22.     After the brain hemorrhage, Mr. Dobbs can no longer fish or go out on his boat.[373] The one instance when Mr. Dobbs tried to take his boat out after his brain hemorrhage "turned into a disaster[,]" and Mr. Dobbs's daughter's boyfriend had to "jump into the driver's seat . . . ."[374] Mr. Dobbs has not attempted to drive the boat since this incident because Mrs. Dobbs "won't let him."[375]

23.     Nor can Mr. and Mrs. Dobbs go on walks or hikes around their property anymore.[376] Mrs. Dobbs credibly testified that, after the brain hemorrhage, Mr. Dobbs "can't do it anymore [because] [h]e doesn't have the balance . . . [and] [their] land is not flat . . . ."[377]   Mrs. Dobbs credibly explained that "even if there's a rock on the road, [Mr. Dobbs] can trip over that."[378]

---

[369] *See* Pls.' Trial Ex. 1 at 1821–22.

[370] *See, e.g.*, Tr. of Bench Trial (Doc. 46) at 368:8–10; Tr. of Bench Trial (Doc. 48) at 825:16–17.  Mr. Dobbs also had an earlier back surgery and knee replacement in 2016, and an arthroscopy of his right shoulder in 2017.  Tr. of Bench Trial (Doc. 47) at 586:14–22; Tr. of Bench Trial (Doc. 48) at 826:19–827:2.

[371] *See* Tr. of Bench Trial (Doc. 47) at 580:15–581:5.

[372] *See id.* at 584:22–585:5, 635:17–25.

[373] *See id.* at 581:17–582:1.

[374] *Id.* at 582:4–10.

[375] *Id.* at 582:18–22.

[376] *Id.* at 636:7–9.

[377] *Id.* at 636:11–13.

[378] *Id.* at 636:14–15.

24.    Mr. Dobbs has stopped driving his tractor around his nine-acre property since his brain hemorrhage.[379]  While he has been able to drive his four-wheeler "down to get the mail and drive it back up[,]" he does not drive the four-wheeler around their property (or any of the neighboring property) like he used to do.[380]  He has, however, visited his neighbor "once in a while on his four-wheeler . . . ."[381]

25.    A neurologist signed off on Mr. Dobbs driving a car.[382]  But Mrs. Dobbs testified that she doesn't believe Mr. Dobbs is capable of driving safely.[383]  She explained at trial that:

> You need to be able to do several different things as you're driving, and his focus is not clear, and I think, you know, I mean, you're holding a steering wheel, you're looking out the window, you're looking in all your mirrors, brake, you know, all that.  I think that's really difficult for him to handle.[384]

Mrs. Dobbs's concerns notwithstanding, Mr. Dobbs still drives alone maybe once or twice a week.[385]  Typically, Mr. Dobbs drives "[j]ust to town and back, about 12 miles on a back road, country road."[386]

26.    Since the brain hemorrhage, Mrs. Dobbs has ridden in a vehicle with Mr. Dobbs while he was driving.[387]  She testified that the experience was "[s]cary" because "he kinda swerves a little bit here and there . . . drives a little too fast . . . [and] [she's] always worried whether or not

---

[379] *See id*. at 584:21–22.  Mrs. Dobbs testified that Mr. Dobbs "loves his tractor[,]" and it's his "favorite little toy." *Id*. at 584:10–11.

[380] *Id*. at 584:22–585:5.  The Court finds that any gait issues or pain Mr. Dobbs had prior to the brain hemorrhage did not prevent him from taking such walks or hikes.

[381] *Id*. at 572:5.

[382] *See id*. at 648:23–25.

[383] *See id*. at 649:1–9.

[384] *Id*. at 649:4–9.

[385] *See id*. at 650:20–25.

[386] *Id*. at 651:1–3.

[387] *See id*. at 649:10–12.

he's going to hit the brake in time."[388]  The Court finds that, for now, Mr. Dobbs can drive a car. But the Court also finds that he does so less frequently, less safely, and less enjoyably than he did before the brain hemorrhage.[389]

27.     Based on these facts, the Court finds that Mr. Dobbs can physically drive several types of vehicles, but it is far more difficult and dangerous for him to do so than it was before the brain hemorrhage.  This is the reason he limits his use of the vehicles.

28.     As Mrs. Dobbs testified, Mr. Dobbs loves gardening, and it is one of his favorite things to do.[390]  Before the brain hemorrhage, Mr. Dobbs had planted trees and a garden on the Dobbs' property, and "he took care of it immaculately."[391]  Before the brain hemorrhage, Mr. Dobbs and his neighbor Mr. Hussey felled trees, worked in each other's yards, and split wood together.[392]  They also "moved a bunch of boulders around and made a big fire pit."[393]

29.     Mrs. Dobbs testified, and the Court finds as fact, that gardening has become "dangerous" for Mr. Dobbs since the brain hemorrhage.[394]  It is now "more of a trip hazard than enjoyable."[395]  Mrs. Dobbs credibly recounted one instance when Mrs. Dobbs found Mr. Dobbs in the garden "literally laying facedown with his arms stuck behind his back, with the hose right in

---

[388] *Id*. at 649:14–19.

[389] The Court also finds that any medical problems present before the brain hemorrhage did not affect Mr. Dobbs's ability to drive any vehicle normally or safely.

[390] *See id*. at 578:23–579:1.

[391] *See id*. at 571:13–14.

[392] *Id*. at 564:17–18, 569:9–11.

[393] *Id*. at 564:20.  Again, whatever gait issues or pain Mr. Dobbs had before the brain hemorrhage, they did not interfere with his ability to garden or work outdoors.  *See, e.g.*, *id*. at 571:13–14.

[394] *Id*. at 579:4–5.

[395] *Id*. at 579:5–7.

his face."[396]   Since that incident, "[h]e's not allowed to go anywhere near the hose, because . . . it's just hazardous for him."[397]

30.      Mr. Hussey hasn't split any wood with Mr. Dobbs since Mr. Dobbs returned from the hospital.[398]   Indeed, as of the time of the trial, Mr. Hussey and another neighbor have had to do some of the yardwork for the Dobbses that Mr. Dobbs would have done in the past.[399]

31.      Before he suffered the brain hemorrhage, Mr. Dobbs had taken up the hobby of woodworking.[400]  Some of the fruits of his woodworking hobby were birdhouses, a chicken coop, and decorations for his home.[401]

32.      Mr. Dobbs has attempted to do some woodworking since the brain hemorrhage, but that endeavor resulted in him cutting his hand open with the saw.[402]   He has not tried to do any woodworking since he cut his hand because Mrs. Dobbs "won't let him."[403]

33.      As Mr. Hussey credibly testified, he and Mr. Dobbs joined a group called the Crosstrail Outfitters several years before Mr. Dobbs's brain hemorrhage.[404]   The group worked with young boys and girls, and Mr. Dobbs used his military experience to teach them about firearm safety.[405]   Additionally, Mr. Hussey also credibly testified that before Mr. Dobbs suffered the brain

---

[396] *Id*. at 579:21–23.

[397] *Id*. at 580:8–10.

[398] *Id*. at 569:12–17.

[399] *Id*. at 568:23–569:8.

[400] *See id*. at 630:14–631:4.

[401] *See id*. at 630:22–631:4.

[402] *See id*. at 631:7–19.

[403] *Id*. at 631:20–24.

[404] *See id*. at 564:20–25.

[405] *See id*. at 564:20–565:5.

injury, he and Mr. Dobbs would go on hog hunts, fishing trips, and camping outings together.[406] There's no suggestion in the record that Mr. Hussey does any of these things with Mr. Dobbs now. And there's no suggestion in the record that Mr. Dobbs does any of these things now on his own or with others—certainly not to the extent he did before the brain hemorrhage. To be complete, there's nothing in the record to suggest that Mr. Dobbs doesn't do any of these things now. But, that is a reasonable inference from the rest of the evidence. In any event, Mr. Hussey's credible testimony concerning what he and Mr. Dobbs did together before the brain hemorrhage is helpful evidence to round out the picture of who Mr. Dobbs was and how he socialized before the brain hemorrhage.

34.     As Mr. Hussey credibly testified, Mr. Dobbs was very structured and organized.[407] This was reinforced by Mrs. Dobbs, who credibly testified that "[e]verything" with her husband was "neat and tidy, meticulous."[408] When asked how Mr. Dobbs was at managing multi-tasking before his brain hemorrhage, Mrs. Dobbs credibly testified that "[h]e could pretty much do just about anything. He could . . . do a whole bunch of different things all at once."[409] She credibly testified that he was a self-sufficient man.[410] The Court finds all this as fact.

35.     Things have been different since the brain hemorrhage. Now, Mr. Dobbs "leaves everything kinda messy[,]" and Mrs. Dobbs has to pick up after him.[411] Before the brain hemorrhage, Mr. Dobbs would shower every day and sometimes twice a day.[412] Now, he usually

---

[406] *See id.* at 565:11–21.

[407] *See id.* at 573:12–14.

[408] *Id.* at 624:6–7.

[409] *Id.* at 624:19–22.

[410] *See id.* at 631:25–632:2.

[411] *Id.* at 625:16–21.

[412] *See id.* at 624:9–11.

only showers once a week.[413]  When Mr. Dobbs has tried to do laundry, he has been unable to turn

the dryer on.[414]  Relatedly, even though Mr. Dobbs was once "the griller of the house[,]" there

have been several instances since the brain hemorrhage when he has forgotten to turn the heat off

after he has cooked something.[415]

36.     Since the brain hemorrhage, Mrs. Dobbs must help her husband get dressed in the

morning because "he has a really hard time putting socks and shoes on and putting his feet, like,

into pants and stuff like that."[416]

37.     In the same vein, Mrs. Dobbs credibly testified that she now has to be careful with

her husband everywhere they go.[417]  She credibly explained that, "if [they] go to the grocery store,

to keep him in check, he's the one that's pushing the cart.  And sometimes he can stay in the aisle,

and sometimes he'll just, like, sway over, you know, and I kinda hold the front of it and kinda

guide it along sometimes."[418]  There is no suggestion that similar caution was required before the

brain hemorrhage.

38.     Whenever the Dobbses leave their home, Mrs. Dobbs is "always scoping out where

[they're] going, where [they're] walking, if there's steps, if there's something to hold on to [sic],

---

[413] *See id*. at 624:12–18.

[414] *See id*. at 633:13–25.

[415] *Id*. at 634:13–635:8.

[416] *Id*. at 626:24–627:2.  As noted in paragraph 75, *infra*, one of the expert witnesses testified that Mr. Dobbs could dress himself with the exception of being able to put on his socks or shoes.  *See* Tr. of Bench Trial (Doc. 48) at 830:6–10.  There is no real conflict between this testimony and Mrs. Dobbs's testimony.  Both the expert witness and Mrs. Dobbs say that Mr. Dobbs can't put on his socks and shoes by himself.  *See* Tr. of Bench Trial (Doc. 47) at 626:24–627:2; Tr. of Bench Trial (Doc. 48) at 830:6–10.  And while Mr. Dobbs may be physically able to put on his pants, that does not mean it is not a difficult task for him—one for which he often seeks help from Mrs. Dobbs.  *See* Tr. of Bench Trial (Doc. 47) at 626:24–627:2.

[417] *See* Tr. of Bench Trial (Doc. 47) at 636:15–19.

[418] *Id*. at 636:22–637:1.

if there's any kind of trip thing that [Mr. Dobbs] might trip on."[419]  And "sitting is a big thing."[420]

Mr. Dobbs must always have a stable chair to sit in.[421]  The chair can't roll or be too light, and it

must have arms so he can get himself up.[422]

39.     Mrs. Dobbs also credibly testified that, before the brain hemorrhage, her husband

was "brilliant at math."[423]  It's not clear what brilliant means in her testimony, but the Court finds

that Mr. Dobbs was competent in math before the brain hemorrhage.  After the brain hemorrhage,

Mr. Dobbs "can barely add or subtract . . . ."[424]  Nor can he make any financial decisions.[425]

40.     Mrs. Dobbs testified that he used to be "very outgoing and loved to talk with

people" and "very much" liked to spend time with his friends and family.[426]  While the record

suggests that might be a bit of an overstatement, the Court does find that Mr. Dobbs was able to

socialize (within normal limits) before the brain hemorrhage.[427]  Since the brain hemorrhage, Mr.

Dobbs keeps to himself, and "it's very hard for him to follow along in a conversation and to

participate . . . in what we're talking about."[428]  Combined with the findings of fact made in

Paragraph 33 above, the Court finds Mrs. Dobbs's observations of how her husband has changed

socially to be credible.

---

[419] *Id*. at 627:19–22.

[420] *Id*. at 627:22.

[421] *See id*. at 627:22–23.

[422] *See id*. at 627:23–628:1.

[423] *Id*. at 625:9.

[424] *See id*. at 625:11.

[425] *See id*. at 634:5–7.

[426] *Id*. at 625:22–626:1.

[427] As Mr. Hussey credibly testified, he and Mr. Dobbs had "been in each other's face" before the brain hemorrhage. *Id*. at 570:20–21.  Also, there is some evidence of mood problems in Mr. Dobbs's pre-brain-hemorrhage history.  *See, e.g.*, Tr. of Bench Trial (Doc. 46) at 375:2–11.

[428] Tr. of Bench Trial (Doc. 47) at 626:3–7.

41.     Before the brain hemorrhage, Mr. and Mrs. Dobbs had an intimate sexual relationship on a regular basis.[429]  But since his brain hemorrhage, the Dobbses have not been able to enjoy that type of relationship.[430]  Mrs. Dobbs testified that, despite attempts to do so, it's very difficult for them and "just doesn't work."[431]  The Court finds this as a fact—specifically, that the Dobbs' intimate sexual relationship has significantly suffered (if not entirely ended) since the brain hemorrhage.

42.     Mr. Hussey credibly testified that Mr. Dobbs is "180-degree[s] different . . . he's not the same person."[432]  Mr. Hussey credibly testified that Mr. Dobbs "remembers things, but not like with the clarity that he did before.  And his emotions are—he's more—he was kinda combative before because of his military experiences . . . [a]nd now it's, he's just not the same person.  It's a personality change for me, you know.[433]  According to Mr. Hussey, Mr. Dobbs was "a strong[,] opinionated guy" before the brain hemorrhage, but "[n]ot so much now."[434]  The Court finds all this as fact.

43.     Mrs. Dobbs's testimony about Mr. Dobbs's emotional capacity after his hemorrhage was similar.  For example, she credibly testified that Mr. Dobbs no longer has an identity.[435]  He wonders what he is good for and why he is here.[436]  Mr. Dobbs used to never stop working from the time he woke up until it was time for dinner.[437]  "[He] was always busy and

---

[429] *See id*. at 629:25–630:4.

[430] *See id*. at 630:5–7.

[431] *See id*. at 630:8–12.

[432] *Id*. at 569:22–570:1.

[433] *Id*. at 570:1–8.

[434] *Id*. at 570:21–22.

[435] *See id*. at 637:23.

[436] *See id*. at 637:25.

[437] *See id*. at 637:12–21.

active and doing something physical."[438]  But now, "he watches TV a lot during the day."[439]  She

credibly testified that she believes "he's kind of almost given up . . . ."[440]  Nevertheless, Mr. Dobbs

is still able to help around the house some.[441]  For example, he can still fill the bird feeders, and he

can retrieve the mail.[442]  The Court finds all this as fact.  The Court acknowledges that there is

evidence that Mr. Dobbs had some mood and emotional problems before the brain hemorrhage.

But the evidence does not suggest those problems ever caused him to act in the way he has acted

since the brain hemorrhage, as described in this paragraph and the preceding paragraph.

## II.    Expert Opinions Concerning Mr. Dobbs's Post-Hemorrhage Changes

44.    Dr. Moore was called by Plaintiffs as an expert witness to explain the effects of

Mr. Dobbs's brain hemorrhage and to consider Mr. Dobbs's neurological status pre- and post-

hemorrhage.[443]

45.    In reviewing Mr. Dobbs's pre-hemorrhage medical records, Dr. Moore testified that

Mr. Dobbs suffered from no cognitive impairments before his brain hemorrhage.[444]  The Court

finds Dr. Moore's testimony on this point highly credible and accepts it as fact.  Among other

things, this is consistent with Dr. Bahgat's pre-hemorrhage impressions of Mr. Dobbs,

Mrs. Dobbs's pre-hemorrhage impressions of Mr. Dobbs, Mr. Hussey's pre-hemorrhage

impressions of Mr. Dobbs, and Mr. Dobbs's pre-hemorrhage medical records as a whole.

---

[438] *Id*. at 637:20–21.

[439] *See id*. at 632:8–9.

[440] *Id*. at 632:7–8.

[441] *See id*. at 632:9.

[442] *See id*. at 584:22–23, 632:9–11.

[443] *See generally* Tr. of Bench Trial (Doc. 46) at 330:1–384:1.  Dr. Moore was accepted as an expert in neurology without objection.  *See id*. at 329:19–24.  Because Dr. Moore is not a neurosurgeon, he did not render standard-of-care opinions.  *See id*. at 365:12–16.

[444] *See id*. at 330:1–4.

46.     Dr. Moore did acknowledge that pre-hemorrhage medical records suggested that Mr. Dobbs suffered from PTSD, mood disorders, opioid addiction, suspected bipolar disorder (otherwise known as manic depressive disorder), irritability, emotional outbursts, cluster B disorder, and difficulty concentrating.[445]  It does not appear to the Court that Mr. Dobbs was ever formally diagnosed with ADHD (despite receiving an on-and-off prescription for Adderall before the hemorrhage).[446]  Nor was he formally diagnosed with PTSD.[447]  The formal diagnosis and treatment of the other suggested disorders is also unclear.[448]  Given the state of the record—including the absence of formal diagnoses—the Court does not find that Mr. Dobbs had specific disorders like PTSD, ADHD, or bipolar disorder prior to (or after) the hemorrhage.  But the Court can and does find that Mr. Dobbs had some unspecified behavioral and emotional issues before the hemorrhage.  The Court further finds those issues were serious enough to be observable, but not so bad as to significantly interfere with Mr. Dobbs's daily life.

47.     Dr. Moore conducted an in-person physical examination of Mr. Dobbs in November 2021.[449]  At the time of the examination, Mr. Dobbs's "gait was a bit unsteady[]" and "[h]e wasn't that talkative."[450]  Additionally, Mr. Dobbs "had some short-term memory deficit[,]" as well as "some asymmetry of his reflexes on the right compared to the left."[451]  And he (and his

---

[445] *See id.* at 368:17–378:6.  The records do note that Mr. Dobbs was "not agreeable" to taking psychiatric medication. *See id.* at 375:12–15; Pls.' Trial Ex. 1 at 1959.

[446] *See* Tr. of Bench Trial (Doc. 46) at 381:10–383:17; Tr. of Bench Trial (Doc. 48) at 866:3–5, 868:5–21; Pls.' Trial Ex. 1 at 1959–62.

[447] *See* Tr. of Bench Trial (Doc. 48) at 866:5–6, 869:2–874:14; Pls.' Trial Ex. 1 at 1951–54.

[448] *See generally* Tr. of Bench Trial (Doc. 46) at 368:17–383:17; Tr. of Bench Trial (Doc. 48) at 869:2–874:14; Pls.' Trial Ex. 1 at 1951–56, 1958–62.

[449] *See* Tr. of Bench Trial (Doc. 46) at 355:12–18.

[450] *Id.* at 355:19–22.

[451] *Id.* at 356:15–16.

wife) complained to Dr. Moore of balance issues that had gotten worse since the hemorrhage.[452] Dr. Moore credibly opined that all of the foregoing was consistent with the hemorrhagic injury Mr. Dobbs suffered.[453]  The Court finds this testimony highly credible and accepts it as fact.[454]

48.     In forming his opinions, Dr. Moore also reviewed a report prepared by another of Plaintiffs' experts, Dr. Joyce.  Dr. Joyce's report will be discussed in more detail below, but essentially the report provides evaluation and testing showing that Mr. Dobbs's post-hemorrhage intellectual functioning is quite low.  Dr. Moore credibly opined that Dr. Joyce's report "tied things together nicely, based on what we saw on his neuroimaging, what his family reported, and then what Dr. Joyce found."[455]  Dr. Moore credibly opined that the IQ scores on Dr. Joyce's reports would be entirely incompatible with Mr. Dobbs's academic history and military career.[456] Dr. Moore further credibly opined that Mr. Dobbs's cognitive and intellectual decline was due to the brain hemorrhage.[457]

49.     Dr. Moore also credibly opined that Mr. Dobbs's intellectual and cognitive impairments affect his quality of life and activities of daily living.[458]  According to Dr. Moore, as a result of the brain hemorrhage (and to a reasonable degree of medical certainty), Mr. Dobbs is not able to live independently, make complex financial decisions, or handle tasks like grocery

---

[452] The Court does not use this testimony for the truth of the matter asserted, but rather as information Dr. Moore relied on in forming his expert opinions.

[453] *See id*. at 358:12–359:24.

[454] Dr. Moore acknowledged that Mr. Dobbs had neuropathy and had fallen on several occasions before the hemorrhage.  *See id*. at 359:3–12.  However, Dr. Moore credibly opined that, whatever small balance issues there might have been prior to the hemorrhage, the hemorrhage was the culprit of the more serious balance issues Mr. Dobbs has now.  *See id*. at 359:13–19.

[455] *See id*. at 360:6–8.

[456] *See id*. at 360:9–16.

[457] *See id*. at 361:4–6.

[458] *See id*. at 361:7–10.

shopping or meal preparation without assistance.[459]   The Court finds this credible and accepts it as fact.

50.     In light of these deficits, Dr. Moore testified that Mr. Dobbs would potentially benefit from ongoing therapy and cognitive rehabilitation.[460]   But Dr. Moore also testified that, to a reasonable degree of medical certainty, Mr. Dobbs's "ability to improve is limited."[461] Accordingly, Mr. Dobbs will more likely than not need lifelong assistance with activities of daily living.[462]   The Court finds this credible and accepts it as fact.

51.     Dr. Joyce was called as an expert witness by Plaintiffs to testify about the neuropsychological evaluation he conducted over the course of two days in January 2022.[463]   The evaluation lasted about five hours on the first day and three hours on the second day, but there were multiple breaks for Mr. Dobbs to "recharge in between the testing."[464]   The evaluation consisted of 12 tests, with many of these tests having multiple subtests.[465]   These tests are objective, standardized tests.[466]   They have been peer reviewed and have undergone validity and

---

[459] See id. at 361:11–25.

[460] Id. at 362:1–7, 363:13–18.

[461] Id. at 363:19–21.

[462] See id. at 363:25–364:4.

[463] See generally id. at 385:1–419:15.  The Court accepted Dr. Joyce as an expert witness without objection.  See id. at 386:7–11.  By his own admission, he was not qualified to testify about the neurosurgical standard of care or medical causation.  See id. at 421:4–10.

[464] See Tr. of Bench Trial (Doc. 46) at 388:5–10.

[465] Id. at 387:25–388:2.  The Government objected to the admission of a summary of these test results as evidence, which this Court sustained in part.  See id. at 389:5–392:20.  Dr. Joyce was allowed to use the summary as a demonstrative, but the Court did not admit the document itself as evidence.  See id. at 392:14–20.

[466] See id. at 388:25.

reliability studies.[467]  Broadly, they test a subject's intellectual functioning, learning and memory, attention, and executive functioning.[468]

52.    The first evaluation that Dr. Joyce testified about was the Wechsler Adult Intelligence Scale.[469]  This test evaluates verbal comprehension, perceptual reasoning, working memory, and processing speed.[470]  These four categories are measured by index scores, which are reflected by percentages—or, more specifically, percentiles in comparison to similar individuals in Mr. Dobbs's age group.[471]  Mr. Dobbs scored in the eighth percentile in the IQ test—i.e., "he performed better than only eight percent of the individuals in the normal sample."[472]  His "full-scale IQ" was 79, while his verbal comprehension IQ, perceptional reasoning, working memory index, and processing speed index scores were 89, 82, 86, and 74, respectively.[473]

53.    Dr. Joyce testified that:

Knowing what I know about [Mr. Dobbs] and his background, having obtained bachelor's degrees, his work history is all consistent with an individual that has a much higher IQ than that.  It's consistent with somebody that has an IQ certainly within the average range.  So this is significantly below what would be expected.[474]

The Court finds this portion of Dr. Joyce's opinion credible and accepts it as fact.

54.    Dr. Joyce also testified that he was able to gauge what Mr. Dobbs's pre-hemorrhage IQ was by testing Mr. Dobbs's premorbid functioning.[475]  This test "involves using a person's

---

[467] *See id.* at 388:14–20.

[468] *See id.* at 393:2–9.

[469] *See id.* at 393:14–15.

[470] *See id.* at 393:14–18.

[471] *See id.* at 393:14–394:10.

[472] *Id.* at 394:11–15.

[473] *Id.* at 395:20–396:3.

[474] *Id.* at 394:16–22.

[475] *See id.* at 394:23–395:3.

ability to pronounce unfamiliar words."[476]   Mr. Dobbs's premorbid functioning test results revealed a range of 99 to 101 in the various index areas.[477]   The Court is far less certain of the propriety, effectiveness, and reliability of this test.   The Court found Dr. Joyce's explanation of this backward-looking test confusing, unpersuasive, and somewhat unsupported.   Accordingly, the Court finds that it does not know a specific pre-hemorrhage IQ (or even a specific range) for Mr. Dobbs.   Nonetheless, the Court finds that it is more likely than not—given Mr. Dobbs's academic history and military career, as well as the impressions conveyed by those who knew him before his brain hemorrhage—that Mr. Dobbs's pre-hemorrhage IQ was significantly higher than it was after the brain hemorrhage.

55.   To reiterate, Dr. Joyce did not base his gauge of Mr. Dobbs's pre-hemorrhage cognitive capacity on IQ alone.[478]   As alluded to above, he considered Mr. Dobbs's educational and vocational background.[479]   And Dr. Joyce also considered the fact that no mental health professionals had identified any significant neurocognitive problems with Mr. Dobbs before he suffered the brain hemorrhage.[480]   The Court finds this portion of the opinion highly credible and adopts it as fact.

56.   The next test Dr. Joyce administered was the California Verbal Learning Test.[481] This test is a measure of "word list learning, and it provides an overall measure of learning, as well

---

[476] *Id*. at 395:14–15.  As part of the premorbid functioning test, the subject is given a set of 50 different words, which he's asked to pronounce.  *See id*. at 397:3–5.  Unless there is a "catastrophic injury," a person's ability to pronounce words is one of the last skills he will lose.  *Id*. at 397:25–398:2.  This is because pronunciation is both overlearned and learned very early in life.  *See id*. at 398:2–4.  As Dr. Joyce testified, this makes the ability to pronounce words a good way to gauge someone's earlier functioning.  *See id*. at 398:4–6.

[477] *See id*. at 396:9–10.

[478] *See id*. at 398:12–16.

[479] *See id*. at 398:18–399:11.

[480] *See id*. at 399:12–21, 401:2–8.

[481] *See id*. at 401:12–13.

as measures of memory recall and memory recognition."[482]  Mr. Dobbs's overall learning score was in the second percentile compared to individuals of a similar age.[483]  Dr. Joyce testified that this score "is much, much lower than we would expect based on [Mr. Dobbs's] background."[484] The Court finds this highly credible and adopts it as fact.

57.     The California Verbal Learning Test also showed that Mr. Dobbs was in the 16th percentile for short delay free recall, which is a measure of a person's immediate verbal memory.[485] This score was "somewhat lower than [Mr. Dobbs's] peers," but "wasn't a terrible score by any means."[486]  The Court finds this highly credible and adopts it as fact.

58.     The next sub-score was for long delay free recall, in which Mr. Dobbs scored in the eighth percentile.[487]  According to Dr. Joyce, this indicated that Mr. Dobbs had "lost significant amounts of information" over a period of about 25 minutes.[488]  Simply put, Mr. Dobbs "was not able to efficiently recall the information."[489]  The Court finds this highly credible and adopts it as fact.

59.     On the final part of the California Verbal Learning Test—the forced choice recognition score—Mr. Dobbs scored 100 percent.[490]  In this test, a person is required to identify two words that he previously saw on a list of words.[491]  Dr. Joyce explained that the 100-percent

---

[482] *Id.* at 401:13–16.

[483] *See id.* at 401:19–21.

[484] *Id.* at 401:21–22.

[485] *See id.* at 401:24–402:2.

[486] *Id.* at 401:25–402:2.

[487] *See id.* at 402:3.

[488] *Id.* at 402:4–6.

[489] *Id.* at 402:6–7.

[490] *See id.* at 402:10–11.  This score measures Mr. Dobbs's ability to "recogniz[e] a word he previously saw."  *Id.* at 402:11–12.

[491] *See id.* at 402:11–14.

score meant that Mr. Dobbs does not have any primary memory deficit.[492]  Instead, Mr. Dobbs's "problem is much more consistent with source memory deficits associated with frontal systems damage."[493]  The Court finds this highly credible and adopts it as fact.  The Court also notes that Mr. Dobbs's brain bleed occurred in or around his frontal lobe.[494]

60.     Dr. Joyce credibly testified that these scores from the Wechsler Adult Intelligence Scale and California Verbal Learning Test show that Mr. Dobbs is "not going to be able to easily learn new things."[495]  And for those things he has been previously exposed to, he is liable to forget them.[496]  Dr. Joyce credibly explained that this can be a safety issue for Mr. Dobbs, insofar as he can forget what he is doing—e.g., leaving propane on—and he can lose track of things he needs to do—e.g., going to appointments.[497]  The Court finds this highly credible and adopts it as fact.

61.     Dr. Joyce also tested several aspects of Mr. Dobbs's attention.[498]  First, Dr. Joyce tested Mr. Dobbs's ability to complete timed tasks with speed and accuracy.[499]  When Mr. Dobbs didn't make errors on any of the tasks, he performed much slower than the control group.[500]  Conversely, when Mr. Dobbs completed the timed tasks at the same speed as his peers in the control group, "he had an incredibly high number of errors."[501]  Dr. Joyce determined that these

---

[492] *See id.* at 402:15–19.

[493] *Id.* at 402:20–403:1.

[494] *See id.* at 330:12–16, 343:17–20, 402:20–403:1, 409:10–16; Tr. of Bench Trial (Doc. 48) at 845:10–12.

[495] Tr. of Bench Trial (Doc. 46) at 403:2–19.

[496] *See id.* at 403:20–21.

[497] *See id.* at 403:22–404:4.

[498] *See id.* at 404:11.

[499] *See id.* at 404:11–16.

[500] *See id.* at 404:16–18.

[501] *Id.* at 404:22–24.  Mr. Dobbs's scores were in the second percentile, which shows that "he had a bunch of errors, bunch of mistakes on those tests."  *Id.* at 404:25–405:3.

scores were not attributable to any pre-existing attention deficit issues that Mr. Dobbs may have had.[502]  The Court finds this highly credible and adopts it as fact.

62.     As with the intelligence test results, Dr. Joyce credibly explained that these poor test results raise safety concerns for Mr. Dobbs.   For example, in an emergency situation, Mr. Dobbs is going to do one of two things:  either he will fail to respond quickly enough, or he will respond in the wrong way.[503]

63.     The next test Dr. Joyce administered was the executive function test.[504]  This test evaluated Mr. Dobbs's working memory, which is the ability to retain information for a very brief period of time—usually 30 seconds or less.[505]  The test is comprised of several subtests.

64.     The first subtest of the executive function test evaluated Mr. Dobbs's ability to remember a sequence of numbers, both backwards and forwards.[506]  Mr. Dobbs "had mild deficit scores in those areas."[507]  The Court finds this highly credible and adopts it as fact.

---

[502] See id. at 405:14–25.  For example, as Dr. Joyce testified, although people with ADHD score less than one standard deviation lower than the control group, Mr. Dobbs scored "well over one and a half or even two standard deviations lower than you would expect." Id. at 405:20–25.  Similarly, while Dr. Joyce acknowledged that there is some research that supports the theory that untreated depression can affect attention (as well as other aspects of the testing that Dr. Joyce did), the Court finds that, as Dr. Joyce testified, there is also research that supports a contrary conclusion. See id. at 425:8–426:2.  Thus, this is an open question.  See id.  Given this, the Court finds that it is more likely than not that any emotional or behavioral problems Mr. Dobbs may have had before the brain hemorrhage—such as PTSD, ADHD, bipolar disorder, depression, etc.—did not meaningfully affect his scores on Dr. Joyce's testing.  Any effect was more likely than not negligible.   The only exception is for the short-term memory testing.  There, Dr. Joyce acknowledged clearly that untreated depression can negatively affect short-term memory.  See id. at 425:25–426:2.  Still, in light of all the other evidence in the record, it is more likely than not that any pre-hemorrhage depression was not the main culprit of Mr. Dobbs's short-term-memory-related deficits.   It is more likely than not that any depression-related effect to short-term memory testing was slight (if it was more than negligible).

[503] See id. at 405:4–13.

[504] See id. at 406:2–3.

[505] See id. at 406:7–9.

[506] See id. at 406:11–14.

[507] Id. at 406:14.

65.     The second subtest—the auditory consonant trigrams test—"measures real world-type working memory."[508]   In other words, it measures how well the subject can remember something when getting interrupted by something else.[509]   Mr. Dobbs scored "from the third percentile to well below the first percentile at various timeframes[,]" which were measured at 9, 18, and 36 seconds.[510]   Dr. Joyce credibly testified that this "indicates a very severe working memory deficit."[511]   The Court finds this highly credible and adopts it as fact.

66.     A third subtest evaluated Mr. Dobbs's verbal fluency—i.e., whether Mr. Dobbs can spontaneously produce verbal information.[512]   He initially scored a mild deficit, but "[w]ith added complexity," Mr. Dobbs's scores fell below the first percentile.[513]   The Court finds this highly credible and adopts it as fact.

67.     The Tower of London Test—which tested whether Mr. Dobbs could solve a planning problem—returned "okay" scores for Mr. Dobbs.[514]   But "he required more time than 99 percent of the people in his age group."[515]   Dr. Joyce credibly opined that this meant Mr. Dobbs "could solve a planning problem, but it just took him an incredibly long time."[516]   The Court finds this highly credible and adopts it as fact.

---

[508] *Id.* at 406:18–20.

[509] *See id.* at 406:20–23.

[510] *Id.* at 406:24–407:2.

[511] *Id.* at 407:2–3.

[512] *See id.* at 407:9–11, 20–22.

[513] *Id.* at 407:22–408:2.

[514] *See id.* at 407:14–19.

[515] *Id.* at 407:17–18.

[516] *See id.* at 407:18–19.

68.     Here again, Dr. Joyce credibly testified that these scores have safety implications for Mr. Dobbs.[517]  As Dr. Joyce testified, in an unexpected emergency situation, Mr. Dobbs is "much more at risk to not initially know what to do."[518]  It may take him ten minutes to figure out what to do, at which point it could be too late to appropriately respond.[519]

69.     As Dr. Joyce also testified, Mr. Dobbs's executive learning and working memory deficits can result in daily inconveniences, such as losing different items repeatedly and having difficulty carrying on a conversation.[520]

70.     Dr. Joyce credibly testified that, to a reasonable degree of neuropsychological certainty, "[t]hese results are consistent in multiple ways with the primary areas of damage [Mr. Dobbs] had from the hemorrhages . . . ."[521]  And, as explained above, as Dr. Joyce testified and as the rest of the record reveals, these results were not in any meaningful way attributable to any of Mr. Dobbs's pre-existing conditions.[522]  Instead, the Court finds that "these deficits are very likely directly related to the hemorrhages and brain injuries [Mr. Dobbs] had in 2018 . . . [and] the deficits that he has are likely to be permanent in nature."[523]

71.     The Government called Dr. Tremwel as an expert witness to testify about Mr. Dobbs's post-hemorrhage cognitive and physical abilities.[524]  Like Dr. Joyce, she too evaluated Mr. Dobbs and administered a battery of tests to evaluate his cognitive and physical

---

[517] See id. at 408:4–18.

[518] Id. at 408:13–16.

[519] Id. at 408:16–17.

[520] See id. at 408:19–409:5.

[521] Id. at 409:6–14.

[522] See id. at 409:17–410:20, 414:11–15, 425:8–426:5.

[523] Id. at 411:1–9.

[524] See Tr. of Bench Trial (Doc. 48) at 817:23–818:2.  The Court accepted Dr. Tremwel as an expert witness in neurology without objection.  See id. at 822:11–15.

functioning in January 2022.[525]  But unlike Dr. Joyce's two-day evaluation, Dr. Tremwel only

evaluated Mr. Dobbs for one hour.[526]

72.     Dr. Tremwel testified that the number of tests Dr. Joyce performed was unusual

because only one or two tests for each area of the brain is sufficient to determine whether the

subject has a deficit.[527]  She explained that repeat testing can make the patient fatigued.[528]  She

also took issue with the number of tests Dr. Joyce performed by testifying that "it implies that

there's more areas of [the] brain that are affected, but it's multiple tests pointing to the same area

of the brain."[529]

73.     The Court understands, but does not agree with, Dr. Tremwel's criticisms.

Dr. Joyce's test was not a non-stop, two-day evaluation.  The evaluation lasted a total of five hours

on the first day, and three hours on the second day.[530]  There were multiple breaks each day, which

allowed Mr. Dobbs to rest.[531]  Considering this, the Court finds that the results of Dr. Joyce's

testing were not in any way attributable to patient fatigue.  And the greater scope of testing

performed by Dr. Joyce does not suggest the type of overreach Dr. Tremwel alleged.  Instead, it

only adds to the reliability of Dr. Joyce's findings.  Indeed, for those reasons, the Court finds that

Dr. Joyce's evaluation was more reliable and persuasive than Dr. Tremwel's evaluation.

---

[525] *See id.* at 827:9–11, 23–24.

[526] *Compare* Tr. of Bench Trial (Doc. 46) at 388:5–6, *with* Tr. of Bench Trial (Doc. 48) at 860:10–11.

[527] *See* Tr. of Bench Trial (Doc. 48) at 846:24–847:7.

[528] *See id.* at 847:6–7.

[529] *Id.* at 849:3–5.  Dr. Tremwel also testified that people with ADHD perform poorly on IQ tests.  *See id.* at 849:11–18.  The absence of any formal diagnosis of ADHD notwithstanding, Dr. Joyce acknowledged that someone with ADHD would perform worse on the IQ test than the control group.  *See* Tr. of Bench Trial (Doc. 46) at 405:18–25.  But Dr. Joyce also credibly explained that the standard person with ADHD would perform far less poorly than Mr. Dobbs performed.  *See id.*  It is more likely than not that ADHD played a negligible role (if any) in the test scores.

[530] *See* Tr. of Bench Trial (Doc. 46) at 388:5–6.

[531] *See id.* at 388:8–10.

74. Dr. Tremwel memorialized her findings in an expert opinion report in February 2022.[532] She formulated a supplemental opinion in April 2022 after reviewing Dr. Joyce's deposition.[533] As part of her evaluation, Dr. Tremwel interviewed the Dobbses.[534] They told Dr. Tremwel that while Mr. Dobbs had initially required assistance with all of his activities of daily living, he had significantly improved over the last two years.[535] However, Mr. Dobbs was still walking with a cane, and he could only walk about half a block before growing fatigued.[536] He also still had problems with his balance, which caused him to fall and made him unable to do the outdoor activities he wanted to do.[537] The Court finds as a fact that the Dobbses made these statements to Dr. Tremwel. And the Court finds the statements to be an accurate reflection of reality. Of course, significant improvement is relative; it does not mean serious problems don't persist. And improvements may be permanent or temporary.

75. While Mr. Dobbs once had trouble swallowing and controlling his bladder after the brain hemorrhage, those problems had since resolved (at least at the time Dr. Tremwel examined him).[538] Mr. Dobbs had a good appetite, was sleeping well, could bathe independently, and could dress himself, with the exception of being able to put on his own shoes and socks.[539] The Court finds as a fact that the Dobbses made these statements to Dr. Tremwel. And the Court finds the statements to be an accurate reflection of reality. Of course, as explained above, the fact that Mr.

---

[532] *See* Tr. of Bench Trial (Doc. 48) at 827:14–16.

[533] *See id.* at 827:17–19.

[534] *See id.* at 827:25–828:10.

[535] *See id.* at 829:12–17.

[536] *See id.* at 829:17–19.

[537] *See id.* at 829:20–22.

[538] *See id.* at 829:23–830:1.

[539] *See id.* at 830:1–10.

Dobbs can physically complete a task does not suggest how easy or difficult it is for him to do it on his own.  And it does not suggest whether he will be able to continue doing it on his own.

76.     During Dr. Tremwel's evaluation, Mr. Dobbs told her that he was neither depressed nor anxious, and he felt like his cognition had improved since he returned home from Houston Methodist more than two years before.[540]  Mr. Dobbs was not participating in any therapy at the time, and he was on two medications—one for GERD, and the other for an enlarged prostate.[541]  The Court finds as a fact that Mr. Dobbs made these statements to Dr. Tremwel.  And the Court finds the statements to be an accurate reflection of reality.

77.     Other than difficulty bending at the knees, Dr. Tremwel's physical exam of Mr. Dobbs was unremarkable.[542]  Dr. Tremwel also performed a neurological exam of Mr. Dobbs, which he scored well on.[543]  As part of the neurological exam, she "checked a Thurstone[,]" which tests to see how many words a subject can name within a minute that start with the same letter.[544]  Although Dr. Tremwel testified that Mr. Dobbs "performed it well," she acknowledged that "it's been shown that on average, that a person should be able to name 11 words in a minute, and he only named six."[545]

78.     Dr. Tremwel also evaluated Mr. Dobbs's short-term memory.[546]  This evaluation entailed giving Mr. Dobbs three words to remember and having him repeat them two or three

---

[540] See id. at 830:11–19.

[541] See id. at 830:20–831:2.

[542] See id. at 831:3–14.  Dr. Tremwel also checked Mr. Dobbs's cranial nerves, extremities, fine motor movement, pronator drift, sensation, and temperature.  See id. at 832:17–833:17.  Other than Mr. Dobbs having "some sensory normal hearing loss," the results for these exams were also unremarkable.  See id. at 832:22.  This indicated some improvement of pronator drift since Dr. Moore's examination of Mr. Dobbs.  See id. at 836:12–20.

[543] See id. at 831:15–24.

[544] Id. at 831:25–832:3.

[545] Id. at 832:4–6.

[546] See id. at 832:7.

times.[547]  After five minutes (and other intermittent testing), she would see if he could remember the three words.[548]  Mr. Dobbs remembered none of the words.[549]  Mr. Dobbs was, however, able to spell the word "world" both forwards and backwards.[550]

79.     When Dr. Tremwel tested Mr. Dobbs's vibratory sense with a tuning fork, he could not sense it at his ankles but could at his knees.[551]  A test of Mr. Dobbs's reflexes showed that he had bicep reflexes, but he did not have any reflexes in his triceps or lower extremities.[552]  Dr. Tremwel testified that these sensory and reflex issues were consistent with Mr. Dobbs's pre-hemorrhage neuropathy.[553]  While the Court understands Dr. Tremwel's point, the Court believes the rest of the evidence in this case proves that it is more likely that the sensory and reflex deficiencies Dr. Tremwel observed were, in part, caused by and, in part, significantly exacerbated by, the brain hemorrhage.  In this vein, the Court specifically notes that Dr. Bahgat's pre-hemorrhage examinations and observations revealed no problems with Mr. Dobbs's reflexes.[554]

80.     When Dr. Tremwel had Mr. Dobbs walk, he walked with a wide base and "had a fairly decent stride with that and he ambulated with a cane."[555]

---

[547] *See id*. at 832:7–9.

[548] *See id*. at 832:9–10.

[549] *See id*. at 832:11.

[550] *See id*. at 832:13–15.  Dr. Tremwel described this as "a very basic attention kind of test . . . ."  *Id*. at 832:14.

[551] *See id*. at 833:17–19.

[552] *See id*. at 833:20–23.

[553] *See id*. at 835:7–836:5, 837:3–14.

[554] *See supra* ¶ 6 of Findings of Fact – Damages.

[555] *See* Tr. of Bench Trial (Doc. 48) at 833:24–834:2.  When Dr. Tremwel remarked during the evaluation that Mr. Dobbs had a wide-based gait, he responded that he had had that since before the brain hemorrhage.  *See id*. at 838:19–21.  Dr. Tremwel testified that this was related to Mr. Dobbs's neuropathy.  *See id*. at 838:22–23.  Specifically, she explained that "the gait problem is more than 50% due to the neuropathy[]" but conceded this was "not a scientific calculation . . . ."  *Id*. at 839:13–14.

81.     Mr. Dobbs had intact verbal fluency, which meant that he was able to respond to a question with a full sentence, including a noun, verb, and object.[556]  In the evaluation, Mr. Dobbs "was not lacking for words."[557]  He could also understand the various commands Dr. Tremwel gave him and did not seem confused by them.[558]

82.     Based on the evaluation and other records examined, Dr. Tremwel determined that Mr. Dobbs's executive functioning was impaired.[559]

83.     Dr. Tremwel also performed a cerebellar exam.[560]  This consisted of two tests:  (1) Mr. Dobbs bringing his finger to his nose, and (2) Mr. Dobbs bringing his heel to his shin.[561] Mr. Dobbs was able to do both normally, which evidenced improvement since Dr. Moore's same examination two months earlier.[562]  Again, the Court notes that improvement is a relative term and does not necessarily suggest permanency of improvement.

84.     Dr. Tremwel testified that Mr. Dobbs had "mild cognitive impairment."[563]  She classified Mr. Dobbs's cognitive impairment as mild "[b]ecause he's able to function . . . [e]ssentially independently."[564]  The Court believes this understates Mr. Dobbs's condition. Essentially, the Court finds that (1) Dr. Joyce's testing was more reliable and revealed greater impairments, and (2) Dr. Joyce's testing fits more consistently with the post-hemorrhage observations of Mr. Dobbs by his wife, kids, neighbors, and Dr. Moore.

---

[556] *See id.* at 834:12–17.

[557] *See id.* at 834:16–17.

[558] *See id.* at 834:20–23.

[559] *See id.* at 835:4–6.

[560] *See id.* at 837:15–16.

[561] *See id.* at 837:18–838:5.

[562] *See id.* at 838:6–14.

[563] *Id.* at 839:25.

[564] *Id.* at 840:2–4.

85.     Ultimately, Dr. Tremwel agreed with Dr. Joyce's conclusion that Mr. Dobbs "has frontal lobe dysfunction."[565] But Dr. Tremwel attributed some of Mr. Dobbs's cognitive problems to pre-existing conditions.[566] Frankly acknowledging that her attribution "is not a scientific calculation," Dr. Tremwel suggested that "maybe 50 percent" of Mr. Dobbs's cognitive deficits are attributable to pre-existing conditions.[567] More specifically, Dr. Tremwel testified that ADHD, PTSD, and other "personality traits were quite remarkable before the surgery . . . ."[568] The Court is unpersuaded by Dr. Tremwel's testimony here.  First, the 50-percent figure does not appear to have any scientific, medical, or rational basis.  It seems like a number picked out of thin air. Second, as discussed above, it is not clear that Mr. Dobbs had received a formal diagnosis of ADHD, PTSD, or any other emotional or behavioral issues before (or after) the hemorrhage. Third, all the testimony concerning pre-hemorrhage observations of Mr. Dobbs suggest that any emotional or behavioral issues had no significant effect on his daily life or his cognitive functioning.  Considering the entire record, as well as the testimony of the Plaintiffs' and the Government's expert witnesses, the Court finds that, even though Mr. Dobbs had some pre-existing behavioral and emotional deficits, these deficits, on their own, were not the cause of any of the cognitive impairment seen in Mr. Dobbs's post-hemorrhage testing.

86.     In light of the foregoing—to a reasonable degree of medical certainty, and using the preponderance-of-the-evidence standard—the Court finds that Mr. Dobbs's post-hemorrhage physical and cognitive deficits are directly attributable to the brain hemorrhage Mr. Dobbs

---

[565] *Id*. at 848:17–23.

[566] *See id*. at 839:7–846:14.

[567] *Id*. at 839:7–20.

[568] *Id*. at 839:16–20.  On cross-examination, Dr. Tremwel acknowledged that Mr. Dobbs was never formally diagnosed with ADHD or PTSD.  *See id*. at 866:3–6.

suffered.  In many instances, the hemorrhage is the sole cause of his deficits.  In a few instances, the hemorrhage greatly exacerbated pre-existing issues that, on their own, would have never caused the life-altering consequences Mr. Dobbs has suffered since the hemorrhage.

### III.     Mr. Dobbs's Future Care and Treatment

87.     Based on their findings, Dr. Joyce and Dr. Tremwel made competing recommendations about what care and treatment would be necessary for Mr. Dobbs.  Dr. Joyce testified that Mr. Dobbs would need to see a neurologist on a long-term basis.[569]  Dr. Joyce determined that a neurologist would be ideal to monitor Mr. Dobbs and make sure he's getting the interventions he needs.[570]  Dr. Joyce explained that, because of Mr. Dobbs's brain hemorrhage, Mr. Dobbs is at a higher risk to develop dementia earlier than his peers, and a neurologist could help treat this condition.[571]  Dr. Joyce also recommended psychiatry care due to Mr. Dobbs's significant personality changes as a result of the brain hemorrhage.[572]  And Dr. Joyce recommended monthly meetings with a psychiatrist for the first six months, followed by quarterly meetings thereafter.[573]

88.     He also recommended that Mr. Dobbs have follow-up neuropsychological evaluations to help identify any new neurocognitive symptoms that arise.[574]  These follow-up evaluations would be every five years.[575]  And Dr. Joyce recommended that Mr. Dobbs see a

---

[569] *See* Tr. of Bench Trial (Doc. 46) at 412:13–16.

[570] *See id.* at 412:13–16.

[571] *See id.* at 412:17–21.

[572] *See id.* at 412:22–413:7.

[573] *See id.* at 413:9–10.

[574] *See id.* at 413:14–18.

[575] *See id.*

psychologist or licensed social worker because of his emotional state.[576]  Dr. Joyce testified that these meetings could start out at one to two times a week for six months, and shift to every other week for the next six months.[577]  From there, the frequency would depend on how Mr. Dobbs was doing.[578]

89.     Dr. Joyce next recommended that Mr. Dobbs would need rehabilitation case management and cognitive rehabilitation.[579]  The rehabilitation case management would entail a case manager meeting with Mr. Dobbs in his home a couple of hours per week "to pick him up and get him moving towards doing some things that are more active than he's been doing."[580]  The frequency of the case management tasks would depend on Mr. Dobbs's progress, but Dr. Joyce recommended meeting twice per week.[581]  As for the cognitive rehabilitation, which is specifically focused on helping people with brain injuries,  Dr. Joyce testified that this would help develop strategies for Mr. Dobbs to manage his cognitive deficits.[582]  The frequency of the cognitive rehabilitation would vary depending on how Mr. Dobbs was doing.[583]

90.     Finally, Dr. Joyce recommended attendant care for Mr. Dobbs.[584]  Dr. Joyce credibly testified that, because of Mr. Dobbs's difficulties with managing his activities of daily living (including, for example, cooking, getting dressed, getting from place to place, and keeping

---

[576] *See id.* at 413:19–414:5.  Dr. Joyce testified that Mr. Dobbs was tearful during the evaluation and made extremely negative comments about himself.  *See id.* at 413:23–414:5.

[577] *See id.* at 415:10–15.

[578] *See id.* at 415:15.

[579] *See id.* at 414:18–415:9.

[580] *Id.* at 414:18–23.

[581] *See id.* at 415:20–22.

[582] *See id.* at 415:1–9.

[583] *See id.* at 415:23–24.

[584] *See id.* at 416:1–3.

track of his medical appointments), Mr. Dobbs would need somebody (other than his wife) to be with him at least four hours a day, seven days a week, to help with these things.[585]  Dr. Joyce credibly testified that attendant care would help mitigate some of the safety concerns for Mr. Dobbs.[586]  According to Dr. Joyce, Mr. Dobbs cannot rely solely on his wife to take care of these things.[587]

91.     Dr. Tremwel did not affirmatively dispute the need for Mr. Dobbs to see a neurologist, psychiatrist, psychologist or social worker, or to have further neuropsychological evaluations.[588]  The Court finds that Dr. Joyce's undisputed recommendation is necessary for Mr. Dobbs's future medical care and treatment.

92.     Dr. Tremwel did testify that it was not medically necessary for Mr. Dobbs to have, in the Government's words, "a paid friend or paid safety friend."[589]  Dr. Tremwel explained that Mr. Dobbs would instead benefit from goal-directed therapy that he could then continue on his own.[590]  But her testimony was not persuasive on this point, especially given her concession on cross-examination that Mr. Dobbs still needs supervision and assistance.[591]  This is at least generally consistent with Dr. Joyce's opinion.  The Court finds the need for supervision and assistance as a fact.

---

[585] *See id.* at 416:4–417:14.

[586] *See id.* at 417:5–14.

[587] *See id.* at 417:10–418:7.  The Court overruled the Government's objection to Dr. Joyce's testimony about caregiving being stressful for Mrs. Dobbs.  *See id.* at 418:12–17.

[588] *See* Tr. of Bench Trial (Doc. 48) at 850:19–876:18.

[589] *Id.* at 850:19–851:1.  Dr. Joyce did not recommend that Mr. Dobbs need a "paid safety friend[,]" but the Court construes Dr. Tremwel's present testimony as referring to Dr. Joyce's recommendation for attendant care.  At this point in trial, Plaintiffs' counsel objected to Dr. Tremwel's testimony about what care Mr. Dobbs would need because it was not disclosed in her Rule 26 reports.  *See id.* at 853:11–15.  The Court overruled the objection because this was discussed in Dr. Tremwel's deposition, and Plaintiffs' counsel did not seek leave from the Court to tender a rebuttal report.  *See id.* at 853:11–858:9.

[590] *See id.* at 851:6–853:3.

[591] *See id.* at 876:6–7.

93.     Dr. Tremwel also testified that cognitive rehabilitation counseling for the remainder of Mr. Dobbs's life would not be medically beneficial.[592]  She explained that:

> [W]hat has been shown to be the most helpful is the patient taking the initiative, the family working with the patient, that having outside forces to come in and make a plan, you know, one visit where—and usually it's physical, speech and occupational therapist make a plan for the patient, but from there, the patient owns their own rehab, and that is what has shown to have the best success.[593]

Because of this, Dr. Tremwel has never prescribed anything like cognitive rehabilitation therapy.[594]  The Court finds Dr. Tremwel's explanation unpersuasive and finds Dr. Joyce's opinion on this point far more persuasive.  Accordingly, the Court finds that Mr. Dobbs's need for cognitive rehabilitation therapy is medically necessary in the circumstances of this case and a direct result of the brain hemorrhage.

94.     Plaintiffs called Victoria Powell—a nurse consultant and certified life care planner—as an expert witness to testify about the kind and extent of care that Mr. Dobbs would need as a result of his brain hemorrhage.[595]  Life care planning is the practice of creating a care plan for a person over the course of his life expectancy.[596]  As Ms. Powell explained, this spans the spectrum of care—it's everything from home modifications to Band-Aids.[597]  The life care planning process begins with reviewing the patient's medical records and recommendations made

---

[592] *See id.* at 858:13–18.

[593] *Id.* at 858:20–859:1.

[594] *See id.* at 858:18.

[595] *See generally* Tr. of Bench Trial (Doc. 47) at 480:8–535:21.  The Court accepted Ms. Powell as an expert witness without objection.  *See id.* at 484:19–24.  However, her expert qualifications were limited to the life care plan.  *See id.* at 504:13–505:19.  She was not qualified as a nursing expert.  *See id.* at 505:2–19.  The Court has not considered Ms. Powell's testimony as any form of medical diagnosis.  *See id.* at 505:15–18.

[596] *See id.* at 480:24–25.

[597] *See id.* at 480:25–481:3.

within.[598]  Then there's an independent assessment of the patient.[599]  A life care planner consults with physicians and conducts medical and financial research.[600]

95.    In preparation for Mr. Dobbs's life care plan, Ms. Powell met with him and his wife in their home.[601]  Like Dr. Joyce and Dr. Tremwel, Ms. Powell evaluated Mr. Dobbs by administering several surveys and tests.[602]  These included an "activities[,] balance[,] and confidence survey[,]" the PHQ9 (which screens for depression), the GAD7 (which screens for anxiety), and a fatigue assessment scale.[603]

96.    The activities, balance, and confidence survey measures the subject's confidence in doing different activities.[604]  Mr. Dobbs reported a lack of confidence in most activities and scored a 23 percent.[605]  According to Ms. Powell, any score below 80 percent is an indication that the person needs additional physical therapy.[606]  Mr. Dobbs's PHQ9 score was a 19.[607]  As Ms. Powell testified, this showed that he had moderately severe depression, which warranted treatment.[608]  The GAD7 test did not show that Mr. Dobbs suffered from anxiety.[609]  On the fatigue assessment scale, Mr. Dobbs scored a 44 out of 50, which indicated high levels of fatigue.[610]

---

[598] *See id.* at 485:6–9.

[599] *See id.* at 485:24–25.

[600] *See id.* at 486:19–23.

[601] *See id.* at 486:24–25.  Ms. Powell's assessment of Mr. Dobbs was conducted in September 2021.  *See id.* at 490:18–19.

[602] *See id.* at 487:13–17.

[603] *See id.* at 487:20–21, 488:18, 22, 24.

[604] *See id.* at 487:21–488:2.

[605] *See id.* at 488:13–14.

[606] *See id.* at 488:15–17.

[607] *See id.* at 488:18–19.

[608] *See id.* at 488:19–21.

[609] *See id.* at 488:22–23.

[610] *See id.* at 488:24–25.

97.     Ms. Powell's assessment of Mr. Dobbs also revealed that "[h]is right hand is essentially nonfunctional."[611]  She found that "he was not independent in self-care[,]" and she described his bathing as "setup and supervision."[612]  Ms. Powell explained that, while Mr. Dobbs did not require someone else to bathe him, it was unsafe for him to be in the shower with no one at home due to his risk of falling.[613]  Ms. Powell also testified that he needed help with "setup," such as "getting his clothes out, things of that nature."[614]  And she testified that Mr. Dobbs was unable to reach into the kitchen cabinets—low or high—without falling or holding onto something.[615]  And, as Ms. Powell testified, when she asked Mr. Dobbs to do three things, he would forget to do one or two of the three.[616]  The Court finds this all as fact.

98.     Ms. Powell also testified that Mr. Dobbs had problems with dizziness.[617]  His dizziness is worse in the morning and lasts about half or two-thirds of the day.[618]  But because Ms. Powell was not qualified to testify about the cause of this dizziness (and because Mr. Dobbs's guess that his dizziness stemmed from the holes drilled in his skull after the surgery is unsupported), the Court finds that Mr. Dobbs's dizziness was not proximately caused by his brain hemorrhage.  No other expert witness testified that dizziness was a symptom of a brain hemorrhage.[619]

---

[611] *Id*. at 491:4–5.

[612] *Id*. at 491:5–7.  Despite this, Ms. Powell also testified that Mrs. Dobbs told her she could give her husband a knife and some carrots, and he would be able to cut them.  *See id*. at 494:7–9.  However, he wouldn't know what the next step would be, such as putting the carrots into a bowl.  *See id*. at 494:10–11.

[613] *See id*. at 491:10–12.

[614] *Id*. at 491:16–17.

[615] *See id*. at 491:21–24.

[616] *See id*. at 491:25–492:1.

[617] *See id*. at 498:24–499:5.

[618] *See id*. at 499:1–5.

[619] Dr. Moore testified that neuropathy could cause dizziness.  *See* Tr. of Bench Trial (Doc. 46) at 372:8–9, 18–20.

99.     Ms. Powell determined that Mr. Dobbs had problems with his vision, smell, taste, and hearing since his brain hemorrhage.[620]  But as with dizziness, no other doctor attributed these problems to Mr. Dobbs's brain hemorrhage.[621]  Because there is no expert testimony to support these inhibitions as proximately caused by the brain hemorrhage, the Court finds Mr. Dobbs's problems with vision, smell, taste, and hearing are not a result of the brain hemorrhage.

100.     Ms. Powell also testified that Mr. Dobbs had problems with his speech.[622]  Specifically, he was unable to project his voice, his voice was raspy, and the volume of his speech tended to decline as the conversation went on.[623]  The Court finds all this as fact, and notes that it is not inconsistent with anything observed by the doctors who evaluated Mr. Dobbs or reported by his friends and family.  It is more likely true than not.

101.     Like the other expert witnesses who evaluated Mr. Dobbs, Ms. Powell observed that, while you could ask him a question, and he could answer the question, he could not remember the conversation later.[624]  When that happened, "he became emotional and would be tearful."[625]

102.     Additionally, Ms. Powell determined that Mr. Dobbs has bowel and bladder problems, which includes incontinence and urge frequency.[626]  As a result, Mr. Dobbs has started to wear adult diapers at night, and his wife must always ensure there is a bathroom nearby.[627]  Ms. Powell testified that Mr. Dobbs "should not move quickly and cannot move quickly[,]" but

---

[620] *See* Tr. of Bench Trial (Doc. 47) at 499:6–20.

[621] *See id.* at 558:10–23.  Because Ms. Powell could not "connect the dots" herself, she did not include treatment for these problems in her life care plan.  *See id.* at 558:21–23.

[622] *See id.* at 499:21–500:3.

[623] *See id.*

[624] *See id.* at 500:7–10.

[625] *See id.* at 500:10–11.

[626] *See id.* at 500:12–501:12.

[627] *See id.* at 501:7–12.

"he doesn't have the judgment to know that he move slowly."[628]  Despite this, "he wants to move quickly," which causes more problems like tripping or falling.[629]  The Court finds that this was a fact at the time of Ms. Powell's evaluation.  However, as noted above, the Court finds that the bladder issues improved between Ms. Powell's evaluation and Dr. Tremwel's evaluation.

103.    As Ms. Powell (and other expert witnesses) testified, Mr. Dobbs has fine motor problems.[630]  His hands are moving all the time, and he rolls his fingers and rubs his pants constantly.[631]  He also has gross motor problems.[632]  He does not have full range of motion in his right shoulder, arm, or hand.[633]  Mr. Dobbs also has limited strength and reported to Ms. Powell that he can no longer lift anything over 20 pounds.[634]  The Court finds all this as fact.

104.    In evaluating Mr. Dobbs, Ms. Powell observed that he had lost interest in most things, was often sad, had difficulty concentrating, was unable to plan things, and had limited ability to engage with others socially.[635]  For example, before the brain hemorrhage, Mr. Dobbs oversaw his and his wife's plans.[636]  But now, his wife must do all the planning.[637]  The Court finds all this as fact.

---

[628] *Id.* at 501:16–18.

[629] *Id.* at 501:18–23.

[630] *See id.* at 501:24–502:2.

[631] *See id.* at 501:24–502:2.

[632] *See id.* at 502:7–11.

[633] *See id.* at 502:7–17.

[634] *See id.* at 503:9–19.

[635] *See id.* at 503:22–504:12, 505:25–508:3.

[636] *See id.* at 507:14–17.

[637] *See id.* at 507:17–21.

105.     In determining the length of the life care plan, Ms. Powell relied on official United States Government life tables.[638]  These included CDC tables and the National Vital Statistics Report.[639]  These tables are updated at least once a year (and sometimes multiple times a year) and project an individual's life expectancy based on sex and race.[640]  They do not, however, segregate life expectancy based on comorbidities; instead, all healthy and unhealthy people are lumped together.[641]  Based on these tables, Ms. Powell determined that Mr. Dobbs's life expectancy (as of the fall of 2021) was 18.8 years.[642]  The Court finds these life tables authoritative and reliable.

106.     Considering her evaluation of Mr. Dobbs, Ms. Powell prepared a 12-page life care plan that detailed the expected care (and cost thereof) that Mr. Dobbs would need because of his brain hemorrhage.[643]  As Ms. Powell testified, the life care plan recommendations are directly related to Mr. Dobbs's brain injury.[644]  She clarified, however, that she takes the patient as he comes, and he may have additional issues that are compounded by the brain injury.[645]  But, for

---

[638] See id. at 495:21–24; Pls.' Trial Exs. 29–33.  Before trial, the Government filed a Motion in Limine to, in part, exclude these life tables.  See Def.'s Mot. in Limine (Doc. 29) ¶ 3; Br. in Supp. of Def.'s Mot. in Limine (Doc. 30) at 4–5.  The Court denied this part of the Motion without prejudice to being re-raised at trial.  See Order (Doc. 36); Tr. of Bench Trial (Doc. 45) at 12:4–15:5.  The Government raised this objection again during Ms. Powell's direct examination, and the Court overruled the Government's objection.  See Tr. of Bench Trial (Doc. 47) at 497:25–498:8.  The life tables were admitted as evidence.  See Tr. of Bench Trial (Doc. 47) at 498:9; Pls.' Trial Exs. 29–33.  They are relevant.  They are a proper subject of judicial notice.  At the pre-trial conference, the Government noted it had no objection to the taking of judicial notice as to the life tables themselves.  See Tr. of Bench Trial (Doc. 45) at 14:14–15:5.  The Court takes judicial notice of them.

[639] See Tr. of Bench Trial (Doc. 47) at 495:25–496:1.  Ms. Powell used Volume 69, Number 12 of the report, which was dated November 17, 2021.  See id. at 496:1–3.

[640] See id. at 496:22–23, 497:12–14.  Ms. Powell used the life expectancy for a non-Hispanic, white male in making her findings.  See id. at 496:5–6.

[641] See id. at 539:9–11.

[642] See Pls.' Trial Ex. 34 at 1.

[643] See id. at 1–12; Tr. of Bench Trial (Doc. 47) at 508:10–535:21.

[644] See Tr. of Bench Trial (Doc. 47) at 516:12–21; id. at 547:20–23 ("I don't believe that anything in my plan is not related to the incident.").

[645] See id. at 516:17–19.

example, if the patient already had a wheelchair before the relevant injury, she would not include a second wheelchair in the life care plan.[646]

107.    First, Ms. Powell determined that Mr. Dobbs would need to meet with his primary care physician above and beyond what a normal person would—an additional one to two times a year.[647]  Like Dr. Joyce, she also recommended that Mr. Dobbs see a neurologist every six months because of his balance and cognitive issues.[648]  Ms. Powell also recommended urology and gastroenterology appointments because of Mr. Dobbs's bladder and bowel incontinence.[649] Additionally, the life care plan includes recommendations for physiatry and psychiatry consultations.[650]  Ms. Powell testified that the physiatrist would serve as a "gatekeeper to all of the other recommendations," while the psychiatrist would be a one-time evaluation to assess Mr. Dobbs's situation and provide recommendations with monthly follow-ups for six months, followed by quarterly follow-ups for three years.[651]

108.    Another medical care recommendation Ms. Powell made for Mr. Dobbs in his life care plan was for nutritional consulting five times over the course of his remaining life

---

[646] *See id.* at 516:19–21.

[647] *See id.* at 508:20–509:4.

[648] *See id.* at 509:5–12.

[649] *See id.* at 509:13–20; Pls.' Trial Ex. 34 at 7.  The urology visits would be four times a year, and the gastroenterology visits would be twice a year.  *See* Pls.' Trial Ex. 34 at 1.  Even though Dr. Tremwel testified that the bladder incontinence had resolved by the time she evaluated him, there was no testimony that this resolution was permanent. *See* Tr. of Bench Trial (Doc. 48) at 829:23–830:1.  Other expert witnesses testified that Mr. Dobbs suffered from bladder and bowel incontinence.  *See, e.g.,* Tr. of Bench Trial (Doc. 47) at 500:14–25.  Moreover, Dr. Joyce testified that Mr. Dobbs's deficits are likely permanent.  *See* Tr. of Bench Trial (Doc. 46) at 411:1–9.  The Court thus finds that despite the (perhaps) temporary resolution of Mr. Dobbs's bladder incontinence when Dr. Tremwel evaluated him, it is more likely than not that this deficit, too, will be permanent.  That is especially so given the continuation of Mr. Dobbs's bowel problems.

[650] *See* Tr. of Bench Trial (Doc. 47) at 509:21–510:3.

[651] *Id.* at 509:21–511:10.  Ms. Powell clarified at trial that the years are mislabeled for follow-up psychiatry visits in the life care plan.  *See id.* at 510:21–511:10.  Because the follow-up visits are only for two years, it should read 2021–2023, not 2021–2040.  *See id.;* Pls.' Trial Ex. 34 at 1.

expectancy.[652]   This would be for weight management and to help with Mr. Dobbs's incontinence.[653]   Like Dr. Joyce, she recommended neuropsychiatric evaluations to continue to assess Mr. Dobbs's cognitive functioning.[654]   This would entail an initial evaluation and follow-ups every five years.[655]

109.   Beyond the medical care portion of the life care plan, the plan also includes recommendations for therapeutic evaluation modalities.[656]   This includes physical therapy, occupational therapy, speech therapy, and inpatient rehabilitation.[657]   Ms. Powell testified that the physical and occupational therapy would help Mr. Dobbs work on his balance, gait, and physical functioning.[658]   The speech therapy would not focus on his speech, but instead would be a means to help Mr. Dobbs's executive functioning.[659]   Based on Dr. Joyce's recommendation that Mr. Dobbs needed further inpatient rehabilitation, Mr. Dobbs's life plan includes the average cost for a one-time visit to one of four possible inpatient rehabilitation facilities.[660]   The Court finds that the need for these therapies—both in-patient and out-patient—are a direct and necessary result of Mr. Dobbs's brain hemorrhage and the deficits that stem from it.

110.   The next section of Mr. Dobbs's life care plan is for diagnostic studies and lab work.[661]   These include an annual comprehensive health panel, a CT of the brain every five to

---

[652] *See* Tr. of Bench Trial (Doc. 47) at 512:4–8; Pls.' Trial Ex. 34 at 1.

[653] *See* Tr. of Bench Trial (Doc. 47) at 512:4–8.

[654] *See id*. at 512:9–10.

[655] *See id*. at 512:10–11.

[656] *See* Pls.' Trial Ex. 34 at 3.

[657] *See id*.; Tr. of Bench Trial (Doc. 47) at 512:22–514:13.

[658] *See* Tr. of Bench Trial (Doc. 47) at 513:7–10.

[659] *See id*. at 513:12–14.  This would be a one-time evaluation.  *See id*.; Pls.' Trial Ex. 34 at 3.

[660] *See* Tr. of Bench Trial (Doc. 47) at 513:15–514:7; Pls.' Trial Ex. 34 at 3.

[661] *See* Pls.' Trial Ex. 34 at 4.

seven years, and an EEG every two to three years.[662]  Ms. Powell testified that the comprehensive

health panel would be for kidney and liver function studies that are necessary for someone who is

on long-term medications—medications that Mr. Dobbs would not otherwise be on absent the

brain injury.[663]  The need for comprehensive health panels, CTs, and EEGs is a direct result of Mr.

Dobbs's brain hemorrhage (and the related treatment of the brain hemorrhage), and the Court finds

that the comprehensive health panels, CTs, and EEGs are medically necessary for Mr. Dobbs's

future treatment and care.

111.    Next is medications.[664]  The life care plan includes monthly prescriptions for

Gabapentin (for neuropathy), Naproxen (for pain), Trazodone Hydrochloride (for sleep),

Oxybutynin Chloride and Tamsulosin Hydrochloride (both for urinary issues), and Omeprazole

(for GERD).[665]  The Court finds that the prescription for Gabapentin does not directly result from

Mr. Dobbs's brain hemorrhage.  As repeatedly noted throughout the trial and in medical records,

Mr. Dobbs suffered from neuropathy before his brain hemorrhage.  The same goes for the

Omeprazole and Trazodone Hydrochloride prescriptions.  Mr. Dobbs suffered from GERD before

his brain hemorrhage.[666]  And Mr. Dobbs was on sleep medication before the brain hemorrhage

and reported to Dr. Tremwel that he was sleeping well at night when she evaluated him.[667]

112.    Nevertheless, the Court finds the need for the other prescription medications is

directly related to, and is medically necessary because of, the brain hemorrhage.  Even though Mr.

Dobbs suffered from high general levels of pain before his brain hemorrhage, the Court finds that,

---

[662] See id.

[663] See Tr. of Bench Trial (Doc. 47) at 514:17–23, 515:16–516:9, 644:6–8.

[664] See Pls.' Trial Ex. 34 at 5.

[665] See id.

[666] See Tr. of Bench Trial (Doc. 46) at 249:23–24.

[667] See Tr. of Bench Trial (Doc. 48) at 830:1–2.

based on the expert testimony at trial, it is more likely than not that the brain hemorrhage aggravated and increased Mr. Dobbs's pain and has significantly contributed to his bowel and bladder incontinence.

113.    The life care plan also provides for mobility aids, durable medical equipment, and aids for independent function.[668]  The mobility aids include a scooter (to be replaced every five years), annual scooter maintenance, scooter accessories (to be replaced every three to five years), a HurryCane (to be replaced every three years), and a rolling walker with a seat (to be replaced every five years).[669]  These will all help Mr. Dobbs with his mobility and mitigate his risk of falling.[670]  To Ms. Powell's knowledge, Mr. Dobbs did not require any of these mobility aids before his brain hemorrhage.[671]  The Court finds that Mr. Dobbs's need for these mobility aids is medically necessary and a direct result of his brain hemorrhage.

114.    The durable medical equipment and aids for independent function range from a sock puller to a urinal.[672]  Ms. Powell testified that these would help with Mr. Dobbs's functioning and independence.[673]  Because Mr. Dobbs cannot put his socks or shoes on by himself, she recommended a sock puller and shoehorn to assist with these tasks.[674]  Ms. Powell also recommended a handheld showerhead to better facilitate Mr. Dobbs's bathing.[675]  Further recommendations include toilet rails, a safety bath mat, and indoor and outdoor interlocking grip

---

[668] *See* Pls.' Trial Ex. 34 at 6–7.

[669] *See id.* at 6.

[670] *See id.*

[671] *See* Tr. of Bench Trial (Doc. 47) at 525:1–3.

[672] *See* Pls.' Trial Ex. 34 at 7.

[673] *See* Tr. of Bench Trial (Doc. 47) at 526:5–7.

[674] *See id.* at 526:8–12, 17–19.

[675] *See id.* at 526:13–16; Pls.' Trial Ex. 34 at 7.

tiles, which are all aimed at reducing Mr. Dobbs's risk of falling.[676]   Next, she recommended a

urinal to allow him to use the bathroom more quickly.[677]   And finally, she recommended an

allowance for various memory aids like recording devices, calendars, Post-It notes, batteries, and

medication organizers.[678]   The Court finds that Mr. Dobbs's need for all these aids is medically

necessary and a direct result of his brain hemorrhage.[679]

      115.    Next, the life care plan recommends home and attendant care.[680]   Ms. Powell

testified that while Mr. Dobbs does not need a babysitter, he needs a "paid safety friend."[681]   As

Ms. Powell explained, this is someone who could "assist [Mr. Dobbs] with his activities of daily

living and the heavy housekeeping, home maintenance, [and] the things that he used to want to

do."[682]   The plan provides for this care for four hours a day, seven days a week through 2031.[683]

In 2032, the recommendation increases to eight hours a day, seven days a week.[684]   Ms. Powell

explained that this would help unburden Mrs. Dobbs and provide the necessary care her husband

needs.[685]

---

[676] *See* Tr. of Bench Trial (Doc. 47) at 526:20–527:4; Pls.' Trial Ex. 34 at 7.

[677] *See* Tr. of Bench Trial (Doc. 47) at 527:5–7; Pls.' Trial Ex. 34 at 7.

[678] *See* Tr. of Bench Trial (Doc. 47) at 527:8–19; Pls.' Trial Ex. 34 at 7.  Ms. Powell testified that she did not include an assistive technology specialist in this recommendation but believes Mr. Dobbs would benefit from a one-time evaluation by one.  *See* Tr. of Bench Trial (Doc. 47) at 527:8–16.  Ms. Powell explained that an assistive technology specialist helps someone with a brain injury determine what kind of cueing, apps, and reminders may be helpful.  *See id*. at 527:11–15.  The Court finds that these additional benefits are sufficiently encompassed by the services of the other above-discussed (and soon-to-be-discussed) medical providers.  Because the assistive technology specialist was not included in Mr. Dobbs's proposed life care plan, no reduction for this is necessary.  *See* Pls.' Trial Ex. 34 at 1–12.

[679] Even though Ms. Powell observed that Mr. Dobbs is able to bathe himself, the Court finds that a handheld shower head would better facilitate Mr. Dobbs's ability to bathe on his own and help lessen his risk of falling in the shower and is therefore medically necessary as a direct result of his brain hemorrhage.

[680] *See* Pls.' Trial Ex. 34 at 8.

[681] Tr. of Bench Trial (Doc. 47) at 528:13–14.

[682] *Id*. at 528:14–17.

[683] *See* Pls.' Trial Ex. 34 at 8.

[684] *See id*.

[685] *See* Tr. of Bench Trial (Doc. 47) at 529:22–530:2.

116.    The Court finds that attendant and home care is medically necessary for Mr. Dobbs as a direct result of his brain hemorrhage.  As detailed earlier in this Memorandum of Decision, Mr. Dobbs's cognitive and physical capabilities are significantly diminished as a direct and proximate result of his brain hemorrhage.[686]  Consequently, he is mostly unable to independently complete (or even attempt) many ordinary activities of daily life.  Although Ms. Powell testified that it would be appropriate for this care to total more than four hours a day right off the bat, the Court believes—based on both her and Dr. Joyce's testimony—that four hours of daily home and attendant care seven days a week is sufficient through 2031.  As Mr. Dobbs ages (and, as a direct result of his brain hemorrhage, his brain will age more quickly), eight hours of daily home and attendant care will be necessary for Mr. Dobbs beginning in 2032, and through the remainder of his life.[687]

117.    Relatedly (and in agreement with Dr. Joyce), the life care plan recommends a rehabilitation counselor and case manager.[688]   As Ms. Powell and Dr. Joyce testified, a rehabilitation counselor would help Mr. Dobbs learn to function with his numerous cognitive and physical deficits.[689]   The Court agrees and finds that a cognitive rehabilitation counselor is medically necessary as a direct result of Mr. Dobbs's brain hemorrhage.[690]  The Court finds that

---

[686] Dr. Tremwel testified that attendant and home care, or a paid safety friend, is not medically necessary for Mr. Dobbs.  *See* Tr. of Bench Trial (Doc. 48) at 850:19–851:1.  However, she agreed that Mr. Dobbs needs supervision and assistance.  *See id.* at 876:6–7.  The Court finds that attendant and home care is important to ensure that Mr. Dobbs has the supervision and assistance that is medically necessary as a direct result of the brain hemorrhage.

[687] *See* Tr. of Bench Trial (Doc. 46) at 415:1–9; Tr. of Bench Trial (Doc. 47) at 530:16–531:4.  Based on Ms. Powell's calculation of Mr. Dobbs's life expectancy, this would be from the time of trial until 2040.  *See* Tr. of Bench Trial (Doc. 47) at 539:9–11.

[688] *See* Pls.' Trial Ex. 34 at 10, 11.

[689] *See* Tr. of Bench Trial (Doc. 47) at 533:3–11.

[690] Even though Dr. Tremwel testified that it would be better for Mr. Dobbs to work with his family to resolve these issues, the Court finds that is still possible in addition to the cognitive rehabilitation.  *See* Tr. of Bench Trial (Doc. 48) at 858:20–859:1.  In addition to the other forms of therapy that the Court has found to be medically necessary as a direct result of Mr. Dobbs's brain hemorrhage, the Court finds that Mr. Dobbs's need for cognitive rehabilitation is medically necessary and a direct result of Mr. Dobbs's brain hemorrhage.

Dr. Joyce's recommendation that this rehabilitation occur weekly for two hours a week is, more likely than not, medically necessary considering Mr. Dobbs's numerous deficits.[691]  However, the Court finds that the recommendation for a case manager is not medically necessary, considering the number of providers who will be working with Mr. Dobbs.  As Ms. Powell explained, this is more of a gap-filler role, in case anything falls through with the other providers.[692]

118.    Finally, the life plan provides for mileage reimbursement for the various medical appointments that Mr. Dobbs must attend as a direct result of his brain hemorrhage.[693]  The life care plan determined the round-trip mileage for these appointments and multiplied those totals by the IRS's mileage-reimbursement rate.[694]  Absent Mr. Dobbs's brain hemorrhage, he would not have to travel to these numerous and relatively frequent medical appointments.  The Court therefore finds that the incurred mileage is a direct result of Mr. Dobbs's brain hemorrhage and properly included in Mr. Dobbs's life care plan.

119.    Regarding the cost of Mr. Dobbs's life care plan, the Court also heard testimony from Dr. Hubbard.[695]  Dr. Hubbard testified that when considering a life care plan, "the numbers have already been given to [him], and [his] job there is simply to do the financial mathematics on it . . . ."[696]  In this case, Ms. Powell provided the proposed life care plan for Mr. Dobbs, and Dr. Hubbard calculated the present value of the future expenses using the appropriate inflation and discount rates.[697]  Specifically, Dr. Hubbard used an inflation-adjusted discount rate approach in

---

[691] *See* Tr. of Bench Trial (Doc. 47) at 534:4–21.

[692] *See id.* at 535:2–14.

[693] *See* Pls.' Trial Ex. 34 at 9.

[694] *See id.*

[695] *See generally* Tr. of Bench Trial (Doc. 46) at 428:1–441:21.

[696] *See id.* at 430:18–21.

[697] *See id.* at 432:8–10, 22–25.

calculating the cost of Mr. Dobbs's life care plan.[698]   Using these calculations, Dr. Hubbard concluded that, to a reasonable degree of economic certainty, the present value of Mr. Dobbs's proposed life care plan is $638,373.00.[699]   The Court finds that Dr. Hubbard's methods are authoritative, and his calculations are reliable.

## CONCLUSIONS OF LAW – DAMAGES

As with liability, damages are determined according to Arkansas law.[700]   The Arkansas Medical Malpractice Act provides that "damages awarded may include compensation for actual economic losses recognized by law suffered by the injured person by reason of medical injury, including, but not limited to, the cost of reasonable and necessary medical services, rehabilitation services, custodial care, loss of services, and loss of earnings or earning capacity."[701]   The awarded damages may also "include compensation for pain and suffering and other noneconomic loss recognized by law."[702]   Like liability, "it is not enough for an expert to opine that there was negligence that was the proximate cause of the alleged damages."[703]   "The opinion must be stated within a reasonable degree of medical certainty or probability."[704]

At trial, the Government argued (at least implicitly) that Mr. Dobbs's damages award should be reduced to account for pre-existing conditions.[705]   But under Arkansas law, a fact-finder

---

[698] *See id.* at 433:14–18.

[699] *See* Pls.' Trial Ex. 34 at 12; Tr. of Bench Trial (Doc. 46) at 438:9–16.  This total includes a geographic area factor ("GAF"), which adjusts the costs upward or downward based on where Mr. Dobbs would obtain his various medical services.  *See* Tr. of Bench Trial (Doc. 47) at 511:12–18.  The GAF in Mr. Dobbs's life care plan varied downward for every applicable item.  *See* Pls.' Trial Ex. 34 at 1–4.

[700] *See Wilkinson v. United States*, 564 F.3d 927, 933 (8th Cir. 2009).

[701] Ark. Code Ann. § 16-114-208(a)(1)(A).

[702] *Id.* § 16-114-208(a)(2).

[703] *Williamson*, 348 Ark. at 311, 72 S.W.3d at 492.

[704] *Id.*

[705] *See* Tr. of Bench Trial (Doc. 48) at 976:14–980:9.

"is allowed to consider the full extent of any injury sustained, even though the degree of injury proximately resulted from the aggravation of a pre-existing condition."[706]  This is more commonly known as the "eggshell plaintiff rule," which "embraces the principles that a tortfeasor must accept a plaintiff as he finds him and may not escape or reduce damages by highlighting the injured party's susceptibility to injury."[707]  Of course, "the physician found guilty of malpractice is not chargeable for pain, suffering or anguish that arose because of the original ailment, but is chargeable only for the pain, suffering, anguish and expenses that naturally follow from the malpractice."[708]  This caveat is consistent with the Arkansas Medical Malpractice Act's requirement that "the injured person suffered injuries that would not otherwise have occurred."[709]

Generally, a plaintiff can prove the damages owed for past medical bills with exact certainty.[710]  This is usually done simply by providing the medical bills.[711]  Here, Mr. Dobbs has proved his past medical bills with exact certainty.  He submitted as evidence medical bills from: (1) Houston Methodist[712] for $28,979.55; (2) Metropolitan Emergency Medical Services[713] for $696.15; (3) AirMed[714] for $13,968.00; (4) Baxter Regional Urology Clinic[715] for $1,089.01; (5)

---

[706] *Clawson v. Rye*, 281 Ark. 8, 11, 661 S.W.2d 354, 357 (1983).

[707] *Primm v. U.S. Fid. & Guar. Ins. Corp.*, 324 Ark. 409, 414, 922 S.W.2d 319, 321 (1996).

[708] *Bockman v. Butler*, 226 Ark. 159, 163, 288 S.W.2d 597, 599 (1956).

[709] Ark. Code Ann. § 16-114-206(a)(3).

[710] *See, e.g.*, *Bill Davis Trucking, Inc. v. Prysock*, 301 Ark. 387, 391, 784 S.W.2d 755, 757 (1990).

[711] *See id*. at 392, 784 S.W.2d at 758.  The provision of the Arkansas Medical Malpractice Act that did away with the collateral-source rule was found unconstitutional in *Johnson v. Rockwell Automation, Inc*.  *See* 2009 Ark. 241, at 10, 308 S.W.3d 135, 142.  Therefore, Mr. Dobbs is allowed to recover the full value of his past medical bills.  *See id*.

[712] *See* Pls.' Trial Ex. 7 at 1, 19–24; Pls.' Trial Ex. 16 at 2; Pls.' Trial Ex. 19 at 2.  This includes Mr. Dobbs's bills from Houston Radiology and separate bill from Dr. David Ho.  *See* Pls.' Trial Ex. 16 at 2; Pls.' Trial Ex. 19 at 2.

[713] *See* Pls.' Trial Ex. 18 at 2.

[714] *See* Pls.' Trial Ex. 10 at 2.

[715] *See* Pls.' Trial Ex. 13 at 2.

Baxter Regional Neurology and Spine Clinic[716] for $879.00; (6) Baxter Regional Medical Center[717] for $11,834.77; (7) Mountain Home Radiology[718] for $376.00; (8) Lincoln Paden Medical Group[719] for $2,476.95, and (9) Ozark Physical Therapy[720] for $13,714.10.  Thus, Mr. Dobbs's past medical bills total $74,013.53. The Court awards $74,013.53 to Mr. Dobbs for past medical bills.

"Future medical expenses do not require the same degree of certainty as past medical expenses."[721]  "It is not speculative or conjectural to calculate future medical expenses where there is a history of medical expenses that have accrued as of the date of trial, particularly where there is also a degree of medical certainty as to the need for future medication."[722]  With (1) the exception of a nutritionist, a case manager, and prescriptions for Gabapentin, Omeprazole, and Trazodone Hydrochloride, and (2) the recalculation of one part of the life care plan, in which Ms. Powell made some accounting errors, the Court concludes that the life care plan prepared by Ms. Powell is consistent with the expert medical testimony given at trial and reflective of the reasonable and necessary future medical care and medical expenses that Mr. Dobbs will incur as a direct result of

---

[716] *See* Pls.' Trial Ex. 14 at 2, 9.

[717] *See* Pls.' Trial Ex. 15 at 2.

[718] *See* Pls.' Trial Ex. 17 at 2.

[719] *See* Pls.' Trial Ex. 3 at 2.

[720] *See* Pls.' Trial Ex. 5 at 1, 15.  The Plaintiffs made two separate requests for these medical records—one in March 2019, and the other in June 2022.  *See id*. at 1, 14–18.  As a result, it appears to the Court that there were some duplicative charges between the two records.  *See id*. at 10–13, 19–22.  The Court has excluded these duplicative charges—a total of $7,272.47—from the total of Mr. Dobbs's past medical expenses from Ozark Physical Therapy. *See id*.  The Court does not award damages for past medical bills Mr. Dobbs incurred at Ozark Physical Therapy before his brain hemorrhage.

[721] *Matthews v. Rodgers*, 279 Ark. 328, 335, 651 S.W.2d 453, 457 (1983) ("The doctor testified that the appellee might need future medical procedures.  The appellee testified he still had pain in the area.  This was sufficient for the court to consider this element of damages.").

[722] *Prysock*, 301 Ark. at 392, 784 S.W.2d at 757–58.

his brain injury.[723]  Excluding the items just referenced, the total future value of Ms. Powell's life

care plan is $504,740.00.  The necessary recalculation of the accounting error just referenced adds

another $785,160.00 to that value.  Accordingly, factoring in all these changes (and applying the

spirit of Dr. Hubbard's discount rate), the Court awards $1,417,844.56 to Mr. Dobbs for future

care and medical expenses.[724]

The Court can award damages for pain and suffering that Mr. Dobbs has experienced since

the hemorrhage.  Damages for past pain and suffering—that is, pain and suffering after the

triggering event but before the trial—are awardable.[725]  As to likely pain and suffering after the

---

[723] A fact-finder may award reasonable mileage when calculating future medical and care expenses.  *See* AMI Civ. 2204 ("The reasonable expense of any necessary medical care, treatment and services received, [including *(transportation)(and)(board)(and)(lodging)* expenses necessarily incurred in securing such care, treatment, or services] [and the present value of such expense reasonably certain to be required in the future].") (alterations and emphases in original).

[724] The Court needs to make two additional findings here.  First, Ms. Powell's life care plan incorrectly calculated the total amount necessary to support her attendant care recommendations.  *See* Pls.' Trial Ex. 34 at 8.  Specifically, Ms. Powell miscalculated the frequency of the attendant care in column seven (titled FREQ) of rows one and two—the frequency should represent days, not weeks.  *See id.*  The Court has reworked the math on the recommendations.  For the first ten years of attendant care, the math is as follows:  3,652 days multiplied by four hours a day, multiplied by $22.50 an hour equals $328,680.00.  For the next 8.8 years, the math is as follows:  3,212 days, multiplied by eight hours a day, multiplied by $22.50 an hour equals $578,160.00.  The sum of those two figures is $906,840.00.  That's $785,160.00 more than the $121,680.00 figure that Ms. Powell's life care plan (mis)calculated.  So, the Court has added $785,160.00 to the $504,740.00 that it calculated by excluding from the life care plan's calculated costs the categories that the Court found not medically necessary and unreasonable.  That equals $1,289,900.00, which represents the total future value of the proposed life care plan as altered by the Court.

Second, as already explained, the Court excluded from future expenses several items of medical care, medications, and case management.  And, as just explained, the Court altered the calculation of one item, namely future attendant care.  Dr. Hubbard's net discount rates for these categories are -1.0380 percent (medical care), -1.3233 percent (medications), -0.9515 percent (case management), and -0.9558 percent (attendant care).  *See* Pls.' Trial Ex. 34 at 12.  But even after reviewing Dr. Hubbard's testimony about the mathematical formula he applied, the Court is unsure how to exactly calculate the total present value of Mr. Dobbs's future care and medical expenses (excluding those items the Court found were not medically necessary and altering the one item the Court found was miscalculated) using these exact rates.  Accordingly, the Court has used a work-around that it believes will roughly but fairly approximate what the correct calculated amount would have been using the more intricate category-by-category formula set forth by Dr. Hubbard.  The Court calculated the present value of Mr. Dobbs's future care and medical expenses in the following way:

$$\frac{\$580,767 \text{ total future value of proposed life care plan}}{\$638,373 \text{ (total present value of proposed life care plan)}} = \frac{\$1,289,900 \text{ (total future value of proposed life care plan as altered by Court)}}{X \text{ (total present value of proposed life care plan as altered by Court)}}$$

Put another way, the rough formula would be $1,289,900.00 multiplied by $638,373.00, divided by $580,767.00.  And that equals $1,417,844.56.

[725] *See Garrison v. Hodge*, 2018 Ark. App. 556, at 14, 17, 565 S.W.3d 107, 117, 118 (affirming a jury verdict that awarded, in part, damages for past and future pain and suffering).

trial, "[e]vidence of future pain and suffering and permanent disability must be established with reasonable certainty and must not be left up to speculation or conjecture on the part of the fact-finder."[726]   But the caselaw is clear that the fact-finder may infer pain and suffering from the serious nature of the injury.[727]   And "changes in lifestyle will also support an award for pain and suffering."[728]   At bottom, "[t]here is no definite and satisfactory rule to measure compensation for pain and suffering and the amount of damages must depend on the circumstances of each particular case."[729]   Still, the fact-finder may only award damages for future pain and suffering if it is "reasonably certain to be experienced by [Mr. Dobbs] in the future."[730]

Over the course of trial, the Court heard a significant amount of credible testimony (as explained in the findings of fact above) that Mr. Dobbs was not the same man he was before he suffered the brain hemorrhage.  And the Court heard credible testimony (also explained above) about the nightmare he endured during and after the brain hemorrhage.  By way of example and not limitation, consider the following few lowlights.  He spent over two months in the hospital as a result of Dr. Bahgat's malpractice.  Of those two months, he was in intensive care (first at the Central Arkansas Veterans Healthcare System and then at Houston Methodist) for more than a month.  He was in a coma for an unspecified period of time.  When he left intensive care, he went to inpatient rehabilitation, where he needed nearly continuous care and had to work to relearn basic

---

[726] *MCSA, LLC v. Thurmon*, 2014 Ark. App. 540, at 7–8, 444 S.W.3d 428, 433.

[727] *Garrison*, 2018 Ark. App. 556, at 14, 565 S.W.3d at 117.

[728] *Id.* at 15, 565 S.W.3d at 117.

[729] *Id.* at 14, 565 S.W.3d at 117.

[730] *Bailey v. Bradford*, 244 Ark. 8, 9, 423 S.W.2d 565, 566 (1968) (internal quotation marks and citations omitted). Testimony that there "is a good possibility" that the plaintiff may endure future pain and suffering is not enough. *Id.*, 423 S.W.2d at 567.  When asked whether Mr. Dobbs's deficits are permanent to a reasonable degree of neuropsychological certainty, Dr. Joyce testified "[y]es[,] [g]iven that it's been well over a year since [Mr. Dobbs] had these injuries, the deficits that he has are likely to be permanent in nature."  Tr. of Bench Trial (Doc. 46) at 411:4–9.

functions like swallowing.  He also had significant bladder and bowel control problems, eventually necessitating an adult diaper for some period of time.  This was all directly and proximately caused by the hemorrhage—and the testimony on this point from one or more experts was made to a reasonable degree of medical certainty.

Mr. Dobbs now suffers from numerous cognitive and physical deficits, which are directly and proximately attributable to the brain hemorrhage.  Again, this conclusion is based on testimony made to a reasonable degree of medical certainty.  And these deficits are likely to be permanent.[731] They are wide-ranging, affect most facets of his life, and make it impossible for him to live life in any way close to the way he used to.  The Court will not repeat here all the findings it made above concerning the extent and effect of those deficits.  It incorporates them by reference here.  Based on expert medical testimony, to a reasonable degree of medical certainty and by a preponderance of the evidence, Mr. Dobbs will suffer the consequences (and accompanying pain) of these deficits for the rest of his life.  Simply put, Mr. Dobbs is unable to live life as he once did.  And he will never be able to do so again.  His pain and suffering will be constantly with him, as it has been since the brain hemorrhage.

Considering the thousands of pages of medical records and multiple days of trial testimony from both expert witnesses and those who are personally familiar with Mr. Dobbs's pain and suffering, and based on all the findings of fact made above, and noting the 18-plus-year life expectancy of Mr. Dobbs, the Court awards Mr. Dobbs $1,000,000.00 for past and future pain and suffering directly and proximately caused by the hemorrhage.[732]  The link between the brain

---

[731] *See Wheeler v. Bennett*, 312 Ark. 411, 417, 849 S.W.2d 952, 955 (1993) ("A permanent injury is one that deprives the plaintiff of his right to live his life in comfort and ease without added inconvenience or diminution of physical vigor.").

[732] This award also encompasses Mr. Dobbs's physical and mental impairment as a direct result of the brain hemorrhage.  Mr. Dobbs also sought damages for disfigurement and scarring.  *See* Compl. (Doc. 1) ¶ 8.1.  Damages for disfigurement and scars are "separate and apart from mere embarrassment and the mental anguish they may cause."

hemorrhage and the pain and suffering is short, direct, and unbroken by any intervening cause. None of this pain and suffering would have taken place in absence of the hemorrhage.

Mrs. Dobbs also seeks damages for loss of consortium.[733]  Arkansas courts have defined consortium as the "[c]onjugal fellowship of husband and wife, and the right of each to the company, co-operation, affection, and aid of the other in every conjugal relationship."[734]  "[T]he loss of consortium is something difficult to measure in dollars and cents, but the recovery for loss of consortium should be dictated by reason and justice."[735]

As noted above, Mrs. Dobbs and her husband had a regular and intimate sexual relationship before his brain hemorrhage.  Despite trying to maintain an intimate sexual relationship since the brain injury, they have been unable to do so.  As further noted above, Mrs. Dobbs has also been largely unable to enjoy her husband's cooperation, companionship, affection, fellowship, and aid since the brain hemorrhage.[736]  The change in the relationship has been vast, as Mrs. Dobbs has had to largely transition from the role of wife to a more motherly role.[737]  Mrs. Dobbs married a physically-fit, outdoors-loving, adventure-seeking, retired marine a little more than three years

---

*Matthews*, 279 Ark. at 336, 651 S.W.2d at 458.  But Plaintiffs presented no evidence at trial about Mr. Dobbs scarring or physical disfigurement.  Therefore, the Court does not award any damages for Mr. Dobbs's disfigurement or scars.  Moreover, insofar as Mr. Dobbs seeks damages for his loss of enjoyment of life pre-death, these damages have not been specifically recognized in Arkansas.  *See* Howard W. Brill, *Arkansas Law of Damages* § 34:3.  Finally, as the injured party, Mr. Dobbs cannot recover for loss of consortium with his wife.  *See Hisaw v. State Farm Mut. Auto. Ins. Co.*, 353 Ark. 668, 685, 122 S.W.3d 1, 10 (2003) (describing a loss of consortium claim as "derivative" to the claim of the injured party).

[733] *See* Compl. (Doc. 1) ¶ 8.2; Tr. of Bench Trial (Doc. 48) at 943:14–19.

[734] *White v. Mitchell*, 263 Ark. 787, 807, 568 S.W.2d 216, 225 (1978) (internal quotation marks and citations omitted).

[735] *Id.* at 807–08, 568 S.W.2d at 225.

[736] *See Missouri Pac. Transp. Co. v. Miller*, 227 Ark. 351, 359–60, 299 S.W.2d 41, 46 (1957) ("Mrs. Miller has suffered the complete loss of consortium; Miller is not able to furnish any companionship; it does not appear that he has sufficient mental attainments that would enable him to be an enjoyable companion notwithstanding his present pain and mental anguish and his physical disabilities.  Prior to Mr. Miller's injuries, Mrs. Miller led a happy life, enjoyed her husband, his companionship and marital relation.  And now, instead of a mate with whom she can mutually enjoy life, she has a burden to bear by the loss of consortium.  Undoubtedly, she has been damaged heavily.").

[737] *See* Tr. of Bench Trial (Doc. 47) at 650:6–7 ("I feel like a mother and a caretaker.").

before the brain injury.  Although the Court is certain Mrs. Dobbs is dedicated to her husband now,

Mr. Dobbs is (through no fault of his own) a completely different person and their marriage is of

a completely different character.  Mrs. Dobbs deserves compensation for the loss, which was

directly and proximately caused by the brain hemorrhage.  The link between the hemorrhage and

the losses the Court discusses here is short, direct, and unbroken by any intervening cause.  And

such losses would not have occurred absent the hemorrhage.  Accordingly, based on all the

findings of fact in this Memorandum of Decision, and noting Mr. Dobbs's 18-plus-year life

expectancy, the Court awards Mrs. Dobbs $500,000.00 for the loss of consortium with her

husband.

Finally, Plaintiffs also seek damages for past and future caretaking expenses.[738]  An injured

plaintiff is entitled to reimbursement for past and future caretaking expenses.[739]  This is true

whether the caretaking is provided by his wife or a professional.[740]  Future caretaking expenses,

however, have already been awarded as part of the future medical care damages.  Because the

Court is providing damages for professional attendant care for the rest of Mr. Dobbs's life, the

Court does not believe it appropriate to also pay Mrs. Dobbs for the performance of attendant care.

Such double-dipping would not be appropriate in the circumstances of this case.[741]

---

[738] *See* Compl. (Doc. 1) ¶ 8.2 ("Eileen Dobbs brings this suit to recover all damages cognizable under the law resulting from the injuries to Craig Dobbs and to herself as a result of the occurrence in question.").

[739] *See Gross & Janes Co. v. Brooks*, 2012 Ark. App. 702, at 9–10, 425 S.W.3d 795, 801.

[740] *See Jackson v. United States*, 526 F. Supp. 1149, 1154 (E.D. Ark. 1981) ("We are in agreement that plaintiff is entitled to a substantial award for caretaking expense, even though these services are now provided by his wife who undoubtedly took a marriage vow to care for him in sickness and in health.").

[741] If Ms. Powell had believed it was medically necessary and reasonable to provide Mr. Dobbs round-the-clock attendant care (or even, say, twelve hours of attendant care a day), Ms. Powell would have put that in the proposed life care plan.  She didn't, which leads the Court to believe that Mr. Dobbs does not need attendant care over and above what was suggested by Ms. Powell's plan.  The Court understands that Dr. Joyce and Ms. Powell testified that additional attendant care hours might be appropriate, but finds this testimony incredible and unpersuasive given the proposed life care plan.  Additional hours might be nice, but they are not medically necessary and reasonable.

However, considering Mrs. Dobbs's unavoidable and time-consuming efforts to take care of her husband in nearly every aspect of his life over the four years leading up to trial, the Court finds that Mrs. Dobbs is entitled to past caretaking expenses.  Ms. Powell's proposed life care plan for Mr. Dobbs valued such care at $22.50 an hour.[742]  The Court finds that this rate is reasonable. While Mrs. Dobbs did not keep a timesheet of the hours she spent caring for her husband, the absence of such evidence does not preclude recovery for past caretaking damages.[743]  Based on Mrs. Dobbs's testimony at trial, the Court concludes that it was reasonably and medically necessary for Mrs. Dobbs to spend (on average) four hours a day taking care of her husband.  The Court reaches this conclusion because (1) the need for attendant care in the long term is limited to four hours a day until 2031, and (2) Mrs. Dobbs's own testimony suggests that Mr. Dobbs spends time alone during the day without her.  Mrs. Dobbs spends at least four waking hours per day attending to Mr. Dobbs's needs that are directly attributable to the brain injury.

Mrs. Dobbs took care of Mr. Dobbs over the course of at least 1,452 days.[744]  The Court finds the need for this care was a direct and proximate result of the brain hemorrhage.  There would be no such need without the brain hemorrhage, and the link between the brain hemorrhage and the need for past caretaking is short, direct, and unbroken by an intervening cause.  Considering the time and effort Mrs. Dobbs has spent taking care of her husband as a direct and proximate result of the brain hemorrhage, the Court awards $130,680.00 in past caretaking damages to Mrs. Dobbs.

---

[742] *See* Pls.' Trial Ex. 34 at 8.

[743] *See Carr v. Nance*, 2010 Ark. 497, at 28, 370 S.W.3d 826, 842 ("[I]n those instances where damages simply cannot be proven with exactness, when the cause and existence of damages have been established by the evidence, recovery will not be denied merely because the damages cannot be determined with exactness.").

[744] This represents the time that passed from the day Mr. Dobbs was released from Houston Methodist Rehabilitation (December 21, 2018) to the end of the bench trial in this case (December 2, 2022).

Although Plaintiffs are not entitled to pre-judgment interest under the Federal Tort Claims Act, the Court may order post-judgment interest.[745]  The Court will do so here.[746]  Under federal law, post-judgment interest is calculated "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve system, for the calendar week preceding the day of judgment."[747]  Here, that's 5.16 percent.

Finally, Plaintiffs seek attorney fees equal to 25 percent of the judgment.[748]  The Court does not grant those fees as part of this judgment.  However, the Court will entertain (as it does in every other case) a post-judgment motion for attorney fees.  That motion must address whether attorney fees are appropriate at all, given that the Arkansas Medical Malpractice Act does not explicitly provide for attorney fees.[749]  (In Arkansas, attorney fees are generally not recoverable absent specific statutory authorization.[750])  Additionally, the Court requests information necessary to determine whether a 25-percent fee would be reasonable, including information necessary for the Court to roughly make a lodestar calculation.

---

[745] *See* 28 U.S.C. § 2674; 31 U.S.C. § 1304(b)(1).

[746] Post-judgment interest is allowed "only from the date of filing of the transcript of the judgment with the Secretary of the Treasury through the day before the date of the mandate of affirmance . . . ." 31 U.S.C. § 1304(b)(1)(A).

[747] 28 U.S.C. § 1961 (cleaned up).

[748] A plaintiff may recover attorney fees in a Federal Tort Claims Act case "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *Id.* § 1346(b)(1).  *See also id.* § 2674 ("The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages."); *Tri-State Hosp. Supply Corp. v. United States*, 341 F.3d 571, 572 (D.C. Cir. 2003) (holding that attorney fees are only recoverable under the Federal Tort Claims Act if the law of the state where the tortious act occurred provides for them).

[749] *See generally* Ark. Code Ann. § 16-114-208.

[750] *See, e.g.*, *Gibson v. Buonauito*, 2022 Ark. 206, at 11, 655 S.W.3d 59, 66 ("Arkansas follows the American rule, which requires every litigant to bear his or her attorney[] fees, absent a state statute to the contrary.").

106

## **<u>CONCLUSION</u>**

In accordance with the above Findings of Fact and Conclusions of Law, IT IS HEREBY ORDERED that Judgment shall be entered in FAVOR of Plaintiffs Craig Dobbs and Eileen Dobbs and AGAINST Defendant United States of America for damages in the amount of $3,122,538.09. Judgment will be entered accordingly.  The Judgment will accrue at an interest rate of 5.16 percent.

IT IS SO ORDERED this 5th day of December 2023.

_____

LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE